IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| PGA EUROPEAN TOUR | § | |
| | § | |
| Movant, | § | |
| | § | |
| v. | § | Case No. 3:22-mc-00016-TJC-LLL |
| | § | |
| LIV GOLF, INC. | § | |
| | § | |
| Respondent. | § | |
| | § | |

## LIV GOLF'S OPPOSITION TO PGA EUROPEAN TOUR'S MOTION TO QUASH RULE 45 SUBPOENA

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

BACKGROUND.................................................................................................3

I. The ET negotiated and entered into an anticompetitive agreement with the PGAT in this District, which is aimed at destroying competition in Florida, the U.S., and globally. ....................................................................3

II. In connection with its alliance with the PGAT, the ET has regularly transacted business in this District..........................................................5

III. The ET regularly conducts business throughout the U.S. ..............................8

ARGUMENT .....................................................................................................9

I. The Subpoena satisfies Rule 45(c)'s 100-mile requirement. .........................10

    A. The Subpoena satisfies Rule 45(c) because the ET regularly transacts business in person in Northern Florida. ............................10

    B. Virtual compliance moots the Rule 45(c) issue. ...............................13

II. The Court has personal jurisdiction over the ET..........................................15

    A. The ET has sufficient contacts with Florida and the U.S. .................15

    B. Exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice. ........................................17

III. International comity does not mandate using the Hague Convention. .........18

CONCLUSION ................................................................................................20

_Toc120564664

TABLE OF AUTHORITIES

Page(s)

Cases

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
    2022 WL 504451 (N.D. Fla. Feb. 18, 2022) ....................................................14

*In re: 3M Combat Arms Earplug Prod. Liab. Litig.*,
    2021 WL 2605957 (N.D. Fla. May 28, 2021) ....................................................13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    278 F.R.D. 51 (E.D.N.Y. 2010) .......................................................................20

*In re Auto. Refinishing Paint*,
    229 F.R.D. 482 (E.D. Pa. 2005) ................................................................. 15, 16

*In re Auto. Refinishing Paint Antitrust Litig.*,
    358 F.3d 288 (3d Cir. 2004) ...........................................................................19

*Brookman v. Joseph*,
    522 F. Supp. 3d 8 (S.D.N.Y. 2021) .................................................................14

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ................................................................................. 16, 17

*Cable/Home Comm. Corp. v. Network Prods., Inc.*,
    902 F.2d 829 (11th Cir. 1990) .......................................................................17

*Empagran v. F. Hoffman LaRoche*,
    542 U.S. 155 (2004) ......................................................................................20

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
    752 So. 2d 582 (Fla. 2000) ............................................................................17

*Exhibit Icons, LLC v. XP Co., LLC*,
    609 F. Supp. 2d 1282 (S.D. Fla. 2009) ...........................................................17

*Gucci America Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ..........................................................................15

*Halliburton Energy Servs v. M-I, LLC*,
    2006 WL 2663948 (S.D. Tex. Sep. 15, 2006) ..................................................12

*Int'l Seaway Trading Corp. v. Target Corp.*,
  2021 WL 672990 (D. Minn. Feb. 22, 2021) .......................................................13

*Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*,
  939 F.3d 1145 (11th Cir. 2019)...........................................................................14

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
  473 U.S. 614 (1985) ...........................................................................................20

*In re MTS Bank*,
  2018 WL 1718685 (S.D. Fla. Mar. 16, 2018)....................................................12

*In re Newbrook Shipping Corp.*,
   498 F.Supp.3d 807 (D. Md. 2020), *vacated on other grounds*,
   31 F.4th 889 (4th Cir. 2022) .............................................................................13

*In re Photochromic Lens Antitrust Litig.*,
  2012 WL 12904331 (S.D. Fla. May 2, 2012) ..........................................18, 19, 20

*Ping-Kuo Lin v. Horan Cap. Mgmt., LLC*,
  2014 WL 3974585 (S.D.N.Y. Aug. 13, 2014) ....................................................14

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d 935 (11th Cir. 1997) ...........................................................................15

*S.E.C. v. Carrillo*,
  115 F.3d 1540 (11th Cir. 1997)....................................................................15, 18

*S.E.C. v. Marin*,
  982 F.3d 1341 (11th Cir. 2020)..........................................................................18

*S.E.C. v. Prime Time Group, Inc.*,
  2010 WL 780198 (S.D. Fla. Mar. 2010) ............................................................17

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of
  Iowa*,
  482 U.S. 522 (1987) .....................................................................................18, 19

*Sullivan v. PJ United, Inc.*,
  2017 WL 11675693 (N.D. Ala. Dec. 15, 2017)..................................................12

*U.S. v. $110,000 in U.S. Currency*,
  2021 WL 2376019 (N.D. Ill. Jun. 10, 2021).......................................................13

*Walsh v. Tara Constr., Inc.*,
  2022 WL 1913340 (D. Mass. June 3, 2022) ...................................................... 13

*Wesolek v. Wesolek*,
  2021 WL 3572221 (M.D. Fla. Jan. 20, 2021) ...................................................... 10

Statutes

9 U.S.C. § 7 ........................................................................................................ 14

Rules

Fed. R. Civ. Proc. 45(b)(2) .................................................................................. 15

Fed. R. Civ. Proc. 45(c)(1)(A) ............................................................................. 10

Fed. R. Civ. Proc. 45(c)(2)(A) ............................................................................. 10

INTRODUCTION

The European Tour's ("ET") Motion to Quash is based on artfully worded half-truths, omissions of critical facts, and a misleading picture of the ET's extensive contacts with this District and its central role in the conspiracy at issue in the underlying litigation brought by Respondent LIV Golf, Inc. ("LIV").  The ET's top executives traveled to this District to negotiate in-person an unlawful conspiratorial agreement with the PGA Tour ("PGAT," which is headquartered in this District) to work together to destroy competition from LIV—specifically by conspiring to suspend LIV players from the ET and PGAT, by stymieing the flow of players into LIV from other tours around the world, by denying Official World Golf Ranking points to LIV players, by denying LIV players access to the Majors, and by attempting to preclude LIV's access to vendors, sponsors, and broadcasters.  This conspiracy to thwart competition injured competition in Florida, the U.S., and globally.  In furtherance of that unlawful agreement, ET executives have regularly visited this District to conduct business and have regularly directed electronic communications to and from this District.  Indeed, they have publicly announced a plan to continue those conspiratorial meetings _in this District_ in less than two weeks' time.  Brass Decl. Ex. 31.  And pursuant to that unlawful agreement, the ET added to its board the PGAT Commissioner, Jay Monahan, who resides in this District and has conducted business here on behalf of the ET.

Furthermore, pursuant to the unlawful agreement negotiated in this District, the ET has purposefully availed itself of the laws of the U.S. by jointly sanctioning and promoting two tournaments held every year in the U.S.  These two tournaments are

1

on top of the ET's extensive other business activities throughout the U.S.  For example, the 2022 schedule for the DP World Tour (the ET's flagship tour) boasts six American flags denoting tournaments in the U.S. that qualify for points on the tour—more than any other country on its schedule.  Brass Decl. Ex. 1.  In addition to these tournaments in this season alone, the ET sponsors the biannual Ryder Cup, which has rotated venues between the U.S. and Europe on a regular basis for nearly a century (last held in Wisconsin in 2021), and is one of the ET's primary sources of revenue.

Through the Ryder Cup and otherwise, the ET does big business in the U.S. And it has directly and regularly conducted business in this District, including negotiating and acting in furtherance of an anticompetitive agreement that is at the heart of the underlying lawsuit.  The ET is flat wrong in arguing that it should not be required to provide discovery relating to that unlawful agreement in response to a properly served Rule 45 subpoena.[1]  The ET even has the audacity to argue that "the interests of the United States are not implicated by noncompliance with LIV's request."  Mot. at 24.  The ET could hardly be more misguided.  The U.S. has an obvious interest in the enforcement of its laws, particularly a law as important to protection of fair competition as the Sherman Act.  It is not asking too much to require a foreign-based commercial enterprise operating in the U.S. to comply with a Rule 45 subpoena when (1) it has come to this country (and District) to repeatedly negotiate and carry out an un-

---

[1] While the ET takes a swipe at the facts relating to service of the subpoena (Mot. at 4), it does not and cannot argue that service upon a director of the ET was improper.

lawful agreement to destroy competition, (2) the counter-party to that unlawful agreement is headquartered in this District, (3) the markets in which competition is harmed pursuant to this unlawful agreement cover Florida and the U.S., (4) it has engaged in acts in furtherance of the conspiracy in this District, (5) pursuant to that unlawful agreement it has expanded the business it does in the U.S., and (6) it conducts extensive other business on a regular basis in the U.S.

Discovery in the underlying litigation is moving forward quickly, with discovery scheduled to close on March 3, 2023.  LIV respectfully requests that the Court reject the ET's Motion to Quash and order it to comply with LIV's subpoena.

## BACKGROUND

I.   The ET negotiated and entered into an anticompetitive agreement with the PGAT in this District, which is aimed at destroying competition in Florida, the U.S., and globally.

LIV is a recent entrant into the professional golf marketplace, challenging the dominant position of the PGAT, the longstanding monopolist in the market.  LIV has alleged in the underlying lawsuit that the PGAT, which is headquartered in Ponte Vedra, Florida, has engaged in an array of anticompetitive conduct aimed at foreclosing LIV from entering and surviving as a rival professional golf tour.

One of the central allegations in the underlying action is that the PGAT entered into an anticompetitive agreement with the ET to lock arms in thwarting LIV's entry. *See* Brass Decl. Ex. 32 (Am. Compl.) ¶ 11.C.  Evidence shows that the primary purpose of the ET-PGAT agreement was to thwart competition from LIV, by preventing the ET from working with LIV to facilitate its entry.  *See* Brass Decl. Ex. 2 (memo from

PGAT Commissioner Jay Monahan explaining the PGAT's desire to work more closely with the ET for the purpose of "removing the European Tour as a potential partner of" competing leagues); *see also, e.g.*, *id*. Ex. 3; Ex. 4; Ex. 28.

Pursuant to that unlawful agreement, the PGAT agreed to invest tens of millions of dollars in the ET, co-sanction tournaments with the ET in the U.S., and provide a pathway for ET golfers to play in the U.S.—all acts through which the ET has purposefully availed itself of the benefit of doing business in the U.S. *See* Brass Decl. Ex. 5; Ex. 6. In return, the ET agreed not to partner with LIV, and instead join the PGAT in taking various actions to foreclose competition from LIV, such as agreeing to ban any players who participate in LIV tournaments. *Id.* Ex. 7; Ex. 29; Ex. 30. Those banned players include Florida resident (and plaintiff in the underlying action) Peter Uihlein. LIV's complaint alleges that the ET-PGAT agreement violates Section 1 and 2 of the Sherman Act by harming competition in the U.S. (including Florida) and globally. *See* Brass Decl. Ex. 32 (Am. Compl.) ¶¶ 36, 341-53.

The ET's top executive, CEO Keith Pelley, traveled to PGAT headquarters in this District to negotiate that anticompetitive agreement at the heart of the underlying litigation. *See* Brass Decl. Ex. 8; Waters Decl. ¶ 13. As Mr. Pelley remarked, "Everything changed after November 2020. It was a mind-set shift for both of our organizations …. We went from competitors to partners." Brass Decl. Ex. 9.

The ET's declarant avers that "[n]one of European Tour's business" takes place in Florida (Waters Decl. ¶ 8), and the ET argues that it "does not transact business within 100 miles of the place of compliance" (Mot. at 10). The ET must be applying

an awfully narrow definition of "transacting business" to make such statements.  Negotiating an agreement in-person in this District, with a counter-party based in this District, which secured tens of millions of dollars in funding for the ET as well as an ongoing business relationship in the multi-billion dollar professional golf marketplace, along with a mutual agreement to protect the ET's and PGAT's businesses from competition, surely satisfies any reasonable definition of "transacting business."

Furthermore, given that Mr. Pelley negotiated this agreement in-person in Florida, it lacks credibility for the ET to assert "none of the requested information or documents originated in" the U.S. Mot. at 24.  It is inconceivable that Mr. Pelley conducted these enterprise-defining negotiations without communicating to his colleagues at the ET.  These communications are in the exclusive control of the ET (contrary to its assertion that it has no unique documents), they are highly relevant to this litigation, and the ET should not be permitted to hide them from discovery.

II.  In connection with its alliance with the PGAT, the ET has regularly transacted business in this District.

In furtherance of its conspiratorial agreement with the PGAT, the ET's executives have regularly engaged in business conduct within this District.  For example, Mr. Pelley, the ET's CEO, visited this District in March 2021 for a series of meetings with PGAT Commissioner Monahan, *including attending an ET Board meeting in-person in this District*.  The meeting was memorialized in a photo, in which Mr. Pelley (right) and Mr. Monahan (left) stood together in the PGAT's office in Ponte Vedra, Florida and virtually joined an ET Board meeting (Brass Decl. Ex. 10):



In addition, the record reflects numerous other meetings in which ET executives traveled to this District to meet with the PGAT (and others) in furtherance of the conspiracy. *E.g.*, Brass Decl. Ex. 11 (Guy Kinnings, ET's Deputy CEO, at PGAT offices in Mar. 2020); Ex. 12 (Messrs. Pelley and Kinnings meeting with PGAT executives at the Players Championship in Ponte Vedra in Mar. 2022); *see also id.* Ex. 13 (Mr. Pelley at World Golf Hall of Fame Induction in Ponte Vedra in Mar. 2022). Brazenly, <u>Mr. Pelley is scheduled to return to this District in a mere two weeks' time</u> for another conspiratorial meeting with the PGAT (and others) targeting LIV. *Id.* Ex. 31.

The ET tries to brush aside these business transactions and meetings by its executives in this District with the vague representation that its executives have taken "only" 18 business trips to Florida within the past five years. Mot. at 6; *see also* Waters Decl. ¶ 10. That raw number is anything but minimal, particularly when one considers that the ET is attempting to reduce the per-year average by including the travel-restricted period in the COVID pandemic as well as roughly three years before the ET-PGAT alliance. Moreover, the ET is intentionally silent as to the *business purpose* of these trips, apparently in an effort to conceal its knowledge that some portion of these business trips (likely most of them) are directly related to the formation and execution

of the anticompetitive conspiracy alleged in the underlying litigation.

In addition to the numerous trips by UK-based ET executives to Florida and this District to conduct business, the ET regularly conducts business within this District through the activities of Mr. Monahan, who is based in Ponte Vedra and has had a seat on the ET's Board since the ET-PGAT alliance was formed.  Waters Decl. ¶ 14.  Contrary to the misleading impression the ET seeks to leave, Mr. Monahan's role on behalf of the ET is anything but passive.  Since becoming a member of the ET's Board, Mr. Monahan has engaged in a variety of business actions from within this District on behalf of the ET.  For example, in March 2021, Mr. Monahan pressured a broadcaster on behalf of the ET to resolve its disputes with the ET.  *See* Brass Decl. Ex. 14.  Similarly, in 2022, when the ET triumphantly announced that it had entered into agreements with two smaller golf tours to join in working collectively against LIV, Mr. Pelley made clear that these ET agreements were facilitated by Mr. Monahan in support of their unlawful conspiracy.  *See id.* Ex. 15.  These documented actions by Mr. Monahan on behalf of the ET call into question the assertion that "Mr. Monahan has no authority to unilaterally transact business on behalf of the European Tour in Florida or anywhere else."  Mot. at 7.  The ET appears to put excessive weight on the word "unilaterally"—as though actions by a director of the ET on behalf of the ET taken within this District shouldn't count for Rule 45(c) or jurisdictional purposes if taken at the request of another ET executive.  There is no basis for such a position.

In addition to these actions taken by individuals physically within this District on behalf of the ET, the ET's executives have directed a wide range of actions at this

District, including through electronic communications to counter-parties within this District.  For example, in furtherance of the conspiracy to target LIV's players for punishment to deter further player departures to the new tour, the ET coordinated with the PGA of America—the ET's partner in planning the biannual Ryder Cup—to ban LIV players from the Ryder Cup.  *See* Brass Decl. Ex. 16.  At the time of these discussions, the PGA of America (a different entity than the PGAT, but part of the same conspiracy) was based in Palm Beach Gardens, Florida, Brass Decl. Ex. 17, and thus those conspiratorial communications by the ET were directed at Florida.

III.    The ET regularly conducts business throughout the U.S.

The ET does not argue for any alternative district in which it claims LIV should have served its Rule 45 subpoena.  Instead, the ET appears to argue that it cannot be subject to discovery *anywhere* in the U.S.  In light of the ET's extensive and regular business contacts with the U.S., that position cannot prevail.

The ET's most prominent event is the Ryder Cup, which it co-administers with the PGA of America.  Since 1927, Ryder Cup has been a biannual competition between American and European golfers, held alternatively between the U.S. and Europe, most recently in Wisconsin in 2021.  The ET's Deputy CEO, Guy Kinnings, has acted as Ryder Cup Director since 2018.  *See* Brass Decl. Ex. 18.  And Mr. Pelley, the ET's CEO, is a prominent fixture at Ryder Cup Events.  *Id.* Ex. 19.

In addition to the Ryder Cup, there are a number of events each year in the U.S. that are part of the regular schedule of the ET's flagship tour, the DP World Tour.  Two of these U.S.-based events are co-sanctioned with the PGAT, the Barracuda and

Barbasol Championships.  Waters Decl. ¶ 15.  The DP World Tour's 2022 schedule also includes four other events taking place in the U.S. for which the DP World Tour awards points (all of which are primarily sponsored by other entities but are nonetheless part of its schedule).  Brass Decl. Ex. 1.  In total, the DP World Tour schedule includes more events in the U.S. than in any other country.  Mr. Pelley also serves on the board of the World Golf Foundation, an organization based in St Augustine, Florida (*id.* Ex. 20)—which sponsors the American Golf Industry Coalition—a lobbying entity targeting U.S. legislators and regulators (*id.* Ex. 21).

Mr. Pelley also conducts ET business around the U.S, from Augusta, GA (Brass Decl. Ex. 22), to Kohler, WI (Ex. 23), to Chaska, MN (Ex. 24).  He is not alone— other ET executives routinely conduct business in Florida and around the country. *E.g., id.* Ex. 25 (Mr. Kinnings in Charlotte, NC, Sept. 23, 2022); Ex. 26 (Mr. Waters, ET's COO, at the Ryder Cup, WI, Sept. 23, 2021); Ex. 27 (David Probyn, ET's Director of Competitions and Membership, in Austin, TX, March 16, 2016); *see also id.* Ex. 7 (ET team virtually joining meeting in PGAT's Florida offices).

Moreover, limited discovery already obtained in the underlying action evidences that the ET electronically communicates with the Florida-based PGAT on a near-daily basis, and has done so for years.  *See* Brass Decl ¶ 2.

## ARGUMENT

The European Tour makes three arguments for quashing the subpoena: (1) the subpoena purportedly does not comply with Rule 45(c)'s 100-mile travel limitation; (2) the Court lacks personal jurisdiction; and (3) international comity mandates going

through the Hague Convention.  The European Tour is wrong on all counts.

I.    The Subpoena satisfies Rule 45(c)'s 100-mile requirement.

The ET complains that the subpoena "seeks to haul" it into this District (Mot. at 1).  Nonsense.  The ET and its executives have come to this District willingly and repeatedly, including to enter into an anticompetitive agreement through which they secured tens of millions of dollars in funding for the ET, additional tour opportunities in the U.S., and an agreement with the PGAT to limit competition in this District and throughout the U.S.  They have returned to this District repeatedly to carry out that anticompetitive agreement, and they will be back to meet about LIV before this motion is decided.  And the ET has a director who resides in this District, who has furthered its interests by pressuring other businesses worldwide from his place of business here.

There is no hardship to the ET in asking it to comply with a subpoena in this District.  Rule 45(c)'s 100-mile requirement is readily satisfied here because the ET regularly transacts business in person within 100 miles of Jacksonville.  Indeed, the ET can comply with the subpoena without traveling at all.

A.    The Subpoena satisfies Rule 45(c) because the ET regularly transacts business in person in Northern Florida.

A witness may be compelled to appear for deposition or produce documents within 100 miles of where it "regularly transacts business in person."  Fed. R. Civ. Proc. 45(c)(1)(A), (2)(A).  The party seeking to quash a subpoena bears the burden of establishing that the 100-mile requirement is not met.  *See Wesolek v. Wesolek*, 2021 WL

3572221, *2 (M.D. Fla. Jan. 20, 2021).  The ET has not met that burden.[2]

The ET argues it "does not transact business within 100 miles of the place of compliance."  Mot. at 10.  But that argument cannot withstand scrutiny in the face of evidence showing its top executives came to this District to negotiate the anticompetitive agreement with the PGAT.  Obviously, that agreement—which brought tens of millions of dollars to the ET and structured a global alliance to control the multi-billion dollar professional golf business—meets any meaningful definition of "transacting business."  *See* Brass Decl. Ex. 5.  Furthermore, the ET's repeated contacts within this District in furtherance of that unlawful agreement (as well as its other business dealings) satisfy any reasonable definition of regularly "transacting business."

The ET offers no meaningful argument to carry its burden of showing that it would face any unreasonable burden in complying with LIV's subpoena.  The ET concedes that its executives made 11-18 separate trips to Florida over the last five years (which included the period of COVID travel restrictions and multiple years before the anti-competitive agreement).  Mot. at 10-11; Walters Decl. ¶ 10.  And while its declaration conceals the identity, purpose, and timing of those visits, available evidence fills in some of those gaps, showing that when the ET's executives came to Florida they came for significant periods of time to conduct significant business.  *E.g.*, Brass Decl. Ex. 10 (CEO Keith Pelley attended an ET board meeting virtually from Florida in 2021 because he was in Ponte Vedra for a "series of meetings"); *see also, e.g.*, *id.* Ex. 11;

---

[2] The ET's argument that it doesn't "reside" in Florida is irrelevant.  Mot. at 9-10.  At issue is whether the ET "regularly transacts business in person."  Section II.A.1. of its motion can be ignored.

Ex. 12; Ex. 31. The ET's declarant creates no doubt that its top executives have come to this District repeatedly to carry out the anticompetitive agreement that was negotiated here and aimed at destroying competition in Florida and throughout the U.S. And then there is the problem of PGAT Commissioner Jay Monahan, a resident of this district who is an ET board member that has conducted significant business for the ET from his offices in Ponte Vedra.  Additionally, as explained above, the ET also transacts business with and serves on the board of other golfing organizations in Northern Florida, including the World Golf Foundation in St. Augustine, which oversees the American Golf Industry Coalition—an American lobbying entity.

On the other hand, there is no evidence suggesting any hardship for the ET to respond to a subpoena in this District, and no real question that the ET regularly transacts business in person for purposes of Rule 45(c).  *See, e.g.*, *Sullivan v. PJ United, Inc.*, 2017 WL 11675693, *4 (N.D. Ala. Dec. 15, 2017) (quarterly business visits sufficient); *Halliburton Energy Servs v. M-I, LLC*, 2006 WL 2663948, *2 (S.D. Tex. Sep. 15, 2006) (four 10-day visits per year sufficient); *In re MTS Bank*, 2018 WL 1718685, *5 & n.6 (S.D. Fla. Mar. 16, 2018) ("repeated business transactions provide credible evidence that a subpoena does not violate … Rule 45").  Moreover, the ET does not point to any other district more convenient for subpoena compliance, leaving the untenable implication that this entity that is subject to personal jurisdiction—including for entering an unlawful agreement to harm competition across the U.S. *while in Florida*—is somehow beyond the subpoena power in any court in this country.  The ET and its executives found their way to this District—repeatedly—to negotiate, enter, and carry

12

out an unlawful conspiracy to restrain trade and violate the Sherman Act.  They plan to return.  They can very well comply with LIV's subpoena in this District.

B.    Virtual compliance moots the Rule 45(c) issue.

The Subpoena also satisfies Rule 45(c) because it gives the ET the option to comply virtually.  *See U.S. v. $110,000 in U.S. Currency*, 2021 WL 2376019, *3 (N.D. Ill. Jun. 10, 2021) (ordering virtual compliance from witness located beyond 100 miles because witness did not have to travel to attend virtual deposition; rejecting caselaw cited by ET); *see also, e.g.*, *In re: 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 2605957, at *4 (N.D. Fla. May 28, 2021) (subpoenas permitting "remote testimony within 100 miles of their residences … do not violate the geographic limitations of Rule 45(c) and will not be quashed on that basis"); *Int'l Seaway Trading Corp. v. Target Corp.*, 2021 WL 672990, *5 (D. Minn. Feb. 22, 2021) ("Virtual attendance … is consistent with the plain language of Rule 45(c)(1)(A) because … [the witness] can comply with the deposition from his home or anywhere else he chooses …"); *In re Newbrook Shipping Corp.*, 498 F.Supp.3d 807, 815 (D. Md. 2020), *vacated on other grounds*, 31 F.4th 889 (4th Cir. 2022) ("Given the … notice [] provide[s] for a remote deposition … [it] no longer requires GMS … to travel more than 100 miles (or at all) to comply.").[3]

---

[3] These holdings are further buttressed in the Rule 43 context, where courts have consistently held that compelling virtual trial testimony from more than 100 miles from the courtroom is consistent with compelling virtual depositions under Rule 45.  *E.g.*, *Walsh v. Tara Constr., Inc.*, 2022 WL 1913340, *2 (D. Mass. June 3, 2022) ("the prevailing position among district courts both within and outside this circuit" is to permit a subpoena for "remote testimony from any place … where she regularly conducts business"); *id.* ("Although the Court may not command Mr. McGee's physical presence at trial because he does not … conduct business … within 100 miles of the site of the trial, [Rule] 45(c)(1)[']s subpoena power may reach Mr. McGee … [to] command[] his presence by videoconference.").

Here, given the many electronic communications the ET directs at this District, there is plainly no burden for the ET to comply with the subpoena virtually.[4]

The cases cited by the ET (Mot. at 13-15) do not compel a contrary result. *Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145 (11th Cir. 2019), had nothing to do with Rule 45; it involved an arbitrator's powers under a different statute with different operative language (9 U.S.C. § 7), *id.* at 1152, and Rule 45(c) is not even mentioned in the court's analysis. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2022 WL 504451 (N.D. Fla. Feb. 18, 2022), also does not support the ET's position; instead, *it directly supports LIV's position*, as it holds that Rule 43 (testimony at trial) should be treated like Rule 45 (compelling deposition testimony), and compels virtual testimony. *Id.* at *2, *6. The ET also relies on two S.D.N.Y. decisions that are contrary to the weight of authority and read into the Federal Rules requirements not found in the text by focusing on the location of the proceeding, not the burden on the witness. *See Broumand v. Joseph*, 522 F. Supp. 3d 8, 23-24 (S.D.N.Y. 2021); *Ping-Kuo Lin v. Horan Cap. Mgmt., LLC*, 2014 WL 3974585, *1 (S.D.N.Y. Aug. 13, 2014).

By giving the ET an option to comply virtually, the subpoena does not require any travel—let alone more than 100 miles of travel—and the ET has done nothing to carry its burden to justify quashing LIV's subpoena under Rule 45(c).

---

[4] ET's separate argument about document production (at 15-16) adds nothing. Rule 45(c) uses the same operative text for depositions and document production. And given that the ET send emails to Florida on a near-daily basis, transmitting information electronically would not pose an undue burden.

II.     The Court has personal jurisdiction over the ET.

Personal jurisdiction comports with due process when: (A) the party challenging jurisdiction has minimum contacts with the applicable forum; and (B) exercising jurisdiction will not offend traditional notions of fair play and substantial justice. *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997).  Both are satisfied here.

A.      The ET has sufficient contacts with Florida and the U.S.

The ET gets it wrong from the start by presuming that the applicable forum is Florida.  Mot. at 17-21.  Instead, "where, as here, the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide … service of process," the "applicable forum for minimum contacts purposes is the United States."  *Carrillo*, 115 F.3d at 1543-44; *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946 n.21 (11th Cir. 1997) (when minimum contacts analysis is with the U.S., "contacts with the forum state are not constitutionally required").  In any event, the ET has ample contacts with both Florida and the U.S.

Plaintiffs bring claims under the Sherman Act, 15 U.S.C. §§ 1, 2.  And Rule 45, which governs non-party subpoenas, permits service of process "at any place within the United States."  Fed. R. Civ. Proc. 45(b)(2).  Personal jurisdiction thus turns on whether the ET has "the requisite minimum contacts with the United States, rather than with the particular forum state."  *Carrillo*, 115 F.3d at 1543 (quotation omitted).[5]

---

[5] *See also In re Auto. Refinishing Paint*, 229 F.R.D. 482, 490 (E.D. Pa. 2005) (for a subpoena served on a non-party in an antitrust action, the relevant forum for minimum contacts is the U.S.); *Gucci America Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (in light of Rule 45(b)(2)'s national service provision, personal jurisdiction depends on contacts with the U.S. as a whole).

The ET has had abundant and purposeful contact with the U.S. for decades, including contacts specific to the underlying litigation that easily provide a basis for jurisdiction.  It administers, promotes, and sends its members to numerous professional golf tournaments throughout the U.S., including the flagship Ryder Cup, and it is on the board of U.S.-based organizations.  Additionally, senior ET executives regularly travel to and around the U.S. to conduct ET business.  *E.g., In re Auto. Refinishing Paint*, 229 F.R.D. at 492 ("Regular business trips or personal visits to the forum by an entity's employees or agents can also establish the necessary minimum contacts for the exercise of specific jurisdiction.").  Given these substantial contacts, through which the ET generates millions of dollars (including the tens of millions of dollars it received from the PGAT as part of the unlawful conspiracy), it strains credulity to say that the ET has not "purposefully directed [its] activities at residents of the forum."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Moreover, the ET's contacts with the U.S. and Florida are specific to the claims asserted in this case.  As detailed above, the ET's top executives traveled to Florida to enter into a conspiracy with the Florida-based PGAT to harm competition in the U.S.  Through that conspiracy, ostensible competitors became lockstep partners and unlawfully conspired to restrain trade in the U.S.  In addition to millions of dollars, the ET's payoff from that conspiracy included an agreement to co-sanction two tournaments each year in the U.S.  All of these significant contacts closely relate to the antitrust claims in the underlying action and the discovery sought in the subpoena.  These activities alone establish a "substantial connection" with Florida and the U.S. sufficient

to exercise personal jurisdiction.  *See Burger King*, 471 U.S. at 475 n.18 ("[E]ven a single act can support jurisdiction.").

Furthermore, it is undisputed that those contacts are not the ET's only business dealings in Florida.  *See* Background*, supra*.  ET executives have made frequent trips to Florida, and it has targeted electronic communications to Florida on a near-daily basis through communications with the PGAT in furtherance of the conspiracy.[6]

Finally, the ET's discussion of Florida's long-arm statute (Mot. at 17-20) is inapposite.  When, as here, "a federal statute … provides for nationwide service of process," the Court "need not address whether Florida's long arm statute applies." *S.E.C. v. Prime Time Group, Inc.,* 2010 WL 780198, *2-3 (S.D. Fla. Mar. 2010).  But even if Florida's long arm-statute applied, it provides no refuge because of the ample evidence the ET has unlawfully conspired to restrain trade in Florida and the U.S., bringing it within that statute.  *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000) (non-resident corporation subject to Florida's long-arm statute when it conspired to fix prices "throughout the United States, including Florida").

> **B.**     **Exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice.**

If there are sufficient minimum contacts, a party seeking to escape jurisdiction

---

[6] It is well-established that communications with a forum state are sufficient to establish personal jurisdiction.  *Burger King*, 471 U.S. 462 at 476 (because "a substantial amount of business is transacted solely by mail and wire communication … we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction"); *Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829, 858 (11th Cir. 1990) (similar); *Exhibit Icons, LLC v. XP Co., LLC*, 609 F. Supp. 2d 1282, 1293–94 (S.D. Fla. 2009) (electronic communications, including 188 phone calls, sufficient to establish personal jurisdiction).

must present "a compelling case" that exercising jurisdiction "would be so unreasonable that the party's liberty interests have actually been infringed." *S.E.C. v. Marin*, 982 F.3d 1341, 1350 (11th Cir. 2020) (citation omitted).  Only in "rare" and "highly unusual cases" will litigating in a forum with sufficient minimum contacts offend traditional notions of fair play and substantial justice. *Id.* (citation omitted).

Here, the ET has come nowhere close to making "a compelling case" to resist jurisdiction.  As the Eleventh Circuit has recognized, "modern methods of transportation and communication" have significantly lessened the burden on foreign nationals to litigate in U.S. courts. *Carrillo*, 115 F.3d at 1547.  The ET, for its part, routinely relies on such methods to conduct its business in Florida and across the U.S.  Moreover, "contesting a subpoena does not present the same burden as defending a full-scale trial proceeding." *Marin*, 982 F.3d at 1351.  And complying with the subpoena here would be less burdensome still.  All it need do is designate a representative to attend a virtual deposition and arrange for the electronic delivery of responsive information.

III.   International comity does not mandate using the Hague Convention.

International comity provides no basis to quash the subpoena.  Contrary to the ET's suggestion, "[t]he Hague Convention does not provide the exclusive or even preferred method for obtaining discovery from foreign individuals." *In re Photochromic Lens Antitrust Litig.*, 2012 WL 12904331, *3 (S.D. Fla. May 2, 2012) (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 539–40, 544 (1987)).  Rather, the Supreme Court has squarely held that the Hague Convention "is a permissive supplement, not a pre-emptive replacement, for other

means of obtaining evidence located abroad." *Aérospatiale*, 482. U.S. at 536.  The Federal Rules remain "'the normal method[]' for discovery, "unless the 'optional' or 'supplemental' Convention procedures prove to be conducive to discovery under some circumstances."  *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 300 (3d Cir. 2004) (quoting *Aérospatiale*, 482 U.S. at 536).

"The proponent of using the Hague Convention procedures bears the burden of demonstrating the *necessity* for using those procedures."  *In re Photochromic*, 2012 WL 12904331, at *3 (emphasis added).  The ET has not met that burden here.

*First*, the information sought is central to LIV's antitrust claims.  LIV alleges that the ET unlawfully conspired with the PGAT to destroy competition, including by punishing any players who participate in LIV events, and the evidence shows it took an active role exerting that alliance's influence throughout the golf "ecosystem."  The information in the ET's possession is extremely important to the case, including evidence of ET's internal views toward negotiations with the PGAT, evidence showing what the ET's actions would have been absent the unlawful agreement, and evidence of the ET's actions in furtherance of the unlawful conspiracy, including pressure imposed on other actors in the golf "ecosystem."  If the ET were to succeed in evading discovery, there would be no alternative source for much of this evidence.

*Second*, the subpoena contains targeted document requests and deposition topics.  Those requests are reasonably specific given the scope of the claims, and the ET makes no serious argument to the contrary.  *Third*, the ET is likely in possession of unique information that originated in the U.S. and will not be produced by the PGAT,

including communications between the ET and others within the golf "ecosystem," including other tours, golfers, sponsors, vendors, and others.  In addition, highly relevant evidence relating to the ET's internal analysis of the conspiratorial agreement, its effects, and the parties' negotiations will exist only in the ET's files.

*Fourth*, the Hague Convention is an inadequate substitute.  Plaintiffs initiated Hague Convention proceedings after the ET indicated it would move to quash this subpoena, recognizing that those procedures are slow and cumbersome.  And given that fact discovery closes in early March, "the Hague Convention procedures [may] not be a particularly effective discovery device as discovery under the Hague Convention could take six months to a year."  *In re Photochromic*, 2012 WL 12904331, at *3.

*Finally*, the ET's suggestion that the U.S. has no interest in enforcing its laws is outrageous.  The U.S. has every interest in enforcing it antitrust laws against a foreign company conspiring to restrict competition in its markets.  *E.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (comity did not require resorting to Hague Convention, as antitrust laws "essential to the country's interests in a competitive economy") (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 634–35 (1985)); *F. Hoffman LaRoche v. Empagran*, 542 U.S. 155, 165 (2004) ("appl[ying] our antitrust laws to foreign anticompetitive conduct is … consistent with … comity, [where it] … redress[es] *domestic* antitrust injury").

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to quash.

DATED:  November 29, 2022          Respectfully submitted,

By: _/s/ Rachel S. Brass_____

GIBSON, DUNN & CRUTCHER LLP

RACHEL S. BRASS
  *Admitted Pro Hac Vice*
  rbrass@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

JOSHUA LIPTON (Lead Counsel)
  *Admitted Pro Hac Vice*
  jlipton@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500

JASON STERNBERG
   Fla. Bar No. 72887
   jasonsternberg@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Telephone: 786.850.3607

*Counsel for Respondent LIV Golf, Inc.*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 29, 2022, a true and correct copy of the foregoing document was electronically transmitted to all counsel of record via the CM/ECF system and by email to:

*PGA European Tour*

William P. Keane                              Email: wkeane@fbm.com
Daniel A. Contreras                                  dcontreras@fbm.com
Janice W. Reicher                                    jreicher@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th FL
San Francisco, California 94104
Tel: (415) 954-4400

R. Eric Bilik                                         ebilik@mcguirewoods.com
Kimberly T. Mydock                                    kmydock@mcguirewoods.com
MCGUIREWOODS LLP
50 N. Laura Street, Suite 3300
Jacksonville, Florida 32202
Tel: (904) 798-3200
Fax: (904) 798-3207

*PGA Tour*

John W. Keker                                 Email: jwk@kvn.com
Brook Dooley                                         bdooley@keker.com
Nicholas S. Goldberg                                 ngoldberg@keker.com
Thomas E. Gorman                                     tgorman@keker.com
Sophie A. Hood                                       shood@keker.com
Leo L. Lam                                           llam@keker.com
Robert A. Lauridsen                                  alauridsen@keker.com
Eric H. MacMichael                                   emacmichael@keker.com
Nicholas D. Marais                                   nmarais@keker.com
Elliot R. Peters                                     epeters@keker.com
David J. Silbert                                     dsilbert@keker.com
Kathleen Corey                                       kcorey@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

| | |
|---|---|
| Anthony J. Dreyer | anthony.dreyer@skadden.com |
| Karen H. Lent | karen.lent@skadden.com |
| Matthew M. Martino | matthew.martino@skadden.com |

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

| | |
|---|---|
| Patrick J. Fitzgerald | patrick.fitzgerald@skadden.com |

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive, Suite 2700
Chicago, IL 60606

/s/ *Jason Sternberg*
Jason Sternberg