# EXHIBIT 1



# DP World Tour Schedule

2022

SEASON COMPLETE 43/43

**NOVEMBER** Velocity Global

| Date | Event | Prize Fund / DPWTR Points | Winner | |
|---|---|---|---|---|
| Nov 25 - 28 | Joburg Open › Randpark GC, Johannesburg, South Africa | Prize Fund ZAR 17,500,000 DPWTR Points 2,000 | 2022 Winner LAWRENCE, Thriston › | Results › |

**JANUARY** Velocity Global

| Date | Event | Prize Fund / DPWTR Points | Winner | |
|---|---|---|---|---|
| Jan 20 - 23 | Abu Dhabi HSBC Championship › Yas Links, Abu Dhabi, UAE | Prize Fund USD 8,000,000 DPWTR Points 8,000 | 2022 Winner PIETERS, Thomas › | Results › |
| Jan 27 - 30 | Slync.io Dubai Desert Classic › Emirates GC, Dubai, UAE | Prize Fund USD 8,000,000 DPWTR Points 8,000 | 2022 Winner HOVLAND, Viktor › | Results › |

**FEBRUARY** Velocity Global

| Date | Event | Prize Fund / DPWTR Points | Winner | |
|---|---|---|---|---|
| Feb 03 - 06 | Ras al Khaimah Championship presented by Phoenix Capital › Al Hamra GC, Ras Al Khaimah, UAE | Prize Fund USD 2,000,000 DPWTR Points 2,750 | 2022 Winner HØJGAARD, Nicolai › | Results › |
| Feb 10 - 13 | Ras al Khaimah Classic › Al Hamra GC, Ras Al Khaimah, UAE | Prize Fund USD 2,000,000 DPWTR Points 2,750 | 2022 Winner FOX, Ryan › | Results › |

| Mar 03 – 06 | | Magical Kenya Open presented by Absa › | Prize Fund | EUR 1,750,000 | | 2022 Winner | | Results › |
| | | Muthaiga GC, Nairobi, Kenya | DPWTR Points | 2,750 | | WU, Ashun › | | |

| Mar 10 – 13 | | MyGolfLife Open hosted by Pecanwood › | Prize Fund | USD 1,500,000 | | 2022 Winner | | Results › |
| | | Pecanwood G&CC, Hartbeespoort, South Africa | DPWTR Points | 2,000 | | LARRAZÁBAL, Pablo › | | |

| Mar 17 – 20 | | Steyn City Championship › | Prize Fund | USD 1,500,000 | | 2022 Winner | | Results › |
| | | The Club at Steyn City, Johannesburg, South Africa | DPWTR Points | 2,000 | | NORRIS, Shaun › | | |

| Mar 23 – 27 | | WGC - Dell Technologies Match Play › | Prize Fund | USD 12,000,000 | | 2022 Winner | | Results › |
| | | Austin CC, Austin, Texas, USA | DPWTR Points | 8,000 | | SCHEFFLER, Scottie › | | |

| Mar 24 – 27 | | Commercial Bank Qatar Masters › | Prize Fund | USD 2,000,000 | | 2022 Winner | | Results › |
| | | Doha GC, Doha, Qatar | DPWTR Points | 2,750 | | FERGUSON, Ewen › | | |

**APRIL** — Velocity Global®

| Apr 07 – 10 | | THE MASTERS › | Prize Fund | USD 15,000,000 | | 2022 Winner | | Results › |
| | | Augusta National GC, Augusta, Georgia, USA | DPWTR Points | 10,000 | | SCHEFFLER, Scottie › | | |

| Apr 21 – 24 | | ISPS Handa Championship in Spain › | Prize Fund | USD 2,000,000 | | 2022 Winner | | Results › |
| | | Infinitum, Tarragona, Spain | DPWTR Points | 2,750 | | LARRAZÁBAL, Pablo › | | |

| Apr 28 - May 01 | | Catalunya Championship › | Prize Fund | USD 2,000,000 | | 2022 Winner | | Results › |
| | | Stadium Course, PGA Catalunya Golf and Wellness, Girona, Spain | DPWTR Points | 2,750 | | ARNAUS, Adri › | | |

**MAY** — Velocity Global®

| May 05 – 08 | | Betfred British Masters hosted by Danny Willett › | Prize Fund | GBP 1,850,000 | | 2022 Winner | | Results › |
| | | The Belfry, Sutton Coldfield, England | DPWTR Points | 3,500 | | OLESEN, Thorbjørn › | | |

| May 12 – 15 | | Soudal Open › | Prize Fund | USD 2,000,000 | | 2022 Winner | | Results › |
| | | Rinkven International GC, Antwerp, Belgium | DPWTR Points | 2,750 | | HORSFIELD, Sam › | | |

| May 19 – 22 | | U.S. PGA CHAMPIONSHIP › | | | DPWTR Points | 10,000 | 2022 Winner | THOMAS, Justin › | Results › |
| | | Southern Hills CC, Tulsa, OK, USA | | | | | | | |

| May 26 – 29 | | Dutch Open › | Prize Fund | EUR 1,750,000 | | 2022 Winner | | Results › |
| | | Bernardus Golf, Cromvoirt, Netherlands | DPWTR Points | 2,750 | | PEREZ, Victor › | | |



**JUNE** — Velocity Global

| Jun 02 - 05 | 🇩🇪 | Porsche European Open | Green Eagle Golf Courses, Hamburg, Germany | Prize Fund EUR 1,750,000 | DPWTR Points 2,750 | 2022 Winner SAMOOJA, Kalle | Results |
| Jun 09 - 12 | 🇸🇪 | Volvo Car Scandinavian Mixed | Halmstad GC, Tylösand, Sweden | Prize Fund USD 2,000,000 | DPWTR Points 2,750 | 2022 Winner GRANT, Linn | Results |
| Jun 16 - 19 | 🇺🇸 | U.S. OPEN | The Country Club, Brookline, MA, USA | DPWTR Points 10,000 | | 2022 Winner FITZPATRICK, Matt | Results |
| Jun 23 - 26 | 🇩🇪 | BMW International Open | Golfclub München Eichenried, Munich, Germany | Prize Fund EUR 2,000,000 | DPWTR Points 2,750 | 2022 Winner LI, Haotong | Results |
| Jun 30 - Jul 03 | 🇮🇪 | Horizon Irish Open | Mount Juliet Estate, Thomastown, Co Kilkenny, Ireland | Prize Fund USD 6,000,000 | DPWTR Points 6,000 | 2022 Winner MERONK, Adrian | Results |

**JULY** — Velocity Global

| Jul 04 - 05 | 🇮🇪 | JP McManus Pro-Am* | Adare Manor Hotel & Golf Resort, Co. Limerick, Ireland | | | 2022 Winner SCHAUFFELE, Xander | Results |
| Jul 07 - 10 | 🏴󠁧󠁢󠁳󠁣󠁴󠁿 | Genesis Scottish Open | The Renaissance Club, North Berwick, Scotland | Prize Fund USD 8,000,000 | DPWTR Points 8,000 | 2022 Winner SCHAUFFELE, Xander | Results |
| Jul 07 - 10 | 🇺🇸 | Barbasol Championship | Keene Trace GC, Nicholasville, KY, USA | Prize Fund USD 3,700,000 | DPWTR Points 4,250 | 2022 Winner MULLINAX, Trey | Results |
| Jul 14 - 17 | 🏴󠁧󠁢󠁳󠁣󠁴󠁿 | THE 150TH OPEN | St. Andrews, Old Course, Fife, Scotland | DPWTR Points 10,000 | | 2022 Winner SMITH, Cameron | Results |
| Jul 14 - 17 | 🇺🇸 | Barracuda Championship | Tahoe Mt. Club, Truckee, CA, USA | Prize Fund USD 3,700,000 | DPWTR Points 4,250 | 2022 Winner REAVIE, Chez | Results |
| Jul 21 - 24 | 🏴󠁧󠁢󠁥󠁮󠁧󠁿 | Cazoo Classic | Hillside Golf Club, Southport, England | Prize Fund EUR 1,750,000 | DPWTR Points 2,750 | 2022 Winner RAMSAY, Richie | Results |
| Jul 28 - 31 | 🏴󠁧󠁢󠁳󠁣󠁴󠁿 | Hero Open | Fairmont St Andrews, St Andrews, Fife, Scotland | Prize Fund EUR 1,750,000 | DPWTR Points 2,750 | 2022 Winner CROCKER, Sean | Results |









**AUGUST** Velocity Global

| Dates | Tournament | Prize Fund / Points | 2022 Winner | |
|---|---|---|---|---|
| Aug 04 - 07 | Cazoo Open supported by Gareth Bale ›<br>The Celtic Manor Resort, City of Newport, Wales | Prize Fund EUR 1,750,000<br>DPWTR Points 2,750 | SHINKWIN, Callum › | Results › |
| Aug 11 - 14 | ISPS Handa World Invitational presented by AVIV Clinics ›<br>Galgorm Castle, Co Antrim, Northern Ireland<br>Massereene GC , Co Antrim, Northern Ireland | Prize Fund USD 1,500,000<br>DPWTR Points 2,000 | FERGUSON, Ewen › | Results › |
| Aug 18 - 21 | D+D Real Czech Masters ›<br>Albatross Golf Resort, Prague, Czech Republic | Prize Fund EUR 1,750,000<br>DPWTR Points 2,750 | KIEFFER, Maximilian › | Results › |
| Aug 25 - 28 | Omega European Masters ›<br>Crans-sur-Sierre GC, Crans Montana, Switzerland | Prize Fund EUR 2,000,000<br>DPWTR Points 2,750 | LAWRENCE, Thriston › | Results › |

**SEPTEMBER** Velocity Global

| Dates | Tournament | Prize Fund / Points | 2022 Winner | |
|---|---|---|---|---|
| Sep 01 - 04 | Made in HimmerLand ›<br>HimmerLand, Farsø, Denmark | Prize Fund EUR 3,000,000<br>DPWTR Points 4,250 | WILSON, Oliver › | Results › |
| Sep 08 - 11 | **BMW PGA Championship ›**<br>Wentworth Club, Virginia Water, Surrey, England | Prize Fund USD 8,000,000<br>DPWTR Points 8,000<br>Ryder Cup Points 5,000 | LOWRY, Shane › | Results › |
| Sep 15 - 18 | DS Automobiles Italian Open ›<br>Marco Simone GC, Rome, Italy | Prize Fund EUR 3,000,000<br>DPWTR Points 4,250<br>Ryder Cup Points 2,500 | MACINTYRE, Robert › | Results › |
| Sep 22 - 25 | Cazoo Open de France ›<br>Le Golf National, Saint-Quentin-en-Yvelines, France | Prize Fund EUR 3,000,000<br>DPWTR Points 4,250<br>Ryder Cup Points 2,500 | MIGLIOZZI, Guido › | Results › |
| Sep 29 - Oct 02 | Alfred Dunhill Links Championship ›<br>Old Course St. Andrews, St Andrews, Scotland<br>Carnoustie Golf Links, Carnoustie, Scotland<br>Kingsbarns Golf Links, Kingsbarns, Scotland | Prize Fund USD 5,000,000<br>DPWTR Points 5,500<br>Ryder Cup Points 3,500 | FOX, Ryan › | Results › |

| Date | Tournament | Prize Fund | DPWTR Points | Ryder Cup Points | 2022 Winner | |
|---|---|---|---|---|---|---|
| **OCTOBER** | | | | | | Velocity Global |
| Oct 06 - 09 | acciona Open de España presented by Madrid › Club de Campo Villa de Madrid, Madrid, Spain | EUR 1,750,000 | 2,750 | 2,500 | RAHM, Jon › | Results › |
| Oct 13 - 16 | Estrella Damm N.A. Andalucía Masters › Real Club Valderrama, Sotogrande, Spain | EUR 3,000,000 | 4,250 | 2,500 | OTAEGUI, Adrian › | Results › |
| Oct 20 - 23 | Mallorca Golf Open › Son Muntaner Golf Club, Palma, Mallorca, Spain | USD 2,000,000 | 2,750 | 2,500 | PAUL, Yannik › | Results › |
| Oct 27 - 30 | Portugal Masters › Dom Pedro Victoria Golf Course, Vilamoura, Portugal | USD 2,000,000 | 2,750 | 2,500 | SMITH, Jordan › | Results › |
| **NOVEMBER** | | | | | | Velocity Global |
| Nov 10 - 13 | Nedbank Golf Challenge › Gary Player CC, Sun City, South Africa | USD 6,000,000 | 7,000 | 3,500 | FLEETWOOD, Tommy › | Results › |
| Nov 17 - 20 | **DP World Tour Championship ›** Jumeirah Golf Estates, Earth Course, Dubai, UAE | USD 10,000,000 | 12,000 | 6,000 | RAHM, Jon › | Results › |

DP World Tour Partners

ROLEX

BMW | Callaway | DP WORLD | Emirates

FORTINET | Hilton | Velocity Global | zoom

# EXHIBIT 2



*Privileged and Confidential*

# Memo

To:     PGA TOUR Policy Board

Date:   January 24, 2020

From:  Commissioner Monahan

Re:     Private Equity Golf

---

At the March 2019 Policy Board meeting, we briefed the Board regarding a proposed series of professional golf team events funded by private equity, which I will refer to as "Private Equity Golf." The formation of this proposed tour, which would be competitive to the PGA TOUR, has been the subject of rumors and speculation for several years. The principals of Private Equity Golf have never directly reached out to PGA TOUR management; however, we have received copies of their materials from various constituents within the PGA TOUR community on a confidential basis.

Although principals of Private Equity Golf have been largely dormant in their outward communications since this past spring, they reemerged at the Hero World Challenge and again at the Farmers Insurance Open. These representatives met with select players' agents, providing updated proposals that include monetary guarantees for individual top players. The updated talks are reportedly the byproduct of recently secured financial investment from Saudi interests. To date, we have received only second-hand summaries of Private Equity Golf's proposals based on conversations with players and agents. We have no details on the monetary proposals.

Geoff Shackelford published an article on January 23, 2020 (copy attached), after news of the presence of Private Equity Golf principals at the Hero World Challenge and Farmers Insurance Open. Based on these new developments, we want to brief the Policy Board on our current position and action plan, and to proceed with the next phase of our response discussed with the Board last year.

Starting in the fall of 2018 when we obtained Private Equity Golf's materials, the TOUR closely examined its viability and impact, and has been in active preparations in anticipation of Private Equity Golf making a public entrance into the golf marketplace. We designated representatives from all TOUR departments and stakeholders, developing high-priority action steps with an aim to mitigate any impact, as follows:

<u>Players/Agents</u>
We have had active ongoing communication with top players and their agents to learn of the Private Equity Golf's movement and player interest.  In late 2018, our team met with the top-30 players to reinforce the strength of the TOUR with individualized comprehensive earnings reports and projections inclusive of the new FedExCup Bonus increase and creation of Wyndham Top-10 Rewards.  We are continuing these detailed discussions with key players regarding unprecedented comprehensive earnings growth over the past year, and projections for the future. More specifically, at the January 21, 2020 mandatory Player meeting, we provided projected player earnings through 2025 which showed very significant increases as a result of where we anticipate we will come out on our domestic media negotiations. Also, on January 22nd, we held a pre-scheduled meeting with the Athletes' Representation Council (ARC) which consists of one agent from each of the six leading player management companies.  A number of agents confirmed they had met with Private Equity Golf representatives, and that specific offers are being made to certain top players.

<u>Governance/Membership</u>
Our current Tournament Regulations provide a significant hurdle for PGA TOUR members with respect to contracting with Private Equity Golf under its proposed structure, because of the Regs prohibition against players having a financial interest in another player and its conflicting event provisions. In particular, the Tournament Regulations governing Conflicting Events and Media Rights/Releases would be applicable. Additionally, our current Regulations prevent players from taking actions that would cause the TOUR harm (reputational or otherwise), as the Private Equity Golf structure would undoubtedly do.

Further to the point, in order to ensure that participants in PGA TOUR tournaments give their best efforts and to prevent free riding on the goodwill amassed in the PGA TOUR brand, we developed two proposed changes to our Regulations in a phased approach. First, in November 2019 the Policy Board ratified a revised Media Rights/Release regulation to ensure that all golf events are unequivocally covered on a global basis, as the previous regulation was out of date with our global media presence. The second phase action step is to articulate our desire to protect our interest in our venture by enacting a Regulation that further crystalizes such intention and the corresponding prohibitions. We will seek Board approval on this proposed Regulation at our March 3, 2020 meeting after the PAC process is completed.

<u>Player Comprehensive Earnings</u>
At the November 2019 Policy Board meeting, we presented the Policy Board with Resource Allocation objectives for Player Comprehensive Earnings and Prize Money as we complete our domestic media rights negotiations and in light of completion of the Discovery international partnership. These projections demonstrate unprecedented financial growth and strength of the PGA TOUR now and into the next decade. As previously mentioned, these projections were shared with the membership this week at the Player meeting at the Farmers Insurance Open.

Media Partners

TOUR representatives have reached out to existing and potential media partners to determine if Private Equity Golf organizers have been in contact and, if so, gauge interest.  Those partners that have been contacted indicated to us that they have no interest in dealing with Private Equity Golf because the entity does not own any media rights.

Media Outlets/Communications

We have developed messaging plans/statements for various eventualities of Private Equity Golf entering public domain. We opportunistically packaged the TOUR's successes in the media to showcase its strength without waiting for Private Equity Golf to make an announcement.

Corporate Partners

We have engaged select TOUR partners to determine if Private Equity Golf has been in contact. To date, we have no information regarding outreach to partners.

Tournaments/Host Organizations

We communicated with key members of the Tournament Advisory Council to prepare for a possible entrance of Private Equity Golf to the marketplace.

Major Championships and Governing Bodies

We have liaised with each organization to learn of its position regarding Private Equity Golf.  To date, these organizations have given Private Equity Golf little regard or exhibit a wait-and-see mentality.

European Tour

We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of Private Equity Golf.  The European Tour reports it has been contacted by Private Equity Golf representatives but indicates no interest in a relationship with the organization on any terms.

Official World Golf Rankings

We are monitoring contact by Private Equity Golf representatives with OWGR.  To date, Private Equity Golf made a written request to OWGR requesting confirmation that points will be granted to Private Equity Golf events upon submission of an application. An application was never received by OWGR and no confirmation by OWGR was given other than that Private Equity Golf should follow the normal OWGR governance process for any new tour. Under current OWGR regulations, Private Equity Golf will need to be in operation for two years and meet minimum field size and eligibility requirements in order to be considered for inclusion in the OWGR system.

<u>Legal/Employment Matters</u>
We are evaluating non-compete and proprietary information agreements with select employees.

As a result of Private Equity Golf's recent meetings, we learned of their immediate goal to obtain commitments from eight high-profile players prior to seeking agreements with sponsors and media partners. The impact that Private Equity Golf could have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, Private Equity Golf's ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished.

For these reasons, we believe it prudent to take the next steps in our action plan. We are in the process of developing a communication to player/members regarding Private Equity Golf. Additionally, we will ask the Policy Board in March to approve the Regulation changes which clearly state that PGA TOUR members cannot have a financial interest in, or be a member of, Private Equity Golf and retain PGA TOUR membership.

In closing, I would say that the PGA TOUR's Regulations are rules that were enacted by the players themselves and are the foundation upon which the TOUR has been built. The PGA TOUR's position and history as the world's leading professional golf tour is second to none due to the strength of its members, and the organization's unwavering commitment to delivering the highest financial benefits and playing opportunities. I believe that the PGA TOUR, with its unique player/independent governance structure, has delivered unquestioned value to its members, partners, and communities, and has served a growing global audience of fans over the past 51 years.

In our estimation, the best way to continue this remarkable growth and stability is to amend our regulations as described. I will be reaching out to each of you over the next few days to answer any questions regarding our planned action steps.

Thank you,

Jay

# EXHIBIT 3

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0019032 through PGA_TOUR0019034.   The PGA   Tour   will   be   given   notice   of   this   intended   filing pursuant  to Local Rule 1.11(d), and LIV Golf will supplement this production  if  and  when  appropriate pursuant to the same.

# EXHIBIT 4

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0009948 through PGA_TOUR0009954.   The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 5

   

_(/)   EQUIPMENT REVIEWS   MORE

BACK TO HOME (/)   /   BACK TO NEWS & TOUR (/NEWS-AND-EVENTS/)
/   BACK TO TOUR NEWS (/NEWS-AND-EVENTS/TOUR-NEWS/)
/   BACK TO PGA TOUR AND DP WORLD TOUR 'STRATEGIC ALLIANCE' EXPLAINED

# PGA Tour and DP World Tour 'strategic alliance' explained

Published: 30 June 2022



PGA Tour CEO Jay Monahan and DP World Tour Chief Executive Keith Pelley are working together to try and combat the threat from LIV Golf.



([//todaysgolfer-images.bauersecure.com/wp-images/123166/610x410/0-jay-monahan-keith-pelley-a](//todaysgolfer-images.bauersecure.com/wp-images/123166/610x410/0-jay-monahan-keith-pelley-a)

# Golf's new world order: Breaking down the PGA Tour's 'historic' partnership with the DP World Tour and what it means for fans, players and the LIV Golf series

After months of flirting with the Saudis, DP World Tour chief Keith Pelley has sided with the PGA Tour and extended their 'strategic alliance' until 2035. As part of the extended partnership which is designed to counter the threat of LIV Golf, the Americans have increased their share in European Tour Productions from 15% to 40% – thought to be worth around £120 million – and committed to a coordinated global schedule, which will almost certainly lead to more joint events in the future. Prize money will also grow across the board in each of the next five years.

**RELATED:** **LIV set to get world rankings status (/news-and-events/tour-news/liv-golf-set-to-receive-official-world-golf-rankings-status-thanks-to-alliance-with-mena-tour/)**

"This move will significantly enhance the meritocracy that has successfully served the professional game on both sides of the Atlantic for more than 50 years," says Pelley.



"It is a natural extension and progression of what we have been doing over the past few years and I passionately believe that this move is the right thing for our players, our Tour, our fans, and the game of golf in general."

Some players stand to benefit more than most. From the start of next year, the top 10 in the Race to Dubai, not otherwise exempt, will win a PGA Tour card for the following season. This has led to fears that the DP World Tour will essentially be acting as a feeder circuit and giving away its best players to the PGA Tour. However, Pelley insists this is not the case.

**RELATED: Presidents Cup 2022 Preview (https://www.todays-golfer.com/news-and-events/tour-news/presidents-cup/)**

"We are not a feeder tour into the PGA Tour," says Pelley. "We are a vibrant, independent, strong tour with incredible tournaments. There is one component of our new deal, which is a massive component for our players to be able to get access to the PGA Tour, the world's greatest and largest tour. But it's one component of it."



## New schedule shakeup to create global series

The PGA Tour is reverting back to a calendar-year schedule with a new format and an offseason global series that sounds remarkably like the LIV Golf "exhibitions" which Monahan has previously mocked. The new-look FedEx Cup season will run from January to August and while it won't begin until 2024, a revised qualification for the Playoffs will come into effect next year where only 70 players will take part, not the usual 125.

**RELATED: Premier Golf League to work with PGA Tour? (https://www.todays-golfer.com/news-and-events/tour-news/2022/premier-golf-league-trying-to-partner-with-and-save-the-pga-tour/)**

Three international events will also form part of a limited-field, no-cut series in the autumn which will mimic the LIV Golf model by paying out as much as $25 million each time. Those not involved will then compete in an alternative series where they will fight to keep their cards and improve their status for the following season.

"On the PGA Tour, our members compete for the opportunity to add their names to history books, and, yes, significant financial benefits, without having to wrestle with any sort of moral ambiguity," says Monahan. "And pure competition creates relevancy and context, which is what fans need and expect in order to invest their time in a sport and in a player.

"We have and always will provide a global platform for members to compete against the very best, earn their stardom, and become household names."



A $54 million powerplay to rival LIV Golf

PGA Tour chief Jay Monahan has unveiled a not-so cunning plan to keep everyone happy at the top and bottom of golf's wobbling tree – and it involves throwing even more money at them. Another $54 million will be added to the prize pot across eight marquee tournaments from the start of next season to counter the threat of LIV Golf.

The Genesis Invitational, Bay Hill Invitational, World Match Play, Memorial Tournament, the Fed Ex St Jude and the BMW Championship will be bumped to $20 million, while the Players Championship is rising from $20 million to $25 million.

**RELATED: [LIV Golf Series explained (https://wordpress-todaysgolfer.int.publishing.bauerxcel.tech/cms pages/everything-you-need-greg-norman-liv-golf-series-saudi-golf-league/)](https://wordpress-todaysgolfer.int.publishing.bauerxcel.tech/cms pages/everything-you-need-greg-norman-liv-golf-series-saudi-golf-league/)**

Rory McIlroy, who is one of four player directors on the PGA Tour Policy Board, claims the elevated events are "important for the future of the Tour" without minimising other events on the schedule.

"Everyone has the same opportunity to make the big events with the big prize funds," he says. "I think it'll make it more competitive and make it a more compelling product, honestly. I think it'll be good.

"I think some of these changes to the schedule and some of these increases in prize funds will have some guys that were thinking about it [leaving] to think twice and maybe reconsider their decision."



## The return of Qualifying School

In response to Greg Norman trying to siphon off top young talent for his Saudi-funded series, the PGA Tour has unveiled plans to widen the path for players to reach its top ranks.

For the first time since 2012, players will be able to head to Q-School next year where the top five (and ties) will win a ticket to the big time. The top 30 finishers on the Korn Ferry Tour will also be awarded a PGA Tour card, up from the current 25.

**RELATED: <u>Greg Norman: "Why should the PGA Tour be the only entity in town?" (/news-and-events/tour-news/2021/november/greg-norman-asian-tour-breakaway-golf-league-interview/)</u>**



**Zero tolerance for rebels**

The PGA Tour have already come down hard on rebel members by suspending them "indefinitely" – and now the DP World Tour have gone one step further by banning players from next week's Scottish Open and issuing £100,000 fines for those who "wilfully broke rules".

Ryder Cup veterans Lee Westwood, Sergio Garcia and Ian Poulter are among those who have been punished and warned that further sanctions may follow as a result of playing in this week's LIV Golf Invitational in Portland, Oregon.

**READ NEXT: Solheim Cup stars defend LET's Saudi links (https://wordpress-todaysgolfer.int.publishing.bauerxcel.tech/cms_pages/georgia-hall-bronte-law-defend-ladies-european-tour-amid-saudi-links/)**

Pelley has yet to confirm whether Ryder Cup participation is at stake, but Westwood remains defiant and is adamant that his future involvement should not be influenced by his decision to sign up to the LIV Golf Series.

"Why should it be threatened? I've been playing Ryder Cup golf since 1997, and the criteria has been to be a member of the European Tour. Now, the criteria for being a member of the European Tour is to play four events. Why should they change that now?

"I've been a member of the PGA Tour and still played four events on the European Tour, and why would the European Tour change their rules so dramatically because another tour doesn't like it or feels financially threatened? There's just a bit too much protection going on for my liking and not enough transparency.

"I think as long as you fulfill the criteria to be a European Tour member, then you should still have the opportunity to try and qualify for the Ryder Cup team."

**RELATED: Who is playing at the LIV Golf Invitational in Portland? (https://wordpress-todaysgolfer.int.publishing.bauerxcel.tech/cms_pages/who-is-playing-in-the-liv-golf-series/)**

US Ryder Cup captain Zach Johnson has already confirmed that players who have defected will not be chosen to represent their country next year. But in another twist, Henrik Stenson's management team has reportedly been in talks with Greg Norman about the Swede jumping ship – a move which would almost certainly see him stripped of the European Ryder Cup captaincy.



There's a lot for Pelley to sort out and to make matters worse, fan favourite Tommy Fleetwood has also been heavily linked with the Saudi-backed series after his wife and agent, Clare, was spotted at the first LIV Invitational at Centurion Club.

More player announcements are expected to be made after the LIV Golf Invitational this week. The Secret Tour Pro on Twitter has even admitted a top-10 player, which we believe to be Patrick Cantlay, could be swapping a PGA Tour card for a LIV Golf lanyard.



**READ NEXT: The book extract that caused Mickelson's nightm (https://wordpress-todaysgolfer.int.publishing.bauerxcel.tech/cms pages/alan-shipnuck-wonders-if-gambling-debts-made-phil-mickelson-decide-to-join-the-mega-money-liv-golf-tour/)are (/news-and-events/tour-news/2022/alan-shipnuck-wonders-if-gambling-debts-made-phil-mickelson-decide-to-join-the-mega-money-liv-golf-tour/)**

Michael Catling (/author/michael-catling)

*Features Editor*

(/author/michael-catling)

*- Just so you know, whilst we may receive a commission or other compensation from the links on this page, we never allow this to influence product selections.*

# You may also like

Bay Hill Palmer Kingsman Whispa-Tex Waterproof Wind Top With Zip Off Sleeves Review

Sunice Sanday Waterproof Jacket Review

(https://www.todaysgolfer.co.uk/bags/cobra/db-/king-cobra-db-

King Cobra DB-08 Camo Stand Bag Review

(https://www.todaysgolfer.co.uk/convertible-half-zip-travel-

Ashworth Convertible Half Zip Waterproof Travel Jacket Review

(https://www.todaysgolfer.co.uk/clubs/fairway-woods/orka/xtreme-response/orka-xtreme-response-fairway/?

Orka Xtreme Response Fairway Wood Review

Callaway Alpha G2 Cart Bag

Review



   (/contact-

(https://www.facebook.com/TodaysGolfer (https://twitter.com/TodaysGolfer (https://youtube.com/TheTodaysGo

 (https://www.bauermedia.co.uk) **SITEMAP (/SITE-MAP/)** **CONTACT US (/CONTACT-US/)**
**PRIVACY AND COOKIE POLICY (HTTPS://WWW.BAUERDATAPROMISE.CO.UK/)**
**LEGAL INFO (/TERMS-AND-CONDITIONS/)**
**PRODUCT REVIEWS (HTTPS://WWW.WHATSTHEBEST.CO.UK/)**
**VISIT OUR MEMBERS SITE (HTTPS://MEMBERS.TODAYSGOLFER.CO.UK/?**
**UTM_SOURCE=DYNAMIC&UTM_MEDIUM=BWS&UTM_CAMPAIGN=BAU_TODAYSGOLFER&UTM_CONTENT=FOOTER)**
**COMPLAINTS POLICY (HTTP://WWW.BAUERMEDIACOMPLAINTS.CO.UK/)**

© 1962-2022  Bauer Media Group

Bauer Media Group consists of: Bauer Consumer Media Ltd, Company number: 01176085; Bauer Radio Ltd, Company
Number: 1394141; H Bauer Publishing, Company Number: LP003328
Registered Office: Media House, Peterborough Business Park, Lynch Wood, Peterborough.
All registered in England and Wales. VAT no 918 5617 01

H Bauer Publishing are authorised and regulated for credit broking by the FCA (Ref No. 845898)

# EXHIBIT 6

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0008819 and PGA_TOUR0008820. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 7

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0009274 through PGA_TOUR0009276. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 8

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0008652 through PGA_TOUR0008655.  The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 9

**The New York Times**   https://www.nytimes.com/2022/07/06/sports/golf/pga-dp-world-tour-liv-golf.html

# The PGA and DP World Tours Allied. Then LIV Golf Happened.

The alliance made it easier for players to compete in more tournaments, but the new golf tour is testing the partnership.

**By Paul Sullivan**

Published July 6, 2022    Updated July 9, 2022

Fabrizio Zanotti had been waiting to hear where he'd be this week.

Ranked 38th on the DP World Tour, he was on the cusp of getting into the Genesis Scottish Open. But as of last summer, an alliance between the PGA Tour and the DP tour means that he had a spot in the PGA Tour's Barbasol Championship, nearly 4,000 miles away in Nicholasville, Ky., if he didn't get into the Scottish Open.

Zanotti, who is from Paraguay, wasn't complaining. "It's really good," he said. "The partnership is nice for us here in Europe to have the opportunity to get there."

Just a few months ago, the PGA Tour and the European Tour, which oversees the DP World Tour, had an alliance that looked fruitful. After competing for players for several decades, the tours came together in the early months of the Covid-19 pandemic and by November 2020 they had formalized a partnership.

Last August, the tours announced that they were co-sanctioning three events: the Scottish Open and the Barbasol, which run Thursday through Sunday, and the Barracuda Championship next week near Reno, Nev., opposite the British Open.

This meant players on the PGA and DP World Tours could compete in either event if their ranking was sufficient to get in. But mostly it meant if they didn't get into the Scottish or British Opens, they had a great consolation prize in playing lesser tournaments on the more prestigious PGA Tour.



Fabrizio Zanotti of Paraguay said an alliance between the PGA Tour and the DP World Tour should mean more opportunities for him to play and compete.  Murad Sezer/Reuters

When this deal was announced in August, it was heralded as a sign of the deepening cooperation between the tours and sold as a benefit to both tours' members.

"With us co-sanctioning three events this year, we are no longer competing for top players," Keith Pelley, the European Tour commissioner, said in an interview earlier this year.

"Everything changed after November 2020. It was a mind-set shift for both of our organizations to work as closely together as we could and share all facets of our businesses. We went from competitors to partners."

Those were the days. That alliance is being tested publicly and politically by the new Saudi-backed LIV Golf Tour. The high-dollar invitational series has lured a group of PGA and DP World Tour players away and sent more established tours scrambling to make changes.

In the first event, the winner took home $4 million, but there was guaranteed money for every player, including the last-place finisher, Andy Ogletree, who won the U.S. Amateur in 2019. (He didn't make the field at the first LIV event in the United States, at Pumpkin Ridge in Oregon, throwing into doubt his professional future.)

For golfers trying to play their way up the rankings and into tournaments, money surely matters, but it's the Official World Golf Ranking points that matter the most. They're what determines how much control players have over their schedules.

**Sign up for the Sports Newsletter** Get our most ambitious projects, stories and analysis delivered to your inbox every week. Get it sent to your inbox.

"The playing opportunities with the merger are great," said Maverick Antcliff, who played in college at Augusta State University in Georgia and is ranked 171st on the DP tour. "If you have a good week in that opposite field event, you have an opportunity to transfer to the U.S. That's the avenue I want to go. That strategic alliance has given us a clearer pathway."

Before the alliance, the way players in Europe got invites onto the PGA Tour and into the majors was by being ranked in the top 50 in the world — not just on a particular tour — or by qualifying for the United States or British Opens through their qualifying process. The strategic alliance has given talented but lower-ranked players a chance to compete on the PGA Tour and possibly finish high enough to gain more control over their schedule.

While it presents larger, existential questions for professional golf, it has more practical week-to-week consequences for players trying to get into tournaments like the Scottish Open. Will defectors to the LIV Golf being excluded from events give other players a chance to compete? And that's another way of players on the cusp asking if they have a spot in events after remaining loyal to the tour where they've been playing.

The answers aren't clear. For one, the two tours are structured differently. The PGA Tour is a nonprofit. The European Tour is essentially a union of its members. So their punishments have differed because their members ostensibly have a say.

Jay Monahan, commissioner of the PGA Tour, has threatened to suspend or bar players who go to the LIV tour (with a number of players like Dustin Johnson and Kevin Na resigning their memberships upon moving to LIV).



The LIV Golf Invitational Series presents existential questions for professional golf and has also changed the week-to-week dynamics for players trying to get into tournaments like the Scottish Open.  Troy Wayrynen/EPA, via Shutterstock

Pelley, the European Tour commissioner, had to take a different tact with his players: They were fined $120,000 for playing in the first LIV event in London and barred from playing in the three co-sanctioned events. Pablo Larrazabal and Oliver Bekker paid their fines and were back playing on the European Tour at the recent Horizon Irish Open.

Yet the LIV Tour, which set out to challenge the existing tours, is doing so at the cost of upcoming players. Consider Ogletree, who has struggled on the PGA Tour but had his U.S. Amateur champion status to fall back on. Now the question remains what his defection to the LIV Tour means for his professional career.

The tours announced significant enhancements to their partnership at the end of June. Among them is the PGA Tour increasing its stake in the European Tour to 40 percent, from 15 percent, which will lead to higher prize money on the DP World Tour. It also gives players on that tour a route to get onto the PGA Tour, with the top 10 European players at the end of the season getting playing privileges in the United States.

"The involvement of the DP World Tour and those players will just help expand our tournament, and it's great for our sponsor, Barracuda Networks," said Chris Hoff, tournament director of the Barracuda Championship, noting there will be 50 DP World Tour players in addition to 106 from the PGA Tour.

"There are plenty of guys who want to come over. It's a middle- to upper-middle tournament when it comes to the amount of Race to Dubai points available in addition to the monetary purse."



Andy Ogletree struggled on the PGA Tour but had his United States Amateur champion status to fall back on. Now, after finishing last in the first event of the LIV Golf Tour, it's unclear what his defection means for his professional career. Cliff Hawkins/Getty Images

Those points are important, and since none of the players who went to the LIV Tour are able to play in the three co-sanctioned events this season, it gives an opportunity to other players who remained on the tours.

For a player like Antcliff, whose 550 world ranking sometimes makes getting into tournaments difficult, the alternative field events give him hope. "For myself, it is nice when there's an event and you have the opportunity to play that same week," he said. "It's a long season. Your best week is just around the corner. It's another opportunity to play a PGA Tour event."

The co-sanctioning changes haven't been great for all tournaments. The recent John Deere Classic used to be played opposite the Scottish Open. Its claim to fame was having a jet waiting to fly the winner to the British Open.

Zanotti will play this week at the Scottish Open. Next week, though, he had planned to play in the Barracuda Championship on the PGA Tour, but his fourth place finish in the Irish Open got him into the British Open.

"It's not very easy to go through the world rankings to play on the PGA Tour if you're not a top-50 player," said Zanotti, whose world ranking is 237. "That's why I think it's great to have these two opportunities. You can always win or have a good week."

# EXHIBIT 10



**HOME** / BIOGRAPHY / TOPICS / DESIGN / THE QUADRILATERAL / BOOKS / CONTACT GEOFF

A golf hole, humanly speaking, is like life, in as much as one cannot judge justly of any person's character the first time one meets him. Sometimes it takes years to discover and appreciate hidden qualities which only time discloses, and he usually discloses them on the links. C.B. MACDONALD



## "Historic Milestone Unfolds": Jay Monahan Attends First European Tour Board Meeting

March 22, 2021

What Is The Quad?

Latest Posts From The Quad:

**Golf Media Ecosystem Burns**

**News & Notes Nov. 10th, 2022**





Begin the countdown clock to the end of the **European Tour**…I mean, revel in the historic milestone that unfolded as the European Tour welcomed **PGA Tour Commissioner Jay Monahan** to his first European Tour board meeting.

For Immediate Release and Consternation in Europe:

> An historic milestone in the evolution of the Strategic Alliance between the European Tour and the PGA TOUR unfolded today when PGA TOUR Commissioner Jay Monahan attended his first European Tour Board Meeting.

> Commissioner Monahan's position on the Board came as part of the partnership – announced last November – which saw the PGA TOUR acquire a minority investment stake in European Tour Productions (ETP), the European Tour's Media Production company, which produces and distributes content internationally.

> David Williams, Chair of the European Tour, welcomed Commissioner Monahan to the virtual meeting from the PGA

## Big Business

## News & Notes Nov. 3rd, 2022

## R&A: Open Will Be Open



# The Quad

A year-round news all things Grand Cup and Ryder Cu golf's last indepe

**TheQuadrilateral.golf**

**Archives**

_____

SOCIAL



**Geoff Shackelford**

RT @flushingitgolf: Keith Pelley was just interviewed on Sky and said he's going to raise the OWGR issue at the next board meeting. He…
https://t.co/exJ8hiOdQP
Nov 20, 2022, 1:19 AM

TOUR's Florida base, where he is currently involved in a series of meetings with European Tour CEO Keith Pelley.

"I am delighted to welcome Jay Monahan, representing the PGA TOUR, to the Board of the PGA European Tour at this important and historic time for the Tour and for golf development worldwide," he said. "This illustrates how closely we are aligned now and how closely we will be aligned moving forwards."

Jay Monahan said: "When we announced the Strategic Alliance last year, I said I was looking forward to working even more closely with the European Tour for the benefit of the men's professional game and for golf fans around the world. Today was an important step in that journey."

Veering dangerously to Lepetomane territory with these quotes. And the capitalization…

The Strategic Alliance will see golf's two major Tours explore all facets of collaboration, working together on strategic commercial opportunities including collaborating on global media rights, as well as in areas such as global scheduling, content, prize funds and playing opportunities for the respective memberships.



**Geoff Shackelford**

RT @jonslater37: I mean, he's kinda smart https://t.co/R74hHjRrgp

Nov 19, 2022, 9:02 AM



**Geoff Shackelford**

RT @RuMacdonald: Carnoustie's finish just got tougher 😳 https://t.co/ea6XSXqNGt

Nov 19, 2022, 9:01 AM



**Geoff Shackelford**

RT @byajperez: NEW: Judge presiding over former Masters champ Patrick Reed's defamation lawsuit against Golf Channel analyst Brand… https://t.co/Ej9FszX4KQ

Nov 18, 2022, 10:42 AM

Follow @GeoffShac

INSTAGRAM

Because nothing gets the fan more excited than hearing about playing opportunities.








👤 Geoff Shackelford  /  1 Comment  Share
🔖 European Tour, PGA Tour

### Subscribe to our mailing list

| email address |

Subscribe

| Search |

## MASTERS.COM

‹  Bryson DeChambeau The NFL's New Deal And



Walk the Grounds of A...

## COMMENTS (1)          Oldest First

Preview          POST COMMENT...

### BOOKS BY GEOFF

👤 **Grey**

2 years ago · 1 Like

Awkward group photo there. Tough to place the hands properly. Also tough to see the Euros come to this.

**Grounds for Golf: The History and Fundamentals of Golf Course Design**

By Geoff Shackelford

**Alister MacKenzie's Cypress Point Club**

By Geoff Shackelford

The Future of Golf: How Golf Lost Its Way and How to Get It Back

By Geoff Shackelford

The Golden Age of Golf Design

By Geoff Shackelford

The Art of Golf Design

By Michael Miller, Geoff Shackelford

Lines of Charm: Brilliant And Irreverent Quotes, Notes, And Anecdotes from Golf's Golden Age Architects

The Good Doctor Returns: A Novel

By Geoff Shackelford

Masters of the Links: Essays on the Art of Golf and Course Design

The Captain: George C. Thomas Jr. and His Golf Architecture

By Geoff Shackelford

# The Riviera Country Club: A Definitive History

By Geoff Shackelford

## RECENT POSTS

Archive ⌄

🔊 GeoffShackelford.com RSS

Copyright © 2022, Geoff Shackelford. All rights reserved.

# EXHIBIT 11

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0032675 through PGA_TOUR0032676. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 12

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0011224 through PGA_TOUR0011229.   The PGA   Tour   will   be   given notice   of   this   intended   filing pursuant  to Local Rule 1.11(d), and LIV Golf  will  supplement  this production  if  and  when  appropriate pursuant to the same.

# EXHIBIT 13

🔍  Search the world's best editorial photos

## 2022 World Golf Hall of Fame Induction

PONTE VEDRA BEACH, FL - MARCH 09: Keith Pelley, CEO of the DP World Tour poses on the red carpet during the World Golf Hall of Fame Induction Ceremony prior to THE PLAYERS Championship at PGA TOUR Global Home on March 9, 2022, in Ponte Vedra Beach, FL. (Photo by Chris Condon/PGA TOUR via Getty Images)





## PURCHASE A LICENCE

Standard editorial rights                    **Custom rights**

How can I use this image? ⓘ

Large $499 ⌄

ADD TO BASKET

300 dpi | 43.0 MP

$499.00  USD

DETAILS

| | |
|---|---|
| Restrictions: | No commercial uses without permission. Contact your local office. |
| Credit: | Chris Condon / Contributor |
| Editorial #: | 1239061535 |
| Collection: | PGA TOUR |
| Date created: | 09 March, 2022 |
| Licence type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | PGA TOUR |
| Object name: | TPC Sawgrass |
| Max file size: | 8032 x 5355 px (68.00 x 45.34 cm) - 300 dpi - 19 MB |

## More from this event  View all >

Large $499  ⌄

# EXHIBIT 14

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0014105 through PGA_TOUR0014107. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 15

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0010856 and PGA_TOUR0010857. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 16

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA of America has claimed confidentiality, with Bates Number PGAA_00001132. The PGA of America will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 17

AN Jobs

| Architectural Designe... | Architecture Program ... | Architectural Designe... | Staff Architect / Job C... | Project Architect, Retail | Project Manager | Job Captain |
| PORTLAND OR CLEVELAND, ORE... | KENT, OHIO | EAST HAMPTON, NEW YORK | PORTLAND, OR / SPOKANE, WA /... | SEATTLE, WASHINGTON | PORTLAND, OREGON | PORTLAND, OREG... |



ARCHITECTURE   ART   DESIGN   URBANISM       AN INTERIOR   AWARDS▾   EVENTS▾   SUBSCRIBE   🔍

**Fit To A Tee**

# PGA of America completes new headquarters at burgeoning 600-acre campus in Frisco, Texas

By Matt Hickman   •   August 26, 2022   •   Development, News, Southwest



Just a small part of a sprawling 600-acre campus that's still largely under construction, PGA of America's new headquarters in Frisco, Texas, are now open. (Courtesy Page)

SHARE    

**PGA of America completes new headquarters at burgeoning 600-acre campus in Frisco, Texas**

Jacksonville, the PGA of America has now debuted its own fresh digs located 30 miles north of Dallas in the city of Frisco at a sprawling 600-acre campus devoted to everything and anything golf.





The completion of the $33.5 million new headquarters building, designed by Houston-headquartered multidisciplinary firm Page, marks a new chapter for the 106-year-old PGA of America. Although previously based in a different part of the state as the PGA Tour, the PGA of America also once called the alligator-infested golf nirvana known as Florida home—Palm Beach Gardens, to be exact. PGA of America, now the first major international sports organization to be based in Texas, first announced its departure from Florida in 2018. (Although once part of the same larger organization, PGA Tour spun off from the PGA of America in the late 1960s and operates as a wholly separate organization dedicated to pro golf tournaments for men; PGA of America is an association of golf professionals—*not* professional golfers—such as club directors, instructors, and on.)

The new 106,600-square-foot PGA of America headquarters is described by Page as "an open and welcoming environment that celebrates golf and supports its development as a popular sport." Major elements of the complex include open and private workspaces accommodating 150 employees, seminar and meeting rooms, a professional development center, communal areas including a large social staircase, a fitness facility, and a top-floor event venue with access to a large outdoor terrace. There's also a state-of-the-art indoor training center featuring chipping and putting areas, hitting bays with operable walls, driving range simulators, and more. The stacked four-level structure allows for spacious, south-facing terraces on the upper levels with optimized view of the surrounding campus's marquee attraction: the greens.



**Trending Now**

1   Maine's Portland Museum of Art unveils shortlisted design proposals

2   Jim Olson thoughtfully expands his downtown Seattle condominium

3   OMA's expansion of Buffalo's AKG Art Museum will open in May 2023

4   Surfacedesign introduces a lush garde to an underused backyard

5   Tennessee Titans unveil renderings of new stadium in Nashville

6   Zanzibar's Domino Tower could be Africa's second tallest and rise on a manmade island

7   Eames Institute acquires San Francisco's William Stout Architectural Books

## PGA of America completes new headquarters at burgeoning 600-acre campus in Frisco, Texas





The new PGA headquarters includes an expansive indoor training center for golf professionals. (Courtesy Page)

Describing the layout of the building as one that will provide the PGA with a "flexible framework with which to engage with the local community, as well as with visitors from across the world," Ricardo Muñoz, an associate principal at Page who served as lead design architect on the project, goes on to describe the building's connection with the site:

> "From the moment that you walk into the Home of the PGA, you are immediately welcomed by a double-volume lobby illuminated by a custom fabricated light fixture suspended from above. The gentle curves found in this fixture represent the sinuous lines found throughout a golf course's topography. A 28-foot-high wood feature stands tall behind the reception desk and subtly showcases the signature holes on the courses just a few steps away. But perhaps one of the most striking elements you experience in the lobby is the view of the driving range beyond, framed by dark metal. From the very beginning, the design team wanted the building to have a sense of porosity in terms of creating indoor/outdoor experiences by showcasing the beautiful landscape beyond. The large expanses of shaded glass, as well as the covered terraces and operable window-walls, help provide this connection to the outdoors."

Clad in stucco, glass, and locally sourced Leuders limestone, the building—transparent, yet strategically designed to shield its interiors from the blazing North Texas sun—is a work of Lone Star State regional modernism.

Design Miami/ Basel
June 14–
June 19, 2022
Basel, Switzerland

Design Miami/
November 30 –
December 4, 2022
Miami Beach, USA

**Popular Posts**

1  Buffalo Bills share renderings for new Populous-designed stadium

2  Tennessee Titans unveil renderings of new stadium in Nashville

3  Joseph Giovannini's book Architecture Unbound is deeply researched

4  Smithsonian selects two "optimal" D.C. sites for planned museums

5  Eames Institute acquires San Francisco's William Stout Architectural Books

6  Exhibition brings ancient antiquities to life through colorful reconstructions

7  Louis Kahn's Kimbell Art Museum turns 50







"The project's architectural response to its context and program was driven by regional environmental strategies, as well as from inspiration of the local natural landscape," elaborated Muñoz. "Deep overhangs, shading devices and trellises are implemented much in the same manner as one would find in structures across Texas over the centuries. Terraces facing the golf courses are well-shaded and meant to take advantage of natural breezes. The bent bar form and the terracing of each floor recall the natural earth and rock formations found in the immediate context."



PGA of America sheds its Floridian roots for a new HQ built with regional materials and designed to respond to the North Texas climate. (Courtesy Page)

Joining Muñoz and the larger team from Page, which also helmed the project's interior design, branding, wayfinding, and programming aspects, were general contractor Adolfson & Peterson Construction, construction manager Cushman Wakefield, and a consultant team that included Talley Associates (landscape architect), L.A. Fuess Partners (structural engineer), Schmidt-Stacy (MEP engineer), Brockette Davis Drake (civil engineer), and others.

Construction first kicked off at the 6.2-acre project site, located in the northwest corner of the PGA Frisco campus, in September 2020. Adjacent to the headquarters is an event garden, driving

as well as bicycle parking.



The building is pending LEED Silver certification with sustainability strategies, inside and out, that include: water-efficient fixtures, daylight harvesting, LED lighting and occupancy controls, efficient HVAC systems, drought-tolerant landscaping, and the use of healthy, low-emitting building materials. "Careful attention was paid to the building's placement and its orientation to maximize the availability of natural light while minimizing solar gain," Page explained in its project overview. "The team implemented solar analysis studies to determine overhang depths, window locations and trellis placements."

Seventy-five percent of all construction waste generated during the project was reused or recycled.

As for the larger PGA Frisco campus, the organization's headquarters is just one anchoring element of the burgeoning North Texas' links Shangri-La, which was born from a private-public partnership between the PGA of America, Omni Hotels & Resorts, the City of Frisco, and the Frisco Independent School District. Also located on the massive campus are two 18-hole courses, designed by Gil Hanse and Beau Welling as part of Fields Ranch at PGA Frisco; the 510-room Omni PGA Frisco Resort; a clubhouse and performance center; a 30-acre practice facility; several miles of public hiking and cycling trails, and a "golf-centered entertainment" zone called the PGA District. The rest of the $520 million PGA Frisco campus is slated to open next year.



**PGA of America completes new headquarters at burgeoning 600-acre campus in Frisco, Texas**

economic impact over the next two decades. Also billed by the organization as the largest development currently under construction in North America America, PGA Frisco is part of an *even larger* mixed-use development spanning s 2,500 acres.

For those looking to live the PGA-branded good life, Florida, it would seem, is no longer the spot ... get thee to Frisco.

Golf   Texas


Design your Passion. Build with Ours.
Taking façade design to a whole new level with Shildan's highly engineered terracotta rainscreen and sunscreen products and systems.
SHILDAN GROUP
Visit our new website: shildan.com

**Related Posts**



3D Burbs

**ICON and BIG break ground on the world's largest 3D-printed community**

November 14, 2022



Claustrophobic in Austin

**Windowless dorm rooms are proliferating, exacerbating a growing student mental health crisis. They should be banned.**

October 14, 2022



Xanadude

**The dudes from Dude Perfect reveal plans for Overland Partners–designed headquarters anchored by 30-story trick shot tower**

September 27, 2022

# The Architect's Newspaper

Information     Regions     Topics     Newsletters     Conferences

## PGA of America completes new headquarters at burgeoning 600-acre campus in Frisco, Texas

Privacy Policy

Midwest

East

Southeast

United States

Design

Development

Preservation

Transportation

Urbanism

CE Strong

Outdoor Spaces

Tech+

Trading Notes

Competitions

TimberCon

# EXHIBIT 18



### Guy Kinnings · 3rd

Deputy CEO, Ryder Cup Director & Chief Commercial Officer at PGA European Tour

London, England, United Kingdom · Contact info

500+ connections

PGA European Tour

University of Oxford

🔒 Message   + Follow   More

## Activity

5,483 followers

**Guy hasn't posted lately**

Guy's recent posts and comments will be displayed here.

Show all activity →

## Experience



**Deputy CEO & Ryder Cup Director**
PGA European Tour
Jun 2018 - Present · 4 yrs 6 mos
Wentworth, Surrey

# EXHIBIT 19



MENU

GAME CHANGERS

# A Tribute to a Golf Visionary: Herb Kohler

Published on Tuesday, September 6, 2022



Keith Pelley, CEO of the European Tour and President of the PGA of America Jim Richerson present Kohler Company President and Chief Executive Officer David Kohler and Kohler Company Executive Chairman Herbert Kohler Jr. with a plaque acknowledging their hosting of the 2020 Ryder Cup during Sunday Singles Matches of the 43rd Ryder Cup at Whistling Straits on September 26, 2021 in Kohler, Wisconsin. (Photo by Andrew Redington/Getty Images)

A dynamic leader whose impact has been seen across the game of golf and beyond, Herb Kohler recently passed at the age of 83.

"His zest for life, adventure and impact inspires all of us," his family shared in a Kohler Company press release. "We traveled together, celebrated together, and worked together. He was all in, all the time, leaving an indelible mark on how we live our lives today and carry on his legacy."

Among his many achievements supporting the game of golf, Mr. Kohler guided the creation of the iconic Kohler golf courses near Sheboygan, WI, including combining his vision with Pete Dye's to build Whistling Straits — which hosted 3 PGA Championships (2004, 2010 & 2015) and an unforgettable Ryder Cup (2020). His vast contributions to the game have been felt far & wide and he will truly be missed.

Here are some of our favorite memories & notable tributes:



PGA of America
@PGA · Follow

The PGA of America mourns the passing of Herb Kohler.

8:51 PM · Sep 4, 2022

❤ 86      Reply      Share

Read 1 reply

**Ryder Cup** ✔
@rydercup · **Follow**

The story of Kohler, Wisconsin 📍

A masterpiece created by a true visionary.



Watch on Twitter

6:50 AM · Sep 5, 2022                                                  ⓘ

❤️ **357**        💬 **Reply**      ⬆️ **Share**

**Read 3 replies**

**PGA Championship** ✔
@PGAChampionship · **Follow**

Thank you for the special memories, Herb Kohler. ❤️

#PGAChamp





5:04 PM · Sep 6, 2022                                                    ⓘ

♥ **29**      💬 Reply      ⬆ Share

**Read 1 reply**



**Ryder Cup** ✔
@rydercup · **Follow**

Whistling Straits, as only Herb Kohler could describe it.

1:00 PM · Sep 20, 2021                                                   ⓘ

♥ **1.2K**      💬 Reply      ⬆ Share

**Read 21 replies**



**Ryder Cup USA** ✔
@RyderCupUSA · **Follow**

Rest In Peace to a true visionary,
Mr. Herb Kohler

Watch on Twitter



7:12 PM · Sep 4, 2022                                        (i)

❤️ 557        💬 **Reply**      ⬆ **Share**

Read 8 replies



**Steve Stricker** ✓
@stevestricker · **Follow**                               🐦

I'm saddened to hear about the passing of Herb
Kohler today! He's done so much for golf in
Wisconsin. He made it possible for @RyderCupUSA
to bring the cup back home! That was for you Herb!
RIP



9:27 PM · Sep 4, 2022                                    ⓘ

❤ 1.8K        💬 Reply        ⬆ Share

Read 16 replies

---



**Padraig Harrington** ✔
@padraig_h · **Follow**

Sad to hear of the passing of Herb Kohler. A gracious
host of the 2020 @rydercup at one of his life's great
accomplishments, Whistling Straits. Just a lovely man
who left his mark on life and the game of golf. RIP

5:37 PM · Sep 4, 2022                                   ⓘ

❤ 775        💬 Reply        ⬆ Share

Read 6 replies

---



**Jerry Kelly** ✔
@jerrykelly13pga · **Follow**

The Legend. We will miss you! Thank you for what
you did for my career and for Wisconsin golf!!
Herb Kohler passes away at age 83



tmj4.com
Herb Kohler passes away at age 83

3:59 PM · Sep 4, 2022                                    ⓘ

♥ 95        💬 **Reply**        ⬆ **Share**

**Read 3 replies**

**DP World Tour** ✔
@DPWorldTour · **Follow**

The European Tour group is saddened to learn of the
passing of Herb Kohler.





europeantour.com
Herb Kohler: 1939-2022

7:48 AM · Sep 5, 2022

♥ 34    💬 Reply    ⬆ Share

**Read more on Twitter**

## Explore

Find a Coach

Find a Course

PGA Events

Leaderboard

Stories

PGA Shop

## Contact

Contact

About

Media Center

Partners

## Join

Become a PGA Member

PGA Sections

PGA Careers

## Impact

PGA Reach

We Are Golf

# PGA of America

The PGA of America is one of the world's
largest sports organizations, composed of
PGA Professionals who work daily to
grow interest and participation in the
game of golf.

**Follow Us**

Official Technology Services Agency

Privacy Policy

Terms of Service

Do Not Sell My Personal Information

© Copyright PGA of America 2022.

# EXHIBIT 20



# BOARD OF DIRECTORS

The long-term direction and policies of WGF are determined by the Executive Committee of the World Golf Foundation's Board of Directors. The members of the Board's Executive Committee include:



## JAY MONAHAN

### CHAIR, WORLD GOLF FOUNDATION / COMMISSIONER, PGA TOUR

Monahan was appointed as Commissioner of the PGA TOUR in 2017, having previously served as the TOUR's Deputy Commissioner since 2014 and COO since 2015. He leads the PGA TOUR in promoting their tours (PGA TOUR, PGA TOUR Champions, Korn Ferry) and golf on a global stage.



# MIKE WHAN

## CEO, UNITED STATES GOLF ASSOCIATION (USGA)

Michael (Mike) Whan joined the USGA as its chief executive officer (CEO) on July 1, 2021, becoming its eighth chief executive. As CEO, Whan leads the USGA team and their work to champion and advance the game of golf by conducting global championships, delivering golfer engagement programs, broadening accessibility and driving sustainability.



# RHETT EVANS

## CEO, GOLF COURSE SUPERINTENDENTS ASSOCIATION OF AMERICA (GCSAA) / REPRESENTING WE ARE GOLF EXECUTIVE ROUNDTABLE

Evans has served as the CEO of the GCSAA since 2011, having previously served as the organization's COO since 2009. Evans is responsible for expanding the reach and influence of golf course management and spearheading centralized management practices within all levels of the organization.



## WILL JONES

## EXECUTIVE DIRECTOR, THE MASTERS TOURNAMENT

Jones currently serves as Executive Director of the Masters Tournament, a position he has held since 2013. He joined Augusta National in 1993.



## KEITH PELLEY

## CHIEF EXECUTIVE, EUROPEAN TOUR

Pelley is the Chief Executive of the European Tour, a position he has held since 2015 following leadership roles at Rogers Media and with the Toronto Argonauts. Pelley is in charge of all day-to-day operations as well as the growth and promotion of all various tour entities.



# MARTIN SLUMBERS

## CHIEF EXECUTIVE, THE R&A

Slumbers has served as Chief Executive of the R&A and Secretary of the Royal and Ancient Golf Club of St. Andrews since 2015. Slumbers joined The R&A after a long career in investment banking. In addition to leading a five-year strategic plan, he has also driven a number of initiatives to bring more women and girls to play and work in golf.



# SETH WAUGH

## CEO, PGA OF AMERICA

Waugh has served as the PGA of America's CEO since 2018 after previously serving as the CEO of Deutsche Bank Americas among other leadership positions. Since joining PGA of America, Waugh has assumed the guidance and overall business strategy of the organization serving nearly 29,000 PGA professionals.



# MOLLIE MARCOUX SAMAAN

## COMMISSIONER, LPGA

Marcoux Samaan was appointed as the ninth Commissioner of the LPGA in 2021, after having held several senior executive positions with Chelsea Piers' Management and serving as Athletic Director at Princeton University. She leads the world's premier professional golf organization for women in promoting their global tours (LPGA Tour, Ladies European Tour and the Symetra Tour) and in overseeing the LPGA Foundation and the LPGA Professionals who work each day leading grassroots efforts allowing women and girls the opportunity to achieve their dreams through golf.



# GREG MCLAUGHLIN

## CHIEF EXECUTIVE OFFICER, WORLD GOLF FOUNDATION & FIRST TEE

McLaughlin became CEO of World Golf Foundation and First Tee in 2018, having previously served as the President of PGA TOUR Champions and before that, Tiger Woods Foundation. McLaughlin's role includes the oversight of all initiatives within the World Golf Foundation,

including WE ARE GOLF and World Golf Hall of Fame, in addition to strategic leadership of First Tee.

     

CONTACT US        PRIVACY POLICY        TERMS AND CONDITIONS

DO NOT SELL MY PERSONAL INFORMATION        COOKIE CHOICES

© 2022 World Golf Foundation | All Rights Reserved.

# EXHIBIT 21

American Golf
Industry Coalition

Who We Are     Make Golf Your Thing     Our Partners     Industry Impact     News     Contact Us



# A UNIFIED VOICE

Founded in 2009, the **American Golf Industry Coalition** is a partnership among golf's leading organizations to promote and advocate for the collective interests of the sport by:

- Advocating for legislative and regulatory issues of importance
- Facilitating the industry's diversity, equity and inclusion efforts. More specifically, the golf industry's DE&I initiative known as *Make Golf Your Thing*.

In each area of emphasis, the coalition unites the golf industry in pursuit of goals designed to enhance the vitality and diversity of the recreational and business entities of the sport. We serve as a banner under which collaborative issues can be addressed when it's clear that one collective voice is better than an individual's.

# WHAT IS 'MAKE GOLF

American Golf
Industry Coalition

Who We Are    Make Golf Your Thing    Our Partners    Industry Impact    News    Contact Us

*In 2020, the golf industry united together to address two simultaneous opportunities - how to bring greater diversity to our sport and how to build on the momentum that golf has experienced since the pandemic began.*

*Launched in 2021, **Make Golf Your Thing** consists of six cross-industry work groups which collaboratively advance golf's diversity, equity and inclusion.*

Learn More About Make Golf Your Thing

Make Golf Your Thing — The Golf Industry's DEI Initiative



The American Golf Industry Coalition (formerly "We Are Golf") emphasizes initiatives focused on golf's diversity, equity and inclusion efforts, contributions to the economy (local and national), health and wellness benefits, charitable giving, as well as environmental and sustainability initiatives.

The organization unites the golf industry in pursuit of goals designed to enhance the vitality and diversity of both

**American Golf
Industry Coalition**

Who We Are     Make Golf Your Thing     Our Partners     Industry Impact     News     Contact Us

The coalition is a division of the World Golf Foundation.

©2022 by American Golf Industry Coalition

# EXHIBIT 22

 Search the world's best editorial photos

# The Masters - Round One

AUGUSTA, GEORGIA - APRIL 07: CEO of the PGA European Tour Keith Pelley poses for a photo during the first round of the Masters at Augusta National Golf Club on April 07, 2022 in Augusta, Georgia. (Photo by Andrew Redington/Getty Images)





## PURCHASE A LICENCE

Standard editorial rights                    **Custom rights**

How can I use this image? ⓘ

Large $499 ⌄

ADD TO BASKET

300 dpi | 15.7 MP

## $499.00 USD

## DETAILS

Restrictions: Contact your local office for all commercial or promotional uses. Full editorial rights UK, US, Ireland, Australia, NZ, Canada (not Quebec). Restricted editorial rights for daily newspapers elsewhere, please call.

Credit:            Andrew Redington / Staff
Editorial #:       1390110265
Collection:        Getty Images Sport
Date created:      07 April, 2022
Licence type:      Rights-managed
Release info:      Not released. More information
Source:            Getty Images North America
Object name:       ar_11075_4eb14136-13e8-4a23-93cf-e4d1bd4c28da
Max file size:     4852 x 3235 px (41.08 x 27.39 cm) - 300 dpi - 6 MB

## More from this event   View all >

Large $499 ⌄

# EXHIBIT 23

Ian Randell, Chief Executive at Confederation of Professional Golf News Photo - Getty Images

🔍 Search the world's best editorial photos

## 43rd Ryder Cup - Opening Ceremony

KOHLER, WISCONSIN - SEPTEMBER 23: (2ndL -R) Ian Randell, Chief Executive at Confederation of Professional Golf, PGA Chief Executive Robert Maxfield, Ryder Cup Director Guy Kinnings, Keith Pelley, CEO of the PGA European Tour, Alan White, chairman of the PGA, David Williams, Chairman of The PGA European Tour, arrives for the opening ceremony for the 43rd Ryder Cup at Whistling Straits on September 23, 2021 in Kohler, Wisconsin. (Photo by Warren Little/Getty Images)





## PURCHASE A LICENCE

Standard editorial rights     **Custom rights**

How can I use this image? ⓘ

Large $499 ⌄

ADD TO BASKET

4490 x 2898 px (38.02 x 24.54 cm)
300 dpi | 13.0 MP

# $499.00 USD

## DETAILS

| | |
|---|---|
| Restrictions: | Contact your local office for all commercial or promotional uses. Full editorial rights UK, US, Ireland, Australia, NZ, Canada (not Quebec). Restricted editorial rights for daily newspapers elsewhere, please call. |
| Credit: | Warren Little / Staff |
| Editorial #: | 1342146189 |
| Collection: | Getty Images Sport |
| Date created: | 23 September, 2021 |
| Licence type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | Getty Images North America |
| Object name: | wl_x7429_0f3ac62c-8087-4bcd-8d11-7989259532c1 |
| Max file size: | 4490 x 2898 px (38.02 x 24.54 cm) - 300 dpi - 5 MB |

## More from this event  View all ›

Large $499 ⌄

# EXHIBIT 24

Search the world's best editorial photos

## 2016 Ryder Cup - Opening Ceremony

CHASKA, MN - SEPTEMBER 29: Chief Executive of the European Tour Keith Pelley speaks during the 2016 Ryder Cup Opening Ceremony at Hazeltine National Golf Club on September 29, 2016 in Chaska, Minnesota. (Photo by Ross Kinnaird/Getty Images)





PURCHASE A LICENCE

Standard editorial rights        **Custom rights**

How can I use this image? ⓘ

Large $499 ⌄

ADD TO BASKET

300 dpi | 16.4 MP

# $499.00 USD

## DETAILS

| | |
|---|---|
| Restrictions: | Contact your local office for all commercial or promotional uses. Full editorial rights UK, US, Ireland, Australia, NZ, Canada (not Quebec). Restricted editorial rights for daily newspapers elsewhere, please call. |
| Credit: | Ross Kinnaird / Staff |
| Editorial #: | 611449660 |
| Collection: | Getty Images Sport |
| Date created: | 29 September, 2016 |
| Licence type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | Getty Images North America |
| Object name: | 672193923ML00093_2016_Ryder |
| Max file size: | 4959 x 3306 px (41.99 x 27.99 cm) - 300 dpi - 4 MB |

## More from this event   View all ›

Large $499 ⌄

# EXHIBIT 25

Guy Kinnings, Deputy CEO, Ryder Cup Director & Chief Commercial... News Photo - Getty Images

 🔍  Search the world's best editorial photos

## 2022 Presidents Cup - Day Two

CHARLOTTE, NORTH CAROLINA - SEPTEMBER 23: Guy Kinnings, Deputy CEO, Ryder Cup Director & Chief Commercial Officer at PGA European Tour watches play on the first tee during Friday four-ball matches on day two of the 2022 Presidents Cup at Quail Hollow Country Club on September 23, 2022 in Charlotte, North Carolina. (Photo by Warren Little/Getty Images)





## PURCHASE A LICENSE

Standard editorial rights          **Custom rights**

Move your customers. Explore new concepts. Validate a brilliant idea. Introducing VisualGPS Insights.

GET STARTED

<div style="border:1px solid #6633cc; padding:20px; text-align:center;">ADD TO CART</div>

300 dpi | 20.5 MP

# $499.00 USD

## DETAILS

| | |
|---|---|
| Restrictions: | Contact your local office for all commercial or promotional uses. Full editorial rights UK, US, Ireland, Australia, NZ, Canada (not Quebec). Restricted editorial rights for daily newspapers elsewhere, please call. |
| Credit: | Warren Little / Staff |
| Editorial #: | 1426622247 |
| Collection: | Getty Images Sport |
| Date created: | September 23, 2022 |
| License type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | Getty Images North America |
| Object name: | 004a0657_4b0cce30-01f6-48a7-836a-fbc7f20da098 |
| Max file size: | 5619 x 3643 px (18.73 x 12.14 in) - 300 dpi - 5 MB |

# More from this event   View all ›

Move your customers. Explore new concepts. Validate a brilliant idea. Introducing VisualGPS Insights.

GET STARTED

# EXHIBIT 26

 Search the world's best editorial photos

## 43rd Ryder Cup - Opening Ceremony

KOHLER, WISCONSIN - SEPTEMBER 23: Keith Waters, Chief Operating Officer PGA European Tour attends the opening ceremony for the 43rd Ryder Cup at Whistling Straits on September 23, 2021 in Kohler, Wisconsin. (Photo by Warren Little/Getty Images)



Move your customers. Explore new concepts. Validate a brilliant idea. Introducing VisualGPS Insights.

GET STARTED

ADD TO CART

How can I use this image? ⓘ

| ○ Small | $175.00 |
|---------|---------|
| ○ Medium | $375.00 |
| ○ Large<br>3133 x 4655 px (10.44 x 15.52 in)<br>300 dpi \| 14.6 MP | $499.00 |

$499.00 USD

DETAILS

| | |
|---|---|
| Restrictions: | Contact your local office for all commercial or promotional uses. Full editorial rights UK, US, Ireland, Australia, NZ, Canada (not Quebec). Restricted editorial rights for daily newspapers elsewhere, please call. |
| Credit: | Warren Little / Staff |
| Editorial #: | 1342139894 |
| Collection: | Getty Images Sport |
| Date created: | September 23, 2021 |
| License type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | Getty Images North America |
| Object name: | wl_x8433_f91f5177-db75-44d7-b9fb-36161c810b71 |
| Max file size: | 3133 x 4655 px (10.44 x 15.52 in) - 300 dpi - 4 MB |

More from this event   View all ›

Move your customers. Explore new concepts. Validate a brilliant idea. Introducing VisualGPS Insights.

GET STARTED

# EXHIBIT 27

TV     Movies     Pop Culture     Streaming     Quizzes

What To Watch   Netflix & Hulu   Movie News 2021   Celebrity News   What To Stream   Fun Personality Quizzes   Trivia Games   Photos



## Jordan Spieth and David Probyn Photos

PICTURES

# World Golf Championships-Dell Match Play - Round Four



Getty Images      1 / 1

In This Photo: Jordan Spieth, David Probyn

Jordan Spieth of the United States consults with referee David Probyn of the European Tour where to drop his ball after his tee shot on the 11th hole had fallen into the water hazard during the round of 16 in the World Golf Championships-Dell Match Play at the Austin Country Club on March 26, 2016 in Austin, Texas.

(March 25, 2016 - Source: David Cannon/Getty Images North America)

LIVINGLY                 CONTACT US

MABEL + MOXIE            ADVERTISE                           Join Our Newsletter

LONNY                    CAREERS

STYLEBISTRO              TERMS OF SERVICE

IT'S ROSY               PRIVACY POLICY

ZIMBIO

LIVINGLY MEDIA     Copyright © 2022 Livingly Media, Inc., part of the Recurrent Ventures, Inc.

California Notice / Do Not Sell My Personal Information

# EXHIBIT 28

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0007535 through PGA_TOUR0007566. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 29

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0052539 through PGA_TOUR0052542. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 30

**PLACEHOLDER DOCUMENT**

Pursuant to Middle District of Florida Local Rule 1.11(d), this exhibit is a document for which the PGA Tour has claimed confidentiality, with Bates Numbers PGA_TOUR0360169 through PGA_TOUR0360171. The PGA Tour will be given notice of this intended filing pursuant to Local Rule 1.11(d), and LIV Golf will supplement this production if and when appropriate pursuant to the same.

# EXHIBIT 31





**LEAGUES AND GOVERNING BODIES**

## Golf leaders to meet and discuss plan in response to LIV

11.28.2022

The chief executives of the main golf tours and the leaders of the majors "will meet at 'The Match' to discuss the ever-rising threat of LIV Golf in Florida next week," according to James Corrigan of the London TELEGRAPH. **PGA Tour** Commissioner Jay Monahan, DP World Tour CEO Keith Pelley, R&A CEO Martin Slumbers, PGA of America CEO Seth Waugh and USGA CEO Mike Whan will attend the event, which features **Tiger Woods**, Rory McIlroy, **Justin Thomas** and **Jordan Spieth** at Pelican Golf Club on Dec. 10. It is "as yet unclear" if Augusta National Golf Club Chair Fred Ridley "will also be" at the meeting, but with the other three majors "all sending their top brass, the Masters may not want to miss out." The execs are expected to "draw up plans on how to respond to the Saudi-funded circuit." LIV is "due to announce its 2023 schedule in the forthcoming days, with the 14-event league due to tee off in Mexico in February." Slumbers has vowed "not to ban any LIV players from the Open, but has been vague concerning how difficult it will be for the defectors to qualify for Hoylake next July." The same "largely applies" to the U.S. Open and the PGA Championship, while the Masters is also "tight lipped if it will impose any sanctions." As they all "want the highest quality fields possible, it must be doubted if they will erect any notable barriers and it could well emerge that they want the Tours to broker some sort of negotiation with LIV" (*London TELEGRAPH, 11/28*).

;

© 2022 Leaders Group. All rights reserved. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Leaders Group.

1 All Access article remaining  |  **SUBSCRIBE TODAY** ▶

# EXHIBIT 32

RACHEL S. BRASS, SBN 219301
    rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

ROBERT C. WALTERS, *pro hac vice*
    rwalters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOHN B. QUINN, SBN 90378
    johnquinn@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN
LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
    bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN
    LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000
Facsimile: 650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson
    Swafford, Matt Jones, Bryson DeChambeau, Ian
    Poulter, Peter Uihlein, and LIV Golf Inc.*

WILLIAM V. ROPPOLO, *pro hac vice*
    william.roppolo@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone: 305.789.8900

*Attorneys for Phil Mickelson*

*(additional counsel on signature page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, IAN POULTER, PETER UIHLEIN, and LIV GOLF INC.<br><br>    Plaintiffs,<br><br>    v.<br><br>PGA TOUR, INC.,<br><br>    Defendant. | CASE NO. 5:22-cv-04486-BLF<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

With knowledge as to their own conduct and on information and belief as to all other matters, Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc. ("LIV Golf") (collectively, "Plaintiffs") allege:

## INTRODUCTION

1.     The PGA Tour, Inc. (sometimes "the Tour") began when Jack Nicklaus, Arnold Palmer, and other elite golfers in the 1960s determined the PGA of America was not compensating them their market value; they split off the Players Tournament Division and formed the Tour, a tax-exempt entity organized ostensibly to "promote the common interests of professional tournament golfers." From that seemingly laudable origin, the Tour has evolved into an entrenched monopolist with a vice-grip on professional golf. As the Tour's monopoly power has grown, it has employed its dominance to craft an arsenal of anticompetitive restraints to protect its long-standing monopoly. Now, threatened by the entry of LIV Golf, and opposed to its founding mission, the Tour has ventured to harm the careers and livelihoods of any golfers, including Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein ("Player Plaintiffs"), who have the temerity to defy the Tour and play in tournaments sponsored by the new entrant. The Tour has done so to crush nascent competition before it threatens the Tour's monopoly.

2.     Before LIV Golf's entry, golfers who sold their services in the elite professional golf services market had no meaningful option but to play on the Tour if they wanted to pursue their profession at the highest levels. This provided the Tour with enormous power over the players, including the ability to force players into restrictive terms that foreclose them from playing in competing events and the ability to suppress player compensation below competitive levels. Members of the Tour receive a lower percentage of the Tour's revenues than professional athletes in other major sports, even though the Tour is a tax-exempt non-profit corporation and other major sports leagues are for-profit enterprises. This control has also given the Tour the power to impose restrictions on players—who are independent contractors but are denied independence by the Tour—that make it risky and costly for players to affiliate with another promoter and prohibitively difficult for any would-be entrant to challenge the Tour's monopoly. And, in its response to LIV Golf's competitive challenge, the Tour has exercised this power by punishing the players to choke off the supply of elite professional

golfers—an essential input to LIV Golf's competitive challenge—and cement its dominance over the sport. The Tour's monopoly power has also allowed it to weaken golf itself, by its failure to innovate and broaden the game's appeal and bring the game into the 21st century.

3.    As part of its orchestrated plan to defeat competition, the Tour has threatened lifetime bans on players who play in even a single LIV Golf event. It has backed up these threats by imposing unprecedented suspensions on players (including the Player Plaintiffs) that threaten irreparable harm to the players and their ability to pursue their profession. It has threatened sponsors, vendors, broadcasters, and agents to coerce players to abandon opportunities to play in LIV Golf events. And it has orchestrated a group boycott with the European Tour,[1] which is unlawful under either the *per se* rule or the Rule of Reason, to amplify the Tour's anticompetitive attacks and foreclose LIV Golf from having access to players. The PGA Tour also has leaned on other entities in the so-called golf "ecosystem," including certain entities that put on golf's "Majors," to do its bidding in its effort to maximize the threats and harm to any golfer who defies the Tour's monopsonistic requirements and plays in LIV Golf events.

4.    The Tour's unlawful strategy has been both harmful to the players and harmful to LIV Golf in threatening its otherwise-promising launch. For example, the Tour's conduct caused LIV Golf to cancel its 2022 business plan to launch its full competing League. LIV Golf was not deterred, however, and it changed its 2022 strategy and launched a smaller version of its concept—the LIV Golf Invitational Series—with no League, no franchises, no broadcast deal, fewer elite players, and fewer tournaments. Some players (including Player Plaintiffs) were interested nonetheless. So, in response, the Tour ratcheted up its strategy and doubled-down on its efforts to punish Plaintiffs and to protect its monopoly. The Tour (1) enforced its unlawful player restrictions that deny players (including Player Plaintiffs) the ability to sell their services to others, (2) imposed lengthy suspensions on players for exercising their right as independent contractors to play in a competing promoter's events, and (3)

---

[1]    The European Tour recently changed its name to DP World Tour, but, because it was called European Tour for most of the time period relevant to this case and in most of the relevant documents, it is referred to herein as the European Tour for consistency and clarity.

1    ramped up its threats targeting Player Plaintiffs and others.  The Tour has likewise threatened and

2    blacklisted numerous other third parties with whom LIV Golf has sought to contract, in its effort to

3    defeat LIV Golf's entry and entrench its monopoly.

4         5.    The Tour's conduct serves no purpose other than to cause harm to players and LIV Golf,

5    and foreclose the entry of the most meaningful competitive threat the Tour has ever faced.  Banning

6    Player Plaintiffs and other top professional golfers from its own events degrades the Tour's strength of

7    field and diminishes the quality of the product that it offers to golf fans by depriving them from seeing

8    many top golfers participate in Tour events.  The only conceivable benefit to the Tour from degrading

9    its own product in this manner is the destruction of competition.  Indeed, the Tour has conceded its

10   anticompetitive purpose in attacking and injuring the players.  When the Tour adjusted its rules to

11   render them more effective in defeating competitive entry, a memorandum authored by PGA Tour

12   Commissioner Jay Monahan made clear that the rule change was expressly designed to enable the Tour

13   to foreclose competition.  And when the Tour imposed unprecedented punishments on the players for

14   playing in LIV Golf events, the Tour explained to the players that it was doing so precisely because

15   LIV Golf is attempting to compete with the Tour.

16        6.    Player Plaintiffs have devoted the bulk of their professional careers to growing the PGA

17   Tour.  Yet the Tour has repaid them of late with suspensions, punishments, threats, and disparagement

18   for merely playing professional golf for another promoter and embracing competition for their services.

19   The Tour has denied them income-earning opportunities, attacked their goodwill and reputation,

20   interfered with their businesses, attacked their business partners, threatened them with multiple

21   punishments—including threats to deny them from participating in golf's marquee events, even when

22   they have earned placement or exemptions to participate in those tournaments—and unlawfully

23   prevented them from exercising their independent contractor rights.  And, at every step, the Tour has

24   repeatedly admitted that it has done this to destroy nascent competition.

25        7.    The Tour long stood alone as the only tour anywhere in the world that features the best

26   golfers in the world.  The PGA Tour Commissioner Jay Monahan boasted on June 22, 2022 that the

27   "Tour is doing everything it possibly can . . . [to] mak[e] certain that the best players in the world are

28   competing on the best Tour in the world, the PGA Tour."  The Tour has ensured that remains the case

through its anticompetitive PGA Tour Player Regulations. First, the Tour's Conflicting Events Regulation prohibits its members from participating "in any other golf tournament or event" in North America, without exception, if a Tour-sanctioned event is scheduled in the same week, regardless of whether the players would otherwise have any plans to participate in the Tour's sanctioned event. The Tour has a sanctioned event almost every week of the year, hence the Conflicting Event Regulation effectively prohibits Tour members from playing in any non-Tour golf event in North America. The effect is both a naked restraint on competition and a reduction in output, as Tour members are foreclosed from playing anywhere else when they are not playing in Tour events. For international tours or events, a player may request up to three exemptions a year, but the Tour Commissioner has complete discretion whether to grant these exemptions, something he has refused to do for each of the LIV Golf events. The Conflicting Events Regulation thus invests the leader of the incumbent monopolist with unbridled discretion to foreclose players from participating in any competing events. And while the Tour has historically granted releases to players that allow them to compete in other events throughout the world, Tour Commissioner Monahan has taken a different stance regarding LIV Golf, denying event releases even for LIV Golf events overseas. As Commissioner Monahan admitted, he has departed from past practice in prohibiting members from participating in LIV Golf events outside North America *because* LIV Golf plans to compete with the Tour. And he has enforced the Conflicting Events Regulation to deny players permission to participate in LIV Golf events in North America *because* LIV Golf's North American events compete with the Tour.

8. Second, the Tour uses its Media Rights Regulation as an additional means of foreclosing players from participating in competing events. This regulation prohibits any members from appearing in any "golf program" ("any golf contest, exhibition or play") that takes place *"anywhere in the world"* and is shown on any media of any type. It is fundamental for any organizer of elite-level professional golf tournaments to broadcast the tournament on television and other media, yet the Tour contends no PGA Tour members may participate in any such televised non-Tour golf event anywhere in the world. This broad prohibition is no accident, as the PGA Tour specifically broadened this provision to prevent competitive entry of leagues such as LIV Golf. The provision serves no procompetitive purpose nor benefits consumers, but rather restricts output and forecloses competition, as it prevents all Tour

4

members from playing golf, even casually, if it is recorded for distribution over any media anywhere in the world during weeks when they are not participating in PGA Tour events.

9.      In short, these regulations—the Media Rights Regulation and the Conflicting Event Regulation—foreclose the players, who are independent contractors, from participating in any golf event that the PGA Tour deems to be a competitive threat.  These provisions limit output by keeping golfers on the sidelines when not playing on the Tour.  And these provisions, in turn, foreclose competition and entrench the PGA Tour's monopoly power.  If these provisions are not enjoined, they will foreclose LIV Golf's nascent entry into the markets and prevent LIV Golf from fulfilling its competitive promise, thus harming LIV Golf, the Player Plaintiffs, golf fans, the game of golf, and competition itself.

10.     It is no secret that the PGA Tour is targeting players in order to defeat the threat of competitive entry.  The PGA Tour has been clear since the threat of competitive entry emerged that its most powerful weapon to defeat competition is to target its members—who comprise virtually all of the elite professional golfers in the world—to prevent them from playing on a competing tour.  For example, PGA Tour Commissioner Monahan wrote in a January 2020 strategy memorandum that the best way to prevent a competitor from emerging is to prevent PGA Tour members (including Player Plaintiffs) from supporting the new promoter:

> The impact that [the new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players.  Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished.

A nascent golf league without the golfers necessary to put on elite events is no threat at all.  Deprive the new league of access to virtually all of the top golfers in the world, and it will pose no challenge to the Tour's dominance.

11.     Accordingly, the Tour set out to destroy competition in its infancy by doing everything in its power to lock up its members (including Player Plaintiffs) and deny them the opportunity for sustained competition for their services.  The Tour's conduct has included at least seven practices, each of which is exclusionary, anticompetitive and unlawful under the Sherman Act:

a.      The Tour has repeatedly threatened its members (including Player Plaintiffs) with

devasting consequences if they join LIV Golf.  On multiple occasions, the Tour threatened a *lifetime ban* for any player who joins or participates in LIV Golf.  Then, in June and July 2022, the Tour imposed a *career-threatening ban* on Player Plaintiffs (and others) for playing in LIV Golf events.  For other golfers who resigned their Tour membership because they did not want to be subject to the Tour's punishments, the Tour responded by actually imposing a *lifetime ban*.

b.    The Tour amended and expanded its Media Rights and Conflicting Events Regulations in response to the threat of competitive entry.  And it then enforced these unlawful provisions to foreclose members from participating in LIV Golf events.

c.    The Tour orchestrated a group boycott with the European Tour to ensure that any golfer who considers defying the Tour's threats by playing in any LIV Golf events (including Player Plaintiffs) cannot pursue his career and livelihood anywhere in the global golf "ecosystem."  The Tour's agreement is established through the statements of its partners.  For example, during a meeting in Malta in July 2021, representatives of the entity that sponsored LIV Golf met with the CEO and other representatives of the European Tour to seek a partnership with the European Tour in launching the new league.  The minutes from that meeting prepared by the European Tour's title sponsor state that the CEO of the European Tour, Mr. Keith Pelley, "Confirmed new series appeal and fit, however, stated main issue is US PGA mighty power and need to avoid a collision course between ET [European Tour] and PGA."  Under pressure from the "mighty power" of the PGA Tour, the European Tour agreed to boycott and rejected the opportunity to partner with the new entrant, and instead strengthened its strategic alliance with the PGA Tour.  As part of this illegal partnership, the PGA Tour pressured the European Tour to amend its Regulations to restrict European Tour golfers from playing in LIV Golf events, and it pressured the European Tour to punish its members who played in LIV Golf events with ~$125,000 fines and suspension from any tournaments the PGA Tour and the

European Tour co-sanction.  The European Tour agreed to all of the PGA Tour's demands to implement the group boycott.

d.    Similarly, the PGA Tour has encouraged the PGA of America (a separate entity) to threaten to disallow LIV Golf players from playing both in the Major tournament it sponsors (the PGA Championship) and the Ryder Cup, one of golf's marquee events.  And it has leaned on other golfing entities to do its bidding.  The Tour leaned on Augusta National to pressure golfers against joining LIV Golf.  The Tour has also leaned on the Royal & Ancient ("R&A") (sponsor of The Open) to publicly question whether LIV Golf players could play in their respective tournaments.  And the Tour has leaned on the Official World Golf Ranking ("OWGR") to call into question whether LIV Golf tournaments would be eligible for OWGR ranking points.  This conduct serves no beneficial purpose, but rather serves to harm the careers of the players (including Player Plaintiffs) who play in LIV Golf events, and to deter other players from joining LIV Golf to avoid career destruction at the hands of the Tour.

e.    At various points, the Tour has threatened Tour members' agents and business partners with punishment if the players joined LIV Golf.  In addition, the Tour has threatened numerous vendors and small companies in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf.

f.    The Tour has threatened non-member golfers with exclusion from the golf "ecosystem" if they participate in any LIV Golf events.  For example, the Tour threatened college golfers (who are not PGA Tour members and have no obligation to conform to the Tour's rules for its members) that if they played in any LIV Golf events they would be banned from entry into the PGA Tour University program, which provides top college golfers entry into the Tour's developmental tour (Korn Ferry Tour).

g.    The Tour has also threatened sponsors and broadcasters that they must sever their

relationships with players who join LIV Golf, or be cut off from having any opportunities with the PGA Tour. Based on these threats, several sponsors have cut ties with players who have joined LIV Golf (including the Player Plaintiffs), sometimes ending years-long relationships. The Tour has also intimidated sponsors and vendors into not doing business with LIV Golf, lest they lose the opportunity to do business with the dominant golf tour in North America, the PGA Tour.

12. These restraints have damaged competition and harmed Plaintiffs. They have harmed Player Plaintiffs by, for example, (1) diminishing competition for their services and reinforcing the Tour's monopsony power in the markets in which the Plaintiffs sell those services; (2) denying them income-earning opportunities, tournament performance opportunities (including denying them opportunities to participate in tournaments in which they have qualified), sponsorship revenue, and independent contractor rights; and (3) harming their reputations, goodwill, and brands. These restraints have likewise proved effective at harming competition in the relevant markets by preventing other players from joining LIV Golf who would have joined the new league but for these competitive restraints, thus threatening the competitive viability of LIV Golf and any other potential competitor by protecting the PGA Tour's monopoly power and monopsony power over the purchase of services from professional golfers to participate in elite golf events. The Tour's restraints have harmed LIV Golf by, for example, (i) raising to supracompetitive levels its costs to recruit players who are subject to the Tour's threats; (ii) completely preventing LIV Golf from securing the services of many players who have been subjected to the Tour's threats of severe punishments should they participate in LIV Golf events; (iii) forcing LIV Golf to scrap its launch plans for 2022, and instead launch a smaller-scale series; and (iv) preventing LIV Golf from entering into agreements with third parties and raising to supracompetitive levels its costs for contracting with those third parties who are willing to defy the Tour's threats, thus raising LIV Golf's costs and degrading its product offerings. The impacts of the Tour's continuing restraints threaten LIV Golf's competitive viability and existence.

13. Without fair process, PGA Tour Commissioner Monahan—who is necessarily partial—imposed a 21-month Tour suspension on some Player Plaintiffs, through March 31, 2024 (other Player Plaintiffs' suspensions are indefinite or 9 months as of this Complaint), for exercising their independent

contractor rights to play in the first two LIV Golf events. After imposing these suspensions, the Tour followed its procedurally and substantively unconscionable appeals process to maintain the suspension without giving Player Plaintiffs fair proceedings to be heard by neutral and independent decision-makers. Plaintiffs Gooch, Swafford and Jones (among other Player Plaintiffs) had earned the right to play in the FedEx Cup Playoffs (a series of lucrative and high-profile events scheduled at the end of the PGA Tour's 2022 season) through strong performance and dedication to the Tour, but the Tour banned them from playing in those tournaments, diminishing the strength of its own fields and harming these Plaintiffs. The injury to these players extended beyond mere foreclosure from these tournaments (itself a substantial and irreparable injury), but also crippled their chances of qualifying for both the Majors and the Tour's premier invitationals in future seasons. The punishment that accrued to these players from not being able to play in the FedEx Cup Playoffs is substantial, and involves both monetary injury (as the Tour has maintained) as well as irreparable injuries.

14. The Tour has argued that the Player Plaintiffs have already been fully compensated by LIV Golf for all suspensions the Tour might impose and all of the consequential harms that may flow from those suspensions (including exclusions from the Majors and other important professional golf tournaments and lost sponsorship opportunities). That is simply not true. While the supracompetitive payments LIV Golf was required to make in order to attract players in the face of the Tour's anticompetitive threats were in many cases above the compensation levels that would have been required in the absence of the Tour's anticompetitive conduct, it is also true that (a) many of the injuries the players will suffer are not compensable through money, (b) the monetary injuries the players have suffered and/or will suffer have exceeded and will exceed substantially the amounts they have been paid by LIV Golf, and (c) the negotiated amounts reflect a mutual understanding by the parties that at some point the PGA Tour would adjust its position and allow fair competition from LIV Golf. None of these Player Plaintiffs has agreed to a potential ban from the Majors or other important tournaments, or a long-term ban from the Tour should the Tour succeed in blocking successful long-term entry by LIV Golf.

15. Without injunctive relief prohibiting the PGA Tour's anticompetitive conduct, the Tour's antitrust violations will continue. Without injunctive relief prohibiting the PGA Tour's

9

anticompetitive conduct, Player Plaintiffs will be irreparably harmed, including by the Tour's unlawful suspensions that have denied and will continue to deny them income earning opportunities, tournament performance opportunities, sponsorship revenue, and independent contractor rights that they have earned, as well as by the actions of the Tour and the European Tour that deny them the opportunity to participate in events sponsored by others throughout the golf "ecosystem." LIV Golf will also be irreparably harmed if the Tour's anticompetitive conduct is not abated. While LIV Golf has been able to pursue the launch of its business in the face of supracompetitive costs and artificially reduced access to supply (i.e. players), facing headwinds of this nature is not sustainable. As a result, if the Tour's anticompetitive conduct is not enjoined, LIV Golf's entry will be thwarted and its ability to maintain a meaningful competitive presence in the markets will be destroyed, which will harm not only LIV Golf, but also competition. The Tour will continue to enforce its unlawful Regulations and take anticompetitive actions unless and until a Court enjoins the Tour's unenforceable Regulations and unlawful conduct. Moreover, the Player Plaintiffs will be irreparably harmed in that the Tour's unreasonable control over their media rights and their participation in non-Tour events will continue unless enjoined permanently. And, if LIV Golf's entry into the relevant markets is thwarted by the PGA Tour's anticompetitive conduct, Player Plaintiffs' careers will be detrimentally impacted, they will lose the most significant avenue to gain entry into the Majors, they will lose the platform to display their craft, and they will lose the opportunity to sell their advertising and sponsorship space and sell or license their name image and likeness for their branding, reputation and businesses. On the other hand, with an injunction, the anticompetitive conduct of the PGA Tour will be lifted, LIV Golf will have the opportunity to compete on the merits, and Player Plaintiffs and other professional tournament golfers will enjoy the benefits of competition for their services that the antitrust and other laws protect.

## PARTIES

16. Plaintiff Phil Mickelson is a Hall of Fame American professional golfer who resides in San Diego, California. Mr. Mickelson was a three-time NCAA Champion at Arizona State University. In 1991, he won the Northern Telecom Open, which was the last time an amateur won a tournament on the PGA Tour. He is a 30-year veteran of the PGA Tour who has won 57 worldwide professional events, including six Majors—the most recent in 2021, which earned him the title of the oldest Major

winner in the game's history.  He spent over 26 consecutive years in the top 50 of the Official World Golf Ranking (the only player in the history of the sport to ever do so), including over 700 weeks ranked in the top 10 in the world.  Mr. Mickelson has represented the United States as a professional golfer in 24 team tournaments, which includes 12 Presidents Cups and 12 Ryder Cups, both American records.  He participated as a vice captain in additional United States team tournaments, and played in the Dunhill Cup, World Amateur Team Championship and two Walker Cups for the United States as an amateur.  Mr. Mickelson also has a strong commitment to giving back through the Phil and Amy Mickelson Foundation.  Since its inception in 2004, the Foundation has focused primarily on supporting a variety of youth and family initiatives.  He also founded Birdies for the Brave, the PGA Tour's national military outreach initiative, which raises money for a variety of charities supporting veterans and military families.  Mr. Mickelson dedicated his entire professional career, 30 years, to the PGA Tour.  He has hosted tournaments on the Tour and engaged in countless endeavors to advance the Tour, its purpose, and the game of golf.  Mr. Mickelson has invested in himself and his investment has benefited the Tour's business tremendously over the last 30 years.  As a lifetime member—a hard-earned accomplishment and honor, requiring 20 PGA Tour wins and 15 years of membership on the Tour—Mr. Mickelson desires to continue being a member of the Tour and to play in events on the Tour.

17.     Plaintiff Talor Gooch is a 30-year-old professional golfer who resides in Texas.  He is a member of the Tour.  Mr. Gooch played golf at Oklahoma State University until 2014 when he began his professional career.  He joined the PGA Tour Canada in 2015 and earned his way onto the Korn Ferry Tour in 2016.  In 2017, Mr. Gooch won the News Sentinel Open (which later became the Visit Knoxville Open on the Korn Ferry Tour) and then earned his way onto the PGA Tour in 2018.  In 2021, he won his first PGA Tour tournament at the RSM Classic.  Mr. Gooch was on top of the PGA Tour's FedEx Cup Rankings for the 2021-22 season following the RSM Classic.  Mr. Gooch has played in over one hundred PGA Tour events.  As of the filing of the Complaint in this Action, he was the 20th ranked golfer on the FedEx Cup rankings.  Mr. Gooch played in 21 PGA Tour events in the 2021-22 PGA Tour season and qualified for the FedEx Cup Playoffs, but was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct.  Mr. Gooch desires to continue to be a member

of the Tour and to play in events on the Tour.

18.     Plaintiff Hudson Swafford is a 34-year-old professional golfer who resides in Georgia. He is a member of the Tour.  He started his professional golf career in 2011 after graduating with a B.S. in Consumer Economics from the University of Georgia.  Mr. Swafford joined the Nationwide Tour in 2012, and, that same year, won the Stadion Classic at UGA, a golf tournament on the Web.com Tour (which became known as the Korn Ferry Tour in 2019).  In 2013, Mr. Swafford finished 21st in the Web.Com Tour Finals to earn his PGA Tour card for 2014.  Mr. Swafford won his first PGA Tour victory in 2017 at the CareerBuilder Challenge.  In 2018, Mr. Swafford suffered a rib injury and then, in 2019, Mr. Swafford had to undergo a surgery to remove a small bone from the bottom of his foot, forcing him to miss four months of play.   In September 2020, Mr. Swafford won his second PGA Tour victory at the Corales Puntacana Resort and Club Championship.  In 2022, Mr. Swafford earned his third PGA Tour victory at the American Express.  Since the start of his career, Mr. Swafford has played in over 250 Tour events.  Mr. Swafford played in 21 PGA Tour events in the 2021-22 season, and as of the filing of the Complaint in this Action was 67th in the FedEx Cup rankings, and qualified for the FedEx Cup Playoffs. Mr. Swafford was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct.  Mr. Swafford desires to continue to be a member of the Tour and to play in events on the Tour.

19.     Plaintiff Matt Jones is a 42-year-old professional golfer who resides in Arizona.  He is a member of the Tour.  He was born in Sydney, Australia, and upon meeting fellow Australian Greg Norman at six years old became determined to become a professional golfer.  Mr. Jones moved to the United States to attend Arizona State University where he was a first-team All-American golfer.  Mr. Jones joined the Nationwide Tour in 2004 and earned his PGA Tour card in 2008.  In 2014, Mr. Jones won the PGA Tour's Shell Houston Open.  In 2015, and again in 2019, he won the Emirates Australian Open on the PGA Tour of Australasia.  In 2021, Mr. Jones won the PGA Tour Honda Classic.  Mr. Jones has played in over 350 Tour events.  Mr. Jones played in 20 PGA Tour events in the 2021-22 season, and as of the filing of the Complaint in this Action was ranked 65th in the FedEx Cup rankings, and qualified for the FedEx Cup Playoffs.  Mr. Jones was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct.  Mr. Jones desires to continue to be a member of the

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

Tour and to play in events on the Tour.

20. Plaintiff Bryson DeChambeau is a 28-year-old professional golfer who resides in Texas. He is a member of the Tour. Mr. DeChambeau grew up in California and played golf at Southern Methodist University while majoring in physics. In 2015, Mr. DeChambeau became just the fifth person to win both the NCAA individual championship and the U.S. Amateur title. He made his PGA tour debut in 2015 at the FedEx St. Jude Classic. In 2015, while still an amateur, he was the runner-up in the Australian Masters. He began his professional career in 2016 at the RBC Heritage event, finishing fourth. That year, Mr. DeChambeau won the Korn Ferry DAP Championship, earning his Tour card. In 2017, Mr. DeChambeau won his first PGA Tour event at the John Deere Classic. In 2018, Mr. DeChambeau won the Memorial Tournament. He then won the first two FedEx Cup Playoff events at the Northern Trust and Dell Technologies Championship. Mr. DeChambeau was picked for the U.S. team in the 2018 Ryder Cup. In 2019, Mr. DeChambeau won the Shriners Hospitals for Children Open and the Omega Dubai Desert Classic. In 2020, Mr. DeChambeau won the Rocket Mortgage Classic and won the U.S. Open, his first Major. In 2021, he won the Arnold Palmer Invitational and played on the winning U.S. team at the 2021 Ryder Cup. In 2022, Mr. DeChambeau underwent surgery on his left wrist from a fracture. Mr. DeChambeau desires to continue to be a member of the Tour and to play in events on the Tour.

21. Plaintiff Ian Poulter is a 46-year-old professional golfer who splits his residence between Florida and England. He is a member of the Tour. He was born in England, and began playing golf at just four years old before turning professional in 1994. Mr. Poulter won the 1999 Open de Côte d'Ivoire on the Challenge Tour and was promoted to the European Tour. He was a member of the victorious 2004 European Ryder Cup team and then joined the PGA Tour in 2005. In addition to his many international victories, Mr. Poulter won the 2010 World Golf Championship-Accenture Match Play Championship, the 2012 World Golf Championships-HSBC Champions, and the 2018 Houston Open. Mr. Poulter has played in over 300 Tour events. Mr. Poulter played in 16 PGA Tour events in the 2021-22 season and, as of the filing of the Complaint in this Action, was ranked 168th in the FedEx Cup rankings. Mr. Poulter desires to continue to be a member of the Tour and to play in events on the Tour.

22.     Plaintiff Peter Uihlein is a 32-year-old professional golfer.  He is a member of the Korn Ferry Tour, which is owned and controlled by the Tour.  Mr. Uihlein was born in New Bedford, Massachusetts, played golf at Oklahoma State, and resides in Florida.  Mr. Uihlein has two professional victories on the Korn Ferry Tour—the Nationwide Children's Hospital Championship in 2017 and the MGM Resorts Championship in 2021.  Mr. Uihlein has also won on the European Tour in 2013 at the Madeira Islands Open.  Mr. Uihlein has represented the United States in two Walker Cups (2009 and 2011) and won the 2010 Eisenhower Trophy.  Mr. Uihlein won the 2010 U.S. Amateur Championship.  As of the filing of the Complaint in this Action, Mr. Uihlein ranked 59th on the Korn Ferry Tour regular season points list.  Mr. Uihlein desires to be a member of the Tour and/or continue to be a member of the Korn Ferry Tour, and to play in events on the Tour and the Korn Ferry Tour.

23.     LIV Golf is a Delaware corporation with its principal place of business in New York, New York.  LIV Golf is the sponsor of the LIV Golf Invitational Series, an eight-event series of golf tournaments, a majority of which have been or will be set in the United States, from June to October 2022.  LIV Golf also is the sponsor of a planned season-long golf tour, the League, which the PGA Tour's anticompetitive conduct thwarted and which LIV Golf was forced to delay in 2022.

24.     Defendant PGA Tour is a Maryland non-profit corporation, with its principal place of business in Ponte Vedra Beach, Florida.  The PGA Tour sponsors a season-long series of golf tournaments throughout the calendar year called the PGA Tour.  Those events occur primarily in the United States.  In the 2021-22 PGA Tour season, the Tour sponsored events in twenty states, including six events in California.  The Tour is engaged in interstate commerce.

## JURISDICTION AND VENUE

25.     Plaintiffs' action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.  Plaintiffs seek injunctive relief under 15 U.S.C. § 26 and damages under 15 U.S.C. § 15(a).  This Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation); this Court has jurisdiction over the related state-law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

26.     This Court may exercise personal jurisdiction over the PGA Tour under Section 12 of the Clayton Act, 15 U.S.C. § 22.  The PGA Tour manages or operates two golf courses (TPC Harding

Park and TPC Stonebrae) in this District and employs dozens of individuals who work there. It organizes and promotes annually at least six golf tournaments throughout California (Fortinet Championship, The American Express, Farmers Insurance Open, AT&T Pebble Beach Open, The Genesis Invitational, and the Barracuda Championship), two of which are within the Northern District of California. California hosts more PGA Tour golf tournaments than any other state. The Tour issued the first of its known anticompetitive threats to Player Plaintiffs and other players that is at issue in this lawsuit in La Jolla, California in January 2020. The PGA Tour also threatened Player Plaintiffs and other players with lifetime bans in Los Angeles, California in February 2022. The Tour has unlawfully restricted Player Plaintiffs from participating in events that compete against the PGA Tour, and its conduct has already hindered—and threatens to irrevocably harm—LIV Golf's ability to compete in the market.

27.    This Court also may exercise personal jurisdiction over the PGA Tour under California Code of Civil Procedure § 410.10. The Tour operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state that harmed Plaintiffs; and is engaged in substantial and not isolated activity within this state.

28.    Venue is proper in this district under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) because the Tour may be found in this District and transacts business in this District through the management or operation of two golf courses, hosting and promoting two golf tournaments, and employing individuals in this District.

## BACKGROUND AND FACTS

### Overview of Professional Golf

29.    The business and sport of professional golf are organized around tours and tournaments that combine players of comparable skill levels. These tours and tournaments bring golf competition to fans, financially compensate players, and provide opportunities for sponsors and advertisers to market their products to golf fans of these events.

30.    The elite level of men's professional golf is comprised of (1) the PGA Tour, which sponsors and co-sponsors a series of tournaments scheduled from September to September each season; (2) four annual standalone "Major" tournaments sponsored by entities other than the Tour: the Masters,

the U.S. Open, The Open (or The British Open), and the PGA Championship; (3) two bi-annual team events (Ryder Cup and the Presidents Cup); (4) quadrennial Olympic competition; and (5) a handful of standalone events in which Tour members are only permitted to compete if they are given permission by the Tour Commissioner.

31.     Until LIV Golf's nascent entry, the Tour was the sole elite golf tour in the United States and the world.  Other elite professional golf events are standalone events (such as the Majors) that are not part of an organized tour that extends throughout a season.  Professional golfers who qualify for membership on the Tour invariably compete on it, as it offers by far the largest tournament purses, the greatest opportunities to qualify for the Majors, the greatest opportunities for exposure in the golf world and beyond, and the most expansive opportunities to secure large endorsements from sponsors.  As of the filing of the Complaint in this Action, all of the top 30 golfers in the world were active members of the Tour, except those golfers whom PGA Commissioner Monahan suspended or forced to resign.  No other golf tour in the world is a reasonable competitive substitute for the PGA Tour.  For example, the average purse of a PGA Tour event is roughly two-and-a-half times the average purse of a European Tour event, roughly nine times the average purse of an Asian Tour event, and 13 times the average purse of a Korn Ferry Tour event.  The PGA Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.

32.     The Tour and the four Majors are complements, not competitors.  The Tour schedules no events during the weeks of three of the Majors and schedules only a minor event with a lower prize pool the week of The Open.  Conversely, the Majors do not compete with the Tour; rather, they encourage and incentivize players to participate on certain tours (the PGA Tour in particular) by adopting eligibility requirements that open playing spots to golfers who have performed well on those tours.  Similarly, LIV Golf does not compete with the Majors, as it schedules its Series and will schedule its League around the Majors.

33.     The European Tour is a purchaser of professional golfers' services and a promoter of professional golf events, but it is effectively a feeder into and only a potential competitor to the PGA Tour.  In the 1980s and early 1990s, the European Tour exerted some competitive pressure on the Tour

for certain star international players, including Seve Ballesteros, Nick Faldo, and Bernhard Langer, but that has not been the case for many years. Instead, when European Tour members qualify for Tour membership, they almost invariably elect to immediately become PGA Tour members. None of the Top 30 golfers in the world are only members of the European Tour. PGA Tour superstar Rory McIlroy, originally from Northern Ireland who began his career on the European Tour, has described the European Tour as "a stepping stone," explaining "you can go to America and play for more money and more ranking points. I think as well with the world ranking points, everyone out here, all of their contracts with sponsors, it's all about world ranking points. If players are getting paid more and earning more world ranking points, why would you play over there [European Tour]?" The actions of other European players who qualify for the Tour are consistent with McIlroy's views: they join the PGA Tour when they qualify.

34. European Tour Board Member Paul McGinley told *The Independent* that "the [European] Tour has accepted it is a junior partner to the PGA Tour now and will act as a feeder tour with more and more co-sanctioned events on both sides of the pond." McGinley continued: "We are there to enhance that and enable the PGA Tour to become the premier golf tour in the world. We realise that the [European] Tour will not be that, but we want to be very much . . . a kind of international arm and create pathways for players to come into the ecosystem via the European Tour and perhaps the Korn Ferry Tour and then graduate onto the premier tour in the world which is the PGA Tour." Likewise, European Tour Commissioner Keith Pelley told *The New York Times* that the European Tour agreed not to compete with the PGA Tour for player services as of November 2020.

35. Nonetheless, the European Tour remained a potential competitor to the PGA Tour, particularly as a potential partner of a new entrant that could challenge the Tour's dominance. Recognizing this potential competition from the European Tour and the substantial threat that a new entrant partnered with the European Tour would pose, the Tour entered into an illegal agreement with the European Tour as part of its scheme to ensure that the European Tour does not partner with any entrant (including LIV Golf) that might seek to become part of the golf "ecosystem." In a January 2020 strategy memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European

Tour as a potential partner for a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant. The Tour's strategy was thus designed to ensure no new potential competitor could emerge to challenge its monopoly.

36. The Tour executed Monahan's plan in November 2020, when it announced that it had purchased a minority stake in the European Tour's media production company, and that the two tours would work in concert with one another. As detailed below, since that alliance was formed, the European Tour has joined the PGA Tour in a group boycott aimed at punishing players to foreclose LIV Golf's entry. As set forth in more detail below, that group boycott violates Section 1 of the Sherman Act, under either a *per se* analysis or a Rule of Reason analysis, because it has harmed (and will continue to harm) competition and has no redeeming procompetitive virtue.

37. There are also a number of more limited lower-level tours that operate in the U.S. and throughout the world, but none is a meaningful competitor to the Tour. In fact, the Tour owns, operates, or controls a number of these lower-level tours, ensuring that they do not become meaningful competitors to the PGA Tour and that any bans imposed by the PGA Tour (and its co-conspirator, the European Tour) have a widespread impact on any affected players. These tours include:

- PGA Tour Champions – A tour for players over the age of 50, organized and managed by the Tour;
- Korn Ferry Tour – The PGA Tour's development tour in North America, through which players (like Plaintiff Uihlein) can qualify for the PGA Tour; organized and managed by the PGA Tour and described by the Tour as "the path to the PGA Tour";
- PGA Tour Latinoamerica – A tour with events in Latin America, through which players can qualify for promotion to the Tour, organized and managed by the Tour;
- Mackenzie Tour-PGA Tour Canada – A tour with events in Canada, through which players can qualify for promotion to the Tour, organized and managed by the Tour;
- PGA Tour Series-China – A tour with events in China, organized and managed by the Tour;
- Asian Tour – A tour with events principally in Asia;

18

- Japan Tour – A tour with events in Japan;

- Sunshine Tour – A tour with events in Africa; and

- KPGA Korean Tour – A tour with events in South Korea.

38.     These tours offer considerably lower levels of competition, far lower prize pools, far smaller sponsorship and income opportunities, and far less, if any, broadcast exposure and viewership throughout most of the world.  As a result, players who qualify for the PGA Tour join the PGA Tour. Simply put, until LIV Golf's entry, the PGA Tour had no competition as the premier professional golf tour in the United States and the world.  If the PGA Tour succeeds in thwarting LIV Golf's entry, it will once again face no meaningful competition in the United States or the world.

39.     While the on-course competition among participants in the elite professional golf services market is intense, the Tour itself faces no meaningful competition in the relevant markets. Until LIV Golf arrived on the scene, no other tour came close to the PGA Tour in terms of the money, exposure, quality of on-course competition for players, fan interest, advertising or sponsorship opportunities.

40.     In addition, players in Tour events have a significantly greater opportunity than players in the lower-tier tours to qualify for spots in the Majors, Ryder Cup, Presidents Cup, and the Olympics by winning tournaments that provide entry into the Majors and that provide greater opportunity to earn more points in the world golf ranking system.  A common way for players to qualify for the Majors is by being ranked within the Top 50 of the OWGR.  While players in any tournament recognized by the OWGR can qualify for points, the OWGR awards points based on a tournament's competitive strength and the player's finishing position.  Thus, players on the Tour are eligible to earn far more points than players on lower-tier tours.  In addition, OWGR points are often used to determine the amount of money players receive from sponsors.  Qualification for the Olympics is determined solely by OWGR rankings.  Again, as PGA Tour player Rory McIlroy explained "it's all about world ranking points," and players can earn the most points on the PGA Tour.

41.     The OWGR's Governing Board includes PGA Tour Commissioner Monahan, as well as the top executives from a number of the other bodies:  the CEO of the European Tour (Keith Pelley), the General Counsel of the European Tour (Ben Bye), the COO of the European Tour (Keith Waters),

19

the CEO of the PGA of America (Seth Waugh), the Executive Director of the United States Golf Association (Mike Whan), the Senior Director of the Masters Tournament of the Augusta National Golf Club (Will Jones), the CEO of the R&A (Martin Slumbers), and the former CEO of the R&A (Peter Dawson). As set forth in detail below, the PGA Tour has entered into an unlawful agreement with the European Tour to foreclose competitive entry by locking arms in a group boycott to exclude from the world golf "ecosystem" LIV Golf, any players who play in LIV Golf events (including the Plaintiffs), and any other vendor, tour promoter, or other entity that partners with LIV Golf. And the Tour has leaned on the other world golfing bodies that have representatives on the OWGR Governing Board to do its bidding to heighten threats for associating with LIV Golf.

## PGA Tour Structure

42. The Tour's charter promises it will act to "promote the common interests of professional tournament golfers." The Tour certified to the Internal Revenue Service that its non-profit purpose is to promote the sport of professional golf and the common interests of touring golf professionals.

43. The professional golfers who have earned the right to compete on the Tour are the most skilled and popular professional golfers in the United States and the world. Player Plaintiffs were active members of the Tour until they were given lengthy suspensions for playing in LIV Golf events. Players from the United States who are members of the Tour include Tiger Woods, Plaintiff Mickelson (now suspended), Justin Thomas, Jordan Spieth, Plaintiff DeChambeau (now suspended), Dustin Johnson (now resigned), Scottie Scheffler, Bubba Watson, and Brooks Koepka (now suspended). The PGA Tour's Media Guide also states that its membership includes 94 international players from 29 countries and territories outside the United States, including Justin Rose, Rory McIlroy, Sergio Garcia (now resigned), Jon Rahm, Adam Scott, Henrik Stenson (now suspended), Louis Oosthuizen (now resigned), Hideki Matsuyama, and Cameron Smith. They include some of the biggest names in sports and popular culture in the United States and the world.

44. All member golfers on the Tour are independent contractors, not employees of the Tour. There is no team or other employer to cover their many and substantial expenses as a professional athlete (e.g., coaches, caddies, trainers, therapists, travel, and lodging).

45. The Tour is managed by its Commissioner, Jay Monahan, who assumed the role on

January 2, 2017.  Commissioner Monahan sits on the Board of the European Tour, the Governing Board of the OWGR, and the Board of Directors and Executive Committee of the International Golf Federation.  Through these various roles, Commissioner Monahan assures that the Tour controls what it terms the world golf "ecosystem."  Being blacklisted by the PGA Tour means effective expulsion from the golf "ecosystem" anywhere in the world.

**Elite Professional Golf Has Stagnated Under the PGA Tour's Monopoly**

46.     As Commissioner Monahan acknowledged in a memorandum to the PGA Tour Policy Board (the "January 2020 Monahan Memorandum"), the PGA Tour is "the world's leading professional golf tour" and "is second to none due to the strength of its members."  Thus, not surprisingly, virtually every golfer of public prominence worldwide is a member of the PGA Tour.

47.     While the quality of play on the PGA Tour continues to flourish, the business of professional golf has stagnated under the Tour's monopoly.  In the age of social media, the accessibility and relatability of elite professional golfers should lend itself to a boom in fan interest and viewership, as it has with other sports.  The opposite has happened.  Without any meaningful competition (prior to LIV Golf's entry), the Tour has failed to innovate and its product has grown stale.  At the same time, the Tour's fanbase has shrunk and continues to age (the *average* age of a PGA Tour fan is 64), a trend sharply at odds with other major sports.  Likewise, the Tour's compensation to its members fell behind compensation to other professional athletes, as measured by the share of revenue the players receive, reflecting the Tour's monopsony power over players' services.

48.     Despite offering a stagnant product with a shrinking and aging fanbase, the Tour has used its monopoly position to extract substantially increased revenues from broadcasters and advertisers.  As a monopsonist, however, the Tour has not passed those increased revenues through to its members.  For example, the Tour's revenue has increased between 2011 and 2019 by 163 percent, yet the share of revenue it provided its members fell substantially.  This is because there is no competition for players' services, allowing the Tour to direct its increased revenues into its bloated bureaucracy, extravagant facilities, and multimillion-dollar compensation and lavish perks for Commissioner Monahan and the other executives who run the monopoly, rather than sharing them with players.  Tour data shows that average Tour purses grew an anemic 2.5 percent per year on average

21

from 2014 through 2019—from \$6.62 million in 2014 to \$7.47 million in 2019. By comparison, the total salary pool for other major professional sports leagues grew at much stronger rates over the same period—15 percent per year for the NFL, eight percent per year for the NBA, and four percent per year for the NHL, even though the 2014 base levels for the other professional sports were substantially higher.

49. The Tour has failed to offer its members compensation on par with professional athletes in other sports. The number one player on the Tour money list in 2019 was Brooks Koepka, with \$9.68 million in tournament winnings. His winnings were the equivalent to the 129th highest paid NFL player, the 121st highest paid NBA player, and the 128th highest paid MLB player.

50. It is incongruous that Tour members' share of revenue lags so significantly behind those of players in other sports over the same period, because the Tour is a nonprofit entity that does not compensate players for their travel and other expenses, while the other major professional sports are for-profit enterprises with franchise owners. Unlike those other sports, however, which have free-agency systems that establish competition among franchise owners for players' services, the PGA Tour faced no viable competition before LIV Golf's entry. If LIV Golf's entry is foreclosed, the Tour will once again face no viable competition. As a monopolist, the PGA Tour does not compete for players' services, and the Player Plaintiffs' earnings have been and are suppressed.

51. The lagging compensation the Tour pays to its members is also striking in light of the expenses and risks that the players bear. Unlike professional athletes in other sports, professional golfers have to pay out-of-pocket to play on the Tour. Tour members pay for their own travel to and lodging at Tour events, and they pay for their coaches, therapists, trainers, and caddies. In addition, the players have no guarantees from the Tour—they earn nothing if they get injured, and they get nothing if they miss the cut. As a result, Tour members can end up with *negative* earnings for the year.

52. For example, Pat Perez described a fellow Tour member that "one year ma[d]e \$22,000 on the Tour. He lost, he was in the hole about 90 grand. Mind you, he didn't play well and I get it, but how can he be out money? He earned his card and he was out like \$90 grand that year."

53. A Tour player agent was quoted as saying: "What I think the average fan doesn't know is how much a player spends to go to work. . . . [T]hey spend so much money or reinvest so much

money in themselves and what they pay their team and what they spend on private airfare, renting homes and [paying] chefs and trainers and physical therapists and everything that goes into it. It's a very lucrative sport, but it's also a very expensive sport for them, unlike team-sport athletes who are flown around every place and supplied all those things." But without competition, elite professional golfers have historically had no option other than the Tour.

54. The Tour's monopoly (and monopsony) hold over elite professional golf is also reflected in its failure to innovate or retain (let alone expand) its audience. The Tour's television ratings have struggled. Out of 27 PGA Tour tournaments for which data are available, 16 tournaments (almost 60 percent) had viewership in 2019 that was below the five-year average for that tournament. In 2020 (before the COVID outbreak shut down the Tour), six out of seven tournaments had viewership that was below the five-year average for that tournament. The PGA Tour's fanbase is aging faster than any other sport, because it has failed to capture the attention of younger viewers. As Rory McIlroy (a PGA Tour Member, President of the Players Advisory Council, and PGA Tour Board Member) recognized, "competition is a good thing" and "any business needs competition for things to progress and move on." But the PGA Tour has faced no competition for many years, it has had no reason to innovate and grow its fan base, and its product has grown stale.

55. LIV Golf promises to bring competition and innovation to the market for the promotion of elite professional golf, which will benefit fans, broadcasters, advertisers, players, and all other stakeholders. As the long-standing monopolist facing competition for the first time in at least decades, the Tour has responded not by competing on the merits, but rather by engaging in a course of anticompetitive conduct designed to choke off LIV Golf's nascent competition, to the detriment of LIV Golf, the players (including Player Plaintiffs), fans, broadcasters, advertisers, and others.

### Anticompetitive PGA Tour Player Regulations

56. Membership on the Tour is governed by the PGA Tour Player Regulations & Tournament Regulations ("Regulations"). Exhibit 1. Several interrelated provisions of the Regulations unreasonably restrict the independent contractor-players' ability to participate in competing events.

57. **Media Rights Regulation.** The Regulations contain two provisions relevant to this case that govern players' media rights. First, Section V.B.1.a. of the Regulations purports to grant to

the PGA Tour the media rights for players when they are participating in Tour-sponsored tournaments. Plaintiffs do not challenge that provision on the understanding that the Tour interprets it to apply to golfers only when they are playing in Tour-sponsored events. However, if the Tour relies on that provision to support its position that it can control Tour members' golf media rights even when they are not participating in a Tour event, the Plaintiffs would challenge that provision as being anticompetitive.

58.    A second provision in the Regulations, Section V.B.1.b. (the "Media Rights Regulation") provides that "[n]o PGA Tour member shall participate in any live or recorded golf program without the prior written approval of the Commissioner, except that this requirement shall not apply to PGA Tour cosponsored, coordinated or approved tournaments, wholly instructional programs or personal appearances on interview or guest shows." Exhibit 1. The Tour broadly defines "golf program" to cover "any golf contest, exhibition or play that is shown anywhere in the world in any form of media now known or hereinafter developed." *Id.* According to the PGA Tour, this provision prevents all Tour members from participating in any golf program anywhere in the world, during any time of the year, *even when they are not participating in a Tour event.* According to the PGA Tour, the effect is a year-round prohibition on all Tour-member independent contractors from participating in any competing golf event anywhere in the world that is broadcast on any media. For example, when the Player Plaintiffs participated in a LIV Golf event in London that was streamed on the Internet (but not shown on any television network in the United States), the PGA Tour declared that the Player Plaintiffs had violated this rule.

59.    The global prohibition on playing in competing events is not needed to create or improve any product or offering by the Tour, or to improve any aspect of any product for fans. For example, other provisions purportedly grant the Tour the media rights for Tour events in which the players are participating. The global prohibition serves only to prohibit the Tour's independent contractor players from playing in any competing events during weeks when they are not playing in Tour events.

60.    The Media Rights Regulation is fundamentally inconsistent with the rights of the Player Plaintiffs as independent contractors, denying them the right to sell their own media rights to other bidders for their services. As a result, the Tour has deprived and continues to deprive the Player

Plaintiffs of the opportunity to pursue their profession, thus depriving them of income-earning, marketing, branding, and charitable opportunities.

61.     Furthermore, this provision has injured and foreclosed entry by LIV Golf at its planned scale and harmed LIV Golf by imposing on it a cost basis that the Tour itself describes as "irrational." In addition, and critically, the Tour has compromised LIV Golf's ability to secure a television broadcast contract, a critical component of any sustainable elite golf tour.  Even though LIV Golf has been able to convince some players to defy the Tour's threatened lifetime bans and to participate in LIV Golf events, the Media Rights Regulation has precluded LIV Golf from securing agreements to broadcast its tournaments because United States platforms are disinclined to sign a broadcast contract with LIV Golf while the Tour claims to control the media rights of the players participating in LIV Golf tournaments.  As the PGA Tour has maintained, the Media Rights Regulation purportedly denies any competing tour the opportunity to broadcast tournaments to fans, an essential element of the business plan of LIV Golf or any other elite professional golf promoter.  Unless it is enjoined, this provision will threaten the competitive entry of LIV Golf or any other potential competitor, which would both harm LIV Golf and also the Player Plaintiffs by denying them the opportunity to sell their services in a competitive market.

62.     The anticompetitive intent of the Media Rights Regulation is exposed by the Tour's amendment of the definition of "golf program" in the provision in November 2019 in response to rumors of potential competitive entry.  Whereas the prohibition had previously applied to "any golf contest, exhibition or play that is shown *in the United States,*" the prohibition was expanded to cover "any golf contest, exhibition or play that is shown *anywhere in the world*."  Exhibit 1 (emphasis added). Commissioner Monahan admitted this anticompetitive purpose in his January 2020 Memorandum: "Our current Tournament Regulations provide a significant hurdle for PGA Tour members with respect to contracting with Private Equity Golf under its proposed structure. . .  In particular, the Tournament Regulations governing Conflicting Events and Media Rights/Releases would be applicable. . . .[I]n November 2019 the Policy Board ratified a revised Media Rights/Release regulation to ensure that all golf events are unequivocally covered on a global basis."  The Tour did not negotiate with the Player Plaintiffs or any other Tour Member over its unilateral expansion of the Media Rights Regulation and

does not compensate them for the Tour's purported exclusionary control over their year-round global media rights. The expansion ensures that players are restricted from participating with a competing golf tour anywhere in the world.

63. The anticompetitive purpose of the Media Rights Regulation is further illustrated by comparison with the European Tour. The European Tour does not prohibit its independent contractor golfers from using their media rights when they are not playing in European Tour events. Rather, the European Tour's rules make clear that the players' grant of media rights applies *only* when they participate in European Tour events. During other weeks of the year, that grant of media rights "does not otherwise affect the Member's rights as an independent contractor in respect of their own image except as set out in these Regulations, including Regulation E5(c) [Ryder Cup] below." The European Tour also "recognises the individual rights of all Members operating as independent contractors. . . and will not unreasonably seek to restrain its Members from Participating in certain golf tournaments or events which are not sanctioned by the European Tour. . . ."

64. Some Player Plaintiffs requested releases from the Media Rights Regulation to play in the LIV Golf London Invitational. The PGA Tour denied their request (as well as those of other Tour members) and instead imposed lengthy suspensions on all players who participated in the event.

65. The Tour's anticompetitive use of the Media Rights Regulation is further demonstrated through its selective enforcement of the provision against other events that it does not deem to be competitive threats. For example, the Tour did not require members to obtain releases to participate in a Pro-Am golf competition called the JP McManus held in the Republic of Ireland from July 4–5, 2022, even though the event was broadcast in the United States, Europe, and throughout the world. In contrast, days earlier the Tour enforced the provision with draconian punishments when the Player Plaintiffs and others played in the LIV Golf Portland Invitational from June 30 – July 2, 2022. The key difference between the LIV Golf event and the JP McManus event is that the Tour views only LIV Golf as a competitive threat.

66. The anticompetitive purpose and effect of the Media Rights Regulation is clear. The incumbent monopolist has granted itself the right to foreclose the best golfers in the world from playing in events that create real competition, at its own discretion. And if golfers defy the Tour's threats, the

competitor that is able to secure the players' services is nonetheless foreclosed from securing contracts to broadcast the event on television or any other media.

67. **Conflicting Events Regulation.** A second exclusionary provision in the Regulations (Section V.A.2–3, the "Conflicting Events Regulation") grants Tour Commissioner Monahan with the discretion to prohibit the Player Plaintiffs and all other Tour members from playing in any other golf tournament anywhere in the world. Exhibit 1. Commissioner Monahan has exercised his discretion to foreclose competition from LIV Golf by preventing any Tour members from participating in any LIV Golf events, under penalty of career-threatening suspensions.

68. The Conflicting Events Regulation contains two components, each of which the Tour has employed to attack the Player Plaintiffs in its effort to foreclose LIV Golf's entry. First, the provision prohibits any Tour member from playing in any other golf tournament in North America during any week when the Tour sponsors or co-sponsors an event—without exception, even when the player is not playing in the Tour event. Because the Tour typically sponsors or co-sponsors events approximately 48 weeks per year, the Conflicting Events Regulation effectively prevents independent contractor Tour members from ever playing in non-PGA Tour events in North America. Second, the Regulations also prohibit the Player Plaintiffs and all other Tour members from playing in any events *outside* North America during weeks in which the Tour is sponsoring or co-sponsoring an event, unless the Commissioner grants a release. These releases are limited to three per year, and the Commissioner has complete discretion to deny them.

69. The releases the Commissioner can choose to grant do not permit meaningful competition by other tours. No releases are permitted for any event in North America. Even as to international events, the Commissioner retains "sole discretion" to deny a release. Exhibit 1. While the Tour has historically granted releases for international events, the Tour changed its practice once the threat of potential competitive entry became evident. For the LIV Golf London Invitational, the Tour denied releases for all members. In doing so, Commissioner Monahan clarified that the Tour denied the requested relief because LIV Golf is organizing a tour that competes with the PGA Tour in North America. The Commissioner's vice president wrote, "While releases have been granted in limited circumstances for one-off events outside North America or for events outside of North America

on tours based exclusively outside of North America, the event for which you have requested a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States." Furthermore, even if the Commissioner did not exercise his discretion to attack competition, the Regulation provides that a player may obtain only three Conflicting Event releases per season, and may do so only if he also plays in a minimum of 15 Tour cosponsored or approved tournaments. Also, the PGA Tour Commissioner is only required to give a player a decision 30 days in advance of the event, which makes it difficult for those planning international events to know which players will be permitted by the Tour Commissioner to play in the field.

70. The scope of this Conflicting Events Regulation is expanded by another provision in the Regulations which provides that in any week in which a Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour *Latinoamerica*, PGA Tour Canada, or PGA Tour China cosponsored tournament is scheduled, no Tour member may participate in any golf activity (including public exhibitions, clinics, and pro-ams) in the same geographic area without the prior approval of the Commissioner.

71. The Tour has made clear that it will weaponize the Conflicting Events and the Media Rights Regulation to attack competition. In January 2020, Commissioner Monahan told a meeting of PGA Tour members that the Tour will impose "strict enforcement of the Conflicting Event and Media Rights/Release rules" on players to prevent them from playing golf on a competing tour. When Player Plaintiffs participated in the LIV Golf London Invitational, Commissioner Monahan summarily suspended them within an hour of tee-off. Then, to expand the *in terrorem* effect of the suspension on all other Tour members, Commissioner Monahan immediately notified all PGA Tour members of his action.

72. The Tour has forced members of the Korn Ferry Tour—the developmental tour—like Plaintiff Uihlein, to be bound by the same Regulations and has enforced them to punish young developing professional golfers who play in LIV Golf events.

73. Furthermore, the Tour's argument that it is merely enforcing its membership rules and its assertion that there is some legitimate justification for those rules in preventing simultaneous Tour membership and participation in LIV Golf events are betrayed as mere pretext by the Tour's attacks on

28

golfers who play in LIV Golf events but are not PGA Tour members.  For example, The PGA Tour has even banned golfers who are members in good-standing of the European Tour from the European Tour events it co-sanctions with the PGA Tour simply because they played in a LIV Golf event, including members of the European Tour who were granted permission to play in the LIV Golf event.  Those golfers were not bound by the PGA Tour's membership rules (because they were not Tour members) and did not violate any Tour rule, and yet they were punished by the Tour for playing in a LIV Golf event.  Similarly, the Tour has threatened college golfers—who are not Tour members and are not bound by any Tour rule—that they will not be permitted to participate in the pathway onto the Korn Ferry Tour or the PGA Tour if they play in any LIV Golf events.

74.     The Tour's attack on LIV Golf is not the first time the Tour has used the Media Rights and Conflicting Events Regulations to attack nascent competitive entry.  Before LIV Golf, the last meaningful threat of competitive entry to challenge the PGA Tour was the World Golf Tour, led by Greg Norman, which attempted to launch in 1994.  In response, then-Tour Commissioner Tim Finchem wrote to Mr. Norman that the Tour would not grant conflicting event releases for "events held within the United States" and that it would only grant a media rights release if the World Golf Tour would pay a prohibitive sum to the PGA Tour.  And even then, the Tour's releases would only be granted for events held on a Monday, Tuesday, or Wednesday.  The Commissioner also threatened Tour members that they would lose PGA Tour membership cards if they joined the competing tour.  Within days, the World Golf Tour collapsed.  No other meaningful competitive threat emerged for more than a quarter century.

75.     The Player Plaintiffs are members of the Tour (albeit now subject to lengthy suspensions) and remain subject to the Regulations.  They requested releases from the Media Rights and Conflicting Events Regulations to participate in one or more LIV Golf events.  The Tour denied their requests and imposed severe punishment when they exercised their rights as independent contractors to play in the LIV Golf events (detailed further below).  While the PGA Tour's charter requires that the PGA Tour's acquisition of players' media rights be used "to promote the common interests of professional golfers," the Tour uses its acquisition of players' media rights to prevent other promoters from competing for its members' services.

76. Furthermore, after dozens of Tour members (including the Player Plaintiffs) sought Conflicting Events releases to participate in a LIV Golf event in London, the Tour amended its Conflicting Events Release request form to require its members to verify the event would not be shown on any medium in the United States—an impossible verification given modern technology. As the sequence of events makes clear, the Tour added that provision (the Contractual Assurance Confirmation) in response to LIV Golf's attempted competitive entry. This amendment makes it even harder for the Player Plaintiffs to exercise their independent contractor right to play for other promoters during their off-weeks.

**The PGA Tour's Anticompetitive Response to Potential Competitive Entry in 2020**

77. After the PGA Tour used its Media Rights and Conflicting Events Regulations to deter entry by the World Golf Tour in 1994, there was no attempted entry into professional golf for over 25 years. Then, in late 2019 and into 2020, a number of individuals and entities, some of whom later became involved with LIV Golf, attempted to launch a competing tour known as the Premier Golf League ("PGL"). The Tour orchestrated an anticompetitive response that blocked PGL's attempted entry.

78. PGL was a venture involving the Raine Investor Group SPV, World Golf Group ("WGG"), the Public Investment Fund of Saudi Arabia, and Performance 54. PGL developed a proposal for a new golf league, and it approached various golf stakeholders as part of its effort to launch a new elite professional golf tour to compete with the Tour.

79. PGL had discussions with player representatives in the fourth quarter of 2019 and began offering contracts to players in January 2020.

80. In January 2020, the Tour obtained copies of PGL's marketing materials and the packages the PGL offered Tour players.

81. In response, Commissioner Monahan distributed his January 2020 Memorandum acknowledging that the PGL "would be competitive to the PGA TOUR," and detailed the PGA Tour's "response" to "mitigate any impact" from this potential competitive threat.

82. In his January 2020 Memorandum, Commissioner Monahan explained that the principal means to defeat the threat of competition was to prevent players from joining the new league. As

Commissioner Monahan wrote, "[t]he impact that [the new league] can have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished."

83. Commissioner Monahan pointed out that PGA Tour members would have "a significant hurdle" to join the new league because the Regulations prohibit players from joining a competing tour. In addition, Commissioner Monahan pointed to a rule he claimed would prevent players from competing in the team format proposed by the new league (based on a rule prohibiting "players having a financial interest in another player") and prevent players from competing in "conflicting events" except under limited circumstances.

84. In the 2020 memorandum, Commissioner Monahan also informed the Tour Policy Board that in November 2019, in response to rumors about potential competitive entry of an upstart international golf tour, the Tour had amended the Regulations to expand the Media Rights Regulation "to ensure that all golf events are unequivocally covered on a global basis." He also detailed plans to "further crystallize[] these restrictions."

85. Commissioner Monahan proposed two additional revisions to the Regulations, one that would tighten restrictions on conflicting events and a second that would prohibit players from having an equity interest in another's performance, a direct response to the PGL's team concept. On information and belief, these revisions were later adopted.

86. In addition, Commissioner Monahan stated that the PGA Tour has "communicated with key members of the Tournament Advisory Council," a group of PGA Tour tournament directors who advise the PGA Tour on its business conditions, "to prepare for a possible entrance of the [new league] to the marketplace." Commissioner Monahan similarly detailed that the PGA Tour has "liaised with each [Major Championships and Governing Bodies] organization to learn of its position regarding [the new league]." And the PGA Tour communicated with the OWGR regarding the new league's eligibility for OWGR ranking points.

87. The January 2020 Monahan Memorandum described the PGA Tour's efforts to secure commitments from across the global golf ecosystem to foreclose potential competitive entry.

Recognizing that the competitive threat from the new league would be greatly strengthened through a partnership with the European Tour, Commissioner Monahan stated that the PGA Tour has "continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of [the upstart competitor]." As described, the PGA Tour did in fact partner with the European Tour to prevent competitive entry.

88. Commissioner Monahan and the PGA Tour executed this anticompetitive plan to prevent players from joining the PGL and "remov[e]" others in the ecosystem as potential partners of the PGL, ensuring that the competitive threat from the PGL was thwarted before it could launch.

**The PGA Tour Threatens Players Considering Joining The PGL**

89. At a Tour players' meeting in January 2020 at Torrey Pines in La Jolla, California, Commissioner Monahan read aloud a message to Tour players similarly detailing some of his messages from his January 2020 Memorandum. In that meeting, Commissioner Monahan told PGA Tour players, "[t]he schedule for the [PGL] is designed to directly compete and conflict with the PGA Tour's FedExCup schedule, and to not conflict with [and be in addition to] the Masters, PGA Championship, U.S. Open and The Open Championship." Then, Commissioner Monahan threatened the Tour members with a ban from the PGA Tour if they joined the PGL or any other new league, stating: "If the Team Golf Concept or another iteration of this structure becomes a reality in 2022 or at any time before or after, our members will have to decide whether they want to continue to be a member of the PGA Tour or play on a new series."

90. As Commissioner Monahan made clear, the Tour demanded exclusivity from its independent contractor members, under penalty of a ban from the Tour.

91. In March 2020, Monahan repeated his threats to the players, stating that the Tour would "vigilantly protect [the Tour's] business model" from the competitive entrance of a new league.

92. The Tour's threats to the players' livelihoods had their intended effect. As one player was quoted anonymously in a leading golf publication in early 2020, "the risk of getting banned by the PGA Tour has to be an obvious concern." Many other Tour Members felt the same. As of 2020, the potential harm to the Player Plaintiffs resulting from a ban from the Tour made the idea of signing on to a new start-up too risky to bear. Nonetheless, many Tour members—recognizing that they were

1    disadvantaged by the Tour's monopsonistic control over the market—remained very interested in new

2    playing opportunities in addition to the Tour.

3    **The Tour Induces The European Tour Into a Group Boycott**

4    93.    As Commissioner Monahan admitted in his January 2020 Memorandum, the PGA Tour

5    agreed with the European Tour to remove the European Tour as a potential partner of any new entrant.

6    94.    Throughout 2020, the PGL had been negotiating with the European Tour to develop a

7    partnership to co-sponsor events, which would have been a key step toward enabling the PGL to launch.

8    95.    The co-sponsorship was important because it would have assured that PGL events

9    would qualify players to earn points under the OWGR system.  OWGR rankings are used to determine

10   qualification for the Majors.  Professional golfers are reluctant to join any tour that does not provide a

11   path to qualify for the Majors.

12   96.    Under the rules of the OWGR (on whose board Commissioner Monahan sits), a brand

13   new tour purportedly cannot qualify for OWGR points for at least three years and must be sponsored

14   by one of the six full members of the International Federation of PGA Tours (PGA Tour, European

15   Tour, Asian Tour, Japan Tour, Australasia Tour, and Sunshine Tour).  This establishes a barrier to the

16   entry of any new tour:  No elite professional tour can sustain in the long-term unless it provides players

17   with a path to earn OWGR points, but no professional tour can secure points until it has existed for at

18   least three years (absent an OWGR waiver of that requirement) and has sponsorship from one of the

19   established International Federation members.  To navigate through this Catch-22, the PGL sought to

20   partner with the European Tour as part of its plan to enter and obtain a sponsor for its OWGR

21   application.

22   97.    Recognizing the PGL's need for a partnership with the European Tour, the PGA Tour

23   forged an alliance with the European Tour through threats and financial incentives to put a bearhug

24   around the European Tour and cut off a potential partner of the PGL.  To obtain this agreement, the

25   Tour threatened rule changes that would have made it more difficult for top European players who

26   participate on the PGA Tour to play in European Tour events.

27   98.    The PGA Tour's approach proved highly effective.  In November 2020, the European

28   Tour announced that it would not partner with the PGL, but instead it would enter into an alliance with

33

the PGA Tour. One condition of the agreement was that the European Tour not partner with or sponsor the PGL, thereby removing a key partner for the PGL's planned entry. Additionally, through the alliance with the European Tour, PGA Tour Commissioner Monahan secured a seat on the Board of Directors of the European Tour and the PGA Tour made a massive investment in the European Tour and its subsidiaries. The Tour's illegal alliance with the European Tour enabled it to require the European Tour to work in concert with the PGA Tour to prevent competitive entry. The Tour used its strategic alliance with the European Tour throughout the next two years to carry out its anticompetitive scheme to thwart LIV Golf's entry. The Tour entered into the illegal agreement with the illegal purpose to eliminate a competitor and future potential entrants.

99. The PGA Tour's efforts to thwart the PGL's entry were successful. The PGL never got off the ground, the venture as it existed disbanded, and the PGL was left with no real prospect of viability. In 2022, the PGL offered to partner with the PGA Tour, but under the Tour's control. The Tour summarily rejected the proposal.

100. And through its campaign to destroy the PGL, the PGA Tour had secured an anticompetitive agreement with the European Tour to foreclose any future potential competitive entrants.

**LIV Golf Promises Long-Needed Competition**

101. After the Tour destroyed PGL's viability and the venture disbanded, LIV Golf formed in 2021. LIV Golf is a new golf company whose goal is to improve professional golf for all stakeholders: fans, players, broadcasters, sponsors, and tournament hosts. It seeks to offer more of what fans, broadcasters, and sponsors want, including an exciting new format that will ensure heightened competition among golf's star players. LIV Golf seeks to modernize the professional game by allowing the game's superstars to realize their true market potential, while enhancing the professional golf marketplace with a dynamic, team-inspired format that will complement individual competition.

102. LIV Golf developed a new golf tour (the League) that would include 48 top golfers who would compete both as individuals and on 12 teams of four. The LIV Golf League's format is inspired

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

by the globally successful format for Formula 1 racing.[2]  Twelve headline players would be player-owners, each holding an equity interest in their team and having substantial opportunities to guide their team to on-course and commercial success.  Each LIV Golf League team of four was also set to have two substitute players, thereby offering 72 total players the opportunity to play.  The player-owner of each team was to select four of the six players to play in a given week.  By introducing an innovative format highlighting weekly head-to-head competition among the top players in the game, LIV Golf League's format would have created a more desirable product offering than the PGA Tour format, which has not changed for decades and has the lowest youth viewership of any North American major sport.  LIV Golf League was going to include 54-hole tournaments with shotgun starts[3] and no cut, offering a faster-paced format with high levels of competition in every tournament, dramatically improving the fan experience.

103.    The LIV Golf League format was designed as a fan-friendly alternative to the PGA Tour.  The proposed "shotgun" format would reduce the number of hours required to watch a tournament and increase the excitement of the viewer experience.  The team format would provide opportunities for team allegiances among fans and lead to multiple levels of competition within any given tournament.   The LIV Golf League would also benefit sponsors, advertisers, and other stakeholders, as each team was to be independently commercialized with freedom to develop and select team sponsors and a home city or region.  LIV Golf had strategies for improved broadcast output and an entertainment experience with more storylines and content.

104.    The LIV Golf League was also set to improve conditions for players.  In contrast to the PGA Tour's stagnating tournament purses (until LIV Golf emerged), with about half the players not making the cut and earning nothing in any given tournament, LIV Golf League was set to introduce the benefits of competition to players, including offering players greater economic benefits more

_____

[2] Formula 1 is the world's premier international auto racing series.

[3] Shotgun starts are when all golfers in a tournament tee off of different holes at the same time so that they finish their rounds around the same time, as compared to tournaments where all golfers tee off of the first hole and proceed to the eighteenth hole in consecutive fashion.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

commensurate with their ability to attract revenue, equity ownership opportunities in their own success, and guaranteed income for every tournament in which they participated. LIV Golf would not require players to sign away their name, image and likeness rights for non-LIV Golf events. LIV Golf also would not foreclose players from playing in other tournaments during weeks in which LIV Golf is not playing, which would respect players' independent contractor status and allow them to participate in other tournaments and tours (to the extent not banned by the Tour).

105. The introduction of competition from the LIV Golf League would provide new and improved options for players, fans, and other stakeholders. Innovation would replace stagnation. Players, fans, sponsors, advertisers, and broadcasters would all benefit. The introduction of the LIV Golf franchise model to the sport of golf—with city, country, and regional affiliations—would engage more fans and increase commercial opportunities.

106. The LIV Golf League also aspired to enhance player opportunities more broadly and add meaningfully to the playing opportunities for professional golfers worldwide. It planned to provide qualification opportunities for players not initially selected and to embrace other tours, providing their players with pathways into the League. This format was designed to ensure a high level of competition throughout each season, as well as a fair and inclusive platform for golfers throughout the world, including younger development golfers.

107. If not for the anticompetitive conduct of the Tour, the LIV Golf League would have launched in 2022. LIV Golf had developed a ground-breaking business plan. It secured a chief executive officer and Commissioner—Greg Norman, a giant in the world of golf and a highly successful businessman in multiple industries—hired an experienced team of executives, assembled a board, and built out a full front office with dozens of employees and numerous industry consultants and contractors. LIV Golf partnered with the Asian Tour and invested several hundred million dollars in the Asian Tour to sponsor marquee events throughout the world and develop the sport at multiple levels on a worldwide basis. LIV Golf negotiated with broadcast companies, sponsors, venues, advertisers, vendors, and several other business partners who expressed interest in LIV Golf League. All these successful stakeholders indicated, however, that they would commit only when LIV Golf League had signed up the players needed to launch LIV Golf *and*, critically, secured the players' media

rights.

108.    LIV Golf also sought to cultivate relationships with other tours in the existing golf "ecosystem," in order to ensure that there were further player pathways into and out of LIV Golf events (both within and across seasons) and to ensure that LIV Golf's entry would be additive and beneficial to the sport of golf throughout the world.  For example, LIV Golf made offers to the Ladies European Tour and the LPGA, which rejected those offers due to the PGA Tour's opposition to LIV Golf, and due to the PGA Tour's board seats in those organizations and its control over the golfing world.  As described below, the PGA Tour has thwarted LIV Golf's efforts by spearheading a group boycott designed to exclude LIV Golf from the "ecosystem" and punish any player who plays in any LIV Golf events.

### The Tour's Anticompetitive Response to the Potential Entry of LIV Golf

109.    In response to the potential entry of LIV Golf, the PGA Tour has used a carrot-and-stick approach to prevent the Player Plaintiffs and other PGA Tour Members from playing with LIV Golf.

110.    The carrot is a loosening of the PGA Tour's purse strings to make somewhat greater compensation available to players than the Tour historically provided.  This increased compensation to players in response to competitive entry is direct proof of the PGA Tour's monopsony power and the anticompetitive effects on players (including the Player Plaintiffs) from excluding competition.  When the PGA Tour faced the meaningful threat of competitive entry for the first time in a quarter-century, it suddenly and substantially increased player compensation, thus providing direct proof of the Tour's monopsony power in suppressing player compensation below competitive levels.[4]  These changes in the Tour's practices made only in response to nascent competitive entry are also indicative of the anticompetitive effects that will be imposed on the markets if the Tour is successful in defeating LIV Golf's nascent entry—once the Tour is free from competitive pressures, it will have both the ability and incentive to suppress player payments, as it did for many years before LIV Golf's nascent entry.

111.    The stick used by the Tour is an array of anticompetitive actions by the PGA Tour to

---

[4]  Despite these increases in compensation in response to LIV Golf's entry, PGA Tour compensation for players remains well below competitive levels.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

destroy the careers and livelihood of players who participate in any LIV Golf events (including the Player Plaintiffs), their business partners and agents, and anyone who associates with LIV Golf or its players. It is particularly notable that as LIV Golf's threat of entry grew, and as the press reported increased player interest and player signings, the Tour ramped up the intensity of its punishment and threats. As Commissioner Monahan made clear in his January 2020 Memorandum, the Tour knew that if it could deter players from joining a new league, the new league's "ability to attract media and corporate partners will be significantly marginalized" and "its impact on the [Tour] diminished." Particularly for a 501(c)(6) organization that is required to further the interests of its members, the Tour's commitment to attack and destroy the careers of its members in order to defeat competition is striking. The Tour's conduct is also blatantly anticompetitive, serves no purpose but to harm competition, and cannot be justified under the antitrust laws.

112. **The carrot.** In April 2021, in direct response to rumors of LIV Golf's potential entry into the marketplace, the PGA Tour announced the "Player Impact Program," a $40 million bonus pool for the top 10 players on the PGA Tour who drive engagement with sponsors and fans. This new bonus pool, announced by the PGA Tour in response to potential competitive entry, is a clear indicator of the benefits of competition for players. As the PGA Tour recognized, competition in the labor market from LIV Golf will force it to raise compensation to the players or it will lose its talent to the new entrant. The PGA Tour's "Player Impact Program," however, was a half-measure, and offered far less than the compensation the players would earn in a competitive labor market.

113. In August 2021, in response to reports that LIV Golf's efforts to secure player commitments were gaining momentum and that the new entrant would offer substantially greater compensation, the Tour announced it would increase the purse sizes for tournaments and bonus pools for the 2021–2022 PGA Tour season by 18 percent compared to the purse size and bonus pools for the 2020–2021 PGA Tour season. As noted above, PGA Tour purse sizes had grown at an anemic low-single-digit rate for years, but when competitive entry was rumored, the Tour responded with an 18 percent increase for the next season. This is clear and direct proof of the Tour's monopsony power, the benefits of LIV Golf's competitive entry, and the harm to competition and the Player Plaintiffs if the Tour is permitted to destroy LIV Golf's nascent entry.

114.     In October 2021, the Tour announced it would increase the purse size for the Players Championship by $5 million (from $15 to $20 million) and would provide players with a $50,000 bonus if they compete in 15 PGA Tour events.

115.     In December 2021, the Tour published its increased purse size for 2022 (increasing from $367 million to $427 million in aggregate) including:  (1) increasing FedEx Cup bonus pool from $60 million to $75 million; (2) increasing Top 10 Comcast Business Tour bonus from $10 million to $20 million; (3) increasing the Player Impact Program prize pool from $40 million to $50 million; and (4) making official the October 2021 compensation announcements.

116.     In December 2021, the Tour also disclosed initial plans to copy LIV Golf's team-golf, international, prestigious, exclusive, no-cut, high purse, tournament format.  Whereas the Tour and its spokespersons had previously used LIV Golf's new format as an excuse for justifying their opposition to the new entrant, the Tour's announcement that it planned to knock off LIV Golf's format revealed that any opposition based on the new format was merely pretext.  And again, the Tour's response to LIV Golf's innovations demonstrates the benefits of competition.

117.     In February 2022, the Tour leaked further information about its plan to copy LIV Golf's ideas in creating a fall series of team events with high purses and no cuts.  With that announcement, the Tour also discussed further plans to increase player compensation, reflecting further competitive benefits of LIV Golf's nascent entry.

118.     The increased purses and bonuses that the Tour offered in response to LIV Golf's anticipated entry were, however, a half-measure.  They are materially less than the compensation the players would earn in a competitive labor market.  In a nutshell:  before LIV Golf's anticipated entry, the Tour's market power and the barriers to entry it had created allowed the Tour to compensate its players at levels substantially below what would exist in a competitive market.  In response to LIV Golf's attempted entry, the Tour increased player compensation on numerous occasions, but still at less than competitive levels.  For example, LIV Golf offers tournament purses between 200 percent to 300 percent higher than PGA Tour's purses, including guaranteed income to all participants.  The lowest purse on the LIV Golf tour is millions of dollars greater than the largest purse ever offered by the PGA Tour.  The point at which compensation becomes competitive will be determined only when the Tour

is enjoined from using its anticompetitive threats, retaliations, and restrictive contractual provisions, and has to compete on a level playing field with LIV Golf to secure players' services.

119.    Nonetheless, even the early effects of the threat of competitive entry were striking.  The Tour increased player compensation several times in response to the potential competitive entry of LIV Golf, totaling *$135 million* in a matter of a few months.  This is clear and direct evidence of the Tour's monopsony power and the benefits of competition from LIV Golf.  It is also direct evidence of the harm to competition that will result if LIV Golf's competitive entry is thwarted.  Without the threat of competition from LIV Golf, the Tour would again face neither competition nor any reasonable likelihood of competition in the future.  The Tour would then have both the ability and incentive to suppress player compensation to the sub-competitive levels that existed in the decades before LIV Golf launched.

120.    In response to the increased compensation from the PGA Tour, players recognized that the threat of competitive entry prompted the changes:

      i.    Plaintiff Mickelson: "I'm appreciative of the fact that there is competition, and that leverage has allowed for a much better environment on the PGA Tour, meaning we would not have an incentive program like the PIP [Player Impact Program] for the top players without this type of competition.  We would not have the increase in the FedEx Cup money.  We would not have the increase in the Players Championship to $20 million this year if it wasn't for this threat."

      ii.    Joel Dahmen: "The PGA Tour . . . magically come up with $40 million for PIP and then there paying us all 50 grand to play 15 events, which is another X million dollars.  That's like, $50 million they just magically found laying around overnight.  The money is there.  There's a way to do it."

      iii.    Jason Kokrak:  "I'm curious to see if the PGA Tour would've ever increased any of that without this competition."

121.    As PGA Tour Member and then-PGA Tour Policy Board Member Jordan Spieth said, "I think as a player overall it [competition from LIV Golf] will benefit us . . . . I can only say from my point of view I think that it's been beneficial to the players to have competition."  PGA Tour member

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

Rickie Fowler said, "I think competition is a good thing, and in business, whatever it may be. . . . if you're trying to be the best, you want to find ways that you can be better than your competitors. It goes through sport, business, tours, whatever it may be." And Mr. Fowler noted that these new tours are coming about because the PGA Tour's stale product left players frustrated: "These tours or leagues, however you want to classify or call them, they wouldn't really be coming up if they didn't see that there was more opportunity out there. I've always looked at competition being a good thing. It's the driving force of our game."

122. Then, after LIV Golf had achieved some success with its first LIV Golf Invitational Series event and contracting with some popular golfers, the Tour managed to come up with yet more money to try to deter golfers from leaving the Tour for LIV Golf. On June 21, 2022, just days after LIV Golf London Invitational, the Tour copied LIV Golf's concept of limited field, no cut, team events with high purses, and announced its version of the events to begin in 2023. In that announcement, the Tour announced another increase of approximately $54 million to existing events and, in total, over $100 million purse increases across all of its events. In its announcement to its players, the Tour admitted the increase came from its "reserves." The Tour had the money, but didn't compensate the athletes or seek to offer innovative tournament ideas until LIV Golf introduced actual—albeit fragile— competition in the relevant market. On August 1, 2022, the Tour announced the purse amounts for the entire 2022–2023 schedule, which totaled a record $415 million in prize money in official events and another $145 million in bonuses—further showing how competition from LIV Golf caused the Tour to increase compensation for players.

123. **The stick.** The Tour's increased purses were not successful in deterring player interest in LIV Golf. As noted, the Player Plaintiffs and other players recognized that competition was good for the game of golf and for them, and the promise of true competition for their services fueled player interest in LIV Golf, which offered a more desirable format, more favorable terms for the Player Plaintiffs and other players (such as owning their media rights), and far greater compensation than the Tour was offering even with the recent increases in compensation. As a result, in a desperate effort to thwart competitive entry and protect its monopoly position, the Tour launched a campaign of threats against its own members, including the Player Plaintiffs, that promised career destruction for any

41

players who joined LIV Golf.

124.    After news broke in April 2021 that LIV Golf made formal offers to a number of the top players in the world, on May 4, 2021, Commissioner Monahan addressed a meeting of Tour players (including the Player Plaintiffs) and informed the players that any golfer who joined LIV Golf would immediately lose their status as a PGA Tour member and face *a lifetime ban from the PGA Tour*. The players, including the Player Plaintiffs, were understandably intimidated by the Tour's threat.

125.    The Tour intended its threat of lifetime ban to be a serious deterrent. It was. The prospect of leaving the Tour for an upstart golf promoter that could not guarantee its long-term existence, under threat of a lifetime ban from the incumbent monopsonist, was prohibitively risky. If banned from the Tour, the player would face a serious risk of being foreclosed from pursuing his chosen profession, a harrowing prospect for any golfer, and particularly younger golfers capable of 20 or more years of elite play.

126.    In the 24 hours after the Tour announced that it would impose a lifetime ban on players who join LIV Golf, and after the Tour leaned on them for support, other entities in the golf "ecosystem" issued public statements reinforcing and expanding the Tour's threat:

- Seth Waugh, the CEO of the PGA of America, which sponsors the PGA Championship, publicly indicated the PGA of America's support for the PGA Tour and the European Tour in excluding competition from the "ecosystem of the professional game." He stated: "We are in full support of the PGA Tour and the European Tour regarding the current ecosystem of the professional game."

- Augusta National, which sponsors the Masters, issued a statement that "[t]he PGA Tour and European Tour have each served the global game of golf with honor and distinction. . . . As it has for many decades, the Masters Tournament proudly supports both organizations in their pursuit to promote the game and world's best players."

- A spokesperson for the R&A, which sponsors The Open, stated, "we have deep relationships with the [PGA Tour and the European Tour] and are supportive of them."

127.     When the Tour learned that LIV Golf was continuing to talk with players' representatives (including the Player Plaintiffs' representatives) despite the threat of lifetime bans, the Tour threatened certain of the players' representatives, saying that it would harm the representatives' and the players' business interests if they continued to engage in discussions with LIV Golf. These threats to players' representatives highlight the pretext in the Tour's assertions that it is merely enforcing its own rules. No Tour rule grants it the authority to threaten the business of a player's agent or representative if a player participates in a LIV Golf tournament. And there is no conceivable procompetitive justification that could support such bullying. The Tour's actions are transparently anticompetitive, as they are aimed purely at kneecapping competition from LIV Golf before it can get off the ground and threaten the Tour's monopoly.

128.     Furthermore, the Tour threatened—without basis—the Player Plaintiffs, their representatives, and other players and their representatives, that the Tour would withhold players' vested retirement funds if they were to join LIV Golf. Again, this threat is not justified under any Tour rule, but rather is targeted purely at undermining LIV Golf's competitive entry.

129.     Several player representatives, including those of the Plaintiffs, were threatened that the Tour would use its connections to pressure their sponsors to revoke sponsorship agreements were they to join LIV Golf. Upon information and belief, the Tour successfully pressured sponsors to revoke player sponsorships. This conduct is not justifiable as the enforcement of any Tour rule, but instead is a transparent use of the Tour's muscle to attack players in order to undermine LIV Golf's competitive entry.

130.     Through all of these actions, the Tour has harmed both the Player Plaintiffs and LIV Golf. Furthermore, the Tour's continued anticompetitive bullying aimed at any players or other parties who do business with LIV Golf (including the Player Plaintiffs) presents a severe threat of thwarting LIV Golf's nascent competitive entry. If not enjoined by the Court, the Tour's ongoing anticompetitive conduct threatens to irreparably harm LIV Golf, the Player Plaintiffs (both as direct targets of the Tour's anticompetitive conduct and as sellers into the market in which the Tour aims to secure its monopsony power), and competition itself.

### The Tour Uses Its Strategic Alliance with the European Tour to Exclude LIV Golf and Its Partners from the "Ecosystem"

131.    Before the PGA Tour formed an illegal alliance with the European Tour, the European Tour was a willing partner for prospective innovators and entrants into the global golf ecosystem.  This included Golf Saudi and the Saudi investors who ultimately sponsored LIV Golf.  For example, in a panel discussion in 2019, European Tour CEO Keith Pelley asserted that Saudi Arabia "are at the forefront of helping us develop the game."  In fact, the European Tour partnered with Golf Saudi in launching the Saudi International, co-sanctioning the tournament for three years from 2019 to 2021.

132.    While the Tour and those it has leaned on now use the Saudi sponsorship of LIV Golf as a weapon to smear LIV Golf and the golfers (including the Player Plaintiffs) who play in LIV Golf events and justify their attacks on the golfers, Mr. Pelley's statements reveal that attacks on the Saudi sponsorship of LIV Golf are pure pretext.  The Tour had no problem entering into a partnership with the European Tour at the same time that the European Tour co-sanctioned the Saudi International and while Mr. Pelley gushed about the prospect of partnering with Golf Saudi to grow the sport.  And the Tour has no problem accepting its own sponsorship money from companies that do billions of dollars in business with Saudi Arabia each year.  An estimated 23 PGA Tour sponsors conduct regular business with Saudi Arabia each year—an estimated $40 billion dollars of business with Saudi Arabia.  That the PGA Tour eagerly does business with these companies while criticizing golfers for playing on a tour primarily sponsored by the Public Investment Fund of Saudi Arabia is simply hypocrisy.  And it exposes as pretext any notion that the Tour is orchestrating an attack on the players because the Tour is somehow unable to do business with anyone who has business connections to Saudi Arabia.  The Tour's campaign to destroy these players is about defeating competition even at the cost of punishing its own members.

133.    The European Tour's support for Golf Saudi changed starkly once the European Tour entered into its alliance with the PGA Tour and when Golf Saudi supported a potential competitive entrant to the PGA Tour.

134.    The Tour's agreement with the European Tour to form a group boycott to block competitive entry that could challenge the PGA Tour's dominance is a matter of public record.  For example, on May 4, 2021, the European Tour released a statement that "we are aligned with the PGA

44

Tour in opposing an alternative golf league, in the strongest possible terms."

135. Just over a week later, on May 12, 2021, European Tour Commissioner Keith Pelley wrote to representatives of Golf Saudi, noting its understanding that "Golf Saudi appears to be leading the current pursuit of a new golfing enterprise, referred to widely as the Super Golf League or [LIV Golf]." Commissioner Pelley wrote that the European Tour believed Golf Saudi was "talking to our members about joining this **rebel enterprise**." In an effort to deter Golf Saudi from supporting a new entrant, Commissioner Pelley threatened that the European Tour would refuse to co-sanction the Saudi International (which the European Tour had co-sanctioned since 2019) unless Golf Saudi "publicly denounce[d] [LIV Golf]."

136. Commissioner Pelley also made clear that his threats to Golf Saudi were in furtherance of the European Tour's anticompetitive agreement with the Tour to lock arms in a global "ecosystem" to foreclose LIV Golf's entry:

> We had, and indeed still have, aspirations of working with Golf Saudi in continuing to build the Saudi International into a world class event, and indeed look for other opportunities and have shared this view with our Strategic Alliance partners at the PGA TOUR.
>
> It is, however, impossible for us to continue those discussions while Golf Saudi is championing an alternative Tour that we believe is detrimental to both the European Tour, the PGA TOUR and global professional golf. I know PGA TOUR Commissioner Jay Monahan feels the same.
>
> We would therefore encourage you in the strongest possible terms to publicly denounce SGL as soon as possible which would allow us to reopen dialogue about the Saudi International and how Golf Saudi, operating **_inside_** the ecosystem, could resume the joint vision we began in 2017.[5]

137. The Tour and the European Tour also threatened other prospective partners of LIV Golf, making clear that they will seek to punish those who support LIV Golf by excluding them from the so-called world golf "ecosystem." For example, LIV Golf sought to enter into a relationship with the Asian Tour to co-sanction LIV Golf's tournaments to ensure that players would qualify for OWGR points (which, as described above, is essential to the long-term success of an elite level tour) and to establish a broader relationship for investment in the Asian Tour to grow the sport globally. In

---

[5] "SGL" in Commissioner Pelley's email stands for Super Golf League and refers to the entity and potential entrant that is now known as LIV Golf.

response, the European Tour sent a list of "Consequences" to the CEO of the Asian Tour—under the logos of the European Tour and the PGA Tour—that the Asian Tour would suffer if it entered into any partnership with LIV Golf.  Those consequences included (1) eliminating a "[p]athway for Asian Tour members onto European Tour," (2) taking away "[e]xisting tournaments we co-sanction, totaling in excess of US$10m of prize money and 250 playing opportunities," (3) eliminating all future "co-sanctioned tournaments between the European Tour/PGA TOUR and Asian Tour" and (4) the Asian Tour would lose its "[p]osition within existing global golf ecosystem."  Notably, the European Tour and Tour threatened not only to punish the Asian Tour directly, but to punish golfers on the Asian Tour by eliminating a "pathway for Asian Tour members onto [the] European Tour" and by removing prize money that had previously been available to Asian Tour members.  Despite these threats, LIV Golf was able to offer constructive collaboration and investment in the Asian Tour sufficient to convince the Asian Tour to partner with LIV Golf in the face of the threats from the European Tour and Tour.

138.    Despite these threats, LIV Golf and its sponsors continued in the effort to work constructively with existing golfing bodies to grow the sport.  For example, on July 5, 2021, representatives of the entities that would sponsor LIV Golf met in Malta with leaders of European Tour. They presented an offer that would have made the European Tour a partner in innovating in the sport worth up to $1 billion for the European Tour.  As reflected in the meeting minutes provided by a representative of the European Tour's title sponsor (DP World), the representatives from European Tour were "[g]rateful for the detailed work and preparation" and "[c]onfirmed" the LIV Golf series had "appeal and fit."  However, the European Tour representatives "**stated main issue is US PGA mighty power and need to avoid a collision course between ET and PGA**."  Simply put, partnering with LIV Golf was good for the European Tour, its members, and the sport of golf, but the European Tour feared the "mighty power" of the PGA Tour, turning down the opportunity to partner with LIV Golf because of its "need to avoid a collision course between ET and PGA."

139.    When Golf Saudi did not yield to Commissioner Pelley's May 2021 demand that it "publicly denounce" LIV Golf, the European Tour followed through on its threat to refuse to continue sanctioning the Saudi International.  Then, in August 2021, the Tour announced through the press that it would not grant any PGA Tour members conflict releases for the Saudi International as it had done

since 2019, because the Saudi International was no longer sanctioned by the European Tour.

140.     In response to the PGA Tour's threats to deny releases to play in the Saudi International, the players expressed their concerns:

   a.  Sergio Garcia:  "When you get banned from playing, or whatever, it hurts the game. . . . People want to see us play all around the world and enjoy us wherever we go."

   b.  Rory McIlroy:  "My view as a professional golfer is I'm an independent contractor, I should be able to play where I want if I have the credentials and I have the eligibility to do so. . . .  Just the one thing I would worry about is if guys want to go to Saudi and they are going to make ten percent of their yearly income just by going and playing and [the PGA Tour is] restricting them from doing that, punishing them, that creates resentment for the players and that creates a problem between the tours."

   c.  Xander Schauffele:  "I feel like there just needs to be some sort of counter in the way certain things work.  I'll try and do what I need to do, and they'll tell me what I can and can't do at a certain point, but I feel like they need to counter.  They can't just tell me no, you can't do this and then just kick rocks, kid.  That's not really how I'd want to do things."

141.     Despite the Tour's threat, the demand from the Tour members to play in this non-Tour-sanctioned event was so strong that over 30 players (including Plaintiffs Mickelson and DeChambeau) sought releases to play in the Saudi International.  In response to this pressure from the players, the Tour granted the release requests under the Conflicting Events and Media Rights Regulations, but imposed conditions on the players (including Plaintiffs).   The Tour informed players that the Regulations fully supported the denial of the players' requests but that it would permit players to play in the Saudi International provided that: (1) players who have not played in the AT&T Pebble Beach Pro-Am (a PGA Tour event that takes place annually in this district) at least once in the last five years must commit to playing Pebble Beach at least twice in the next three years; and (2) players who have played Pebble Beach at least once in the last five years must commit to play Pebble Beach at least once in the next two years.  The Tour did not impose these conditions and restrictions when it granted past releases—it did so only after Golf Saudi refused the threat to denounce and boycott LIV Golf.

142. In a message to European Tour members, Commissioner Pelley made clear that the opposition to having players participate in the Saudi International, which the European Tour had co-sanctioned from 2019 to 2021, was an attack on competition from LIV Golf, which he described as "a clear existential threat." As Commissioner Pelley stated, "we have done everything we can to encourage the Asian Tour and LIV Investments to play within our ecosystem," letting golfers play for a partner of LIV Golf would "damage" our business. Commissioner Pelley was blunt in conceding that the tours are acting to protect their own business interests, which diverge from the interests of the players whom they are supposed to support: "We want the best for our members but at the same time will vehemently do everything we can to protect your Tour."

143. Similarly, on December 16, 2021, the PGA Tour and European Tour flexed the muscle of their group boycott and made good on their threats to the Asian Tour. After the Asian Tour accepted investment and partnership with LIV Golf, Asian Tour CEO Cho Minn Thant received a call from Martin Slumbers, the CEO of the R&A, which hosts The Open. Mr. Slumbers told Mr. Thant that the R&A would end its years-long practice of giving the Asian Tour Order of Merit winner entry into The Open because the PGA Tour and European Tour, with whom the R&A was aligned, were displeased about LIV Golf's investment in the Asian Tour. Days later, the media confirmed the R&A would revoke the Asian Tour Order of Merit winner's entry into the Open, identifying punishment of LIV Golf as the basis for harming individual Asian Tour players. Once again, the Tour and those it was pressuring were attacking LIV Golf and its partners by punishing golfers who had any association with LIV Golf.

144. As LIV Golf's player recruitment efforts continued, the Tour encouraged the European Tour to tighten its grip on its members and ensure they would not leave the "ecosystem" to play with LIV Golf. In threatening and imposing punishment on European Tour members, Commissioner Pelley made clear that it was doing so (1) pursuant to its agreement with the PGA Tour, (2) in an effort to thwart competition from LIV Golf, and (3) that the punishments were aimed at coercing players to act contrary to their individual interests. For example, on April 19, 2022, Commissioner Pelley wrote to European Tour members, reminding them of the European Tour's Conflicting Events Regulation. He stated: "Conflicting events, regardless of how attractive they might appear to you personally,

potentially compromise our efforts in these areas and could significantly hurt your Tour in both the short and long term." He continued: "Please, therefore, continue to bear this bigger picture in mind, particularly considering some of these conflicting events in 2022 are scheduled directly opposite some of our most prestigious 'heritage events.'" He also stated: "We are unwavering in our belief that working together with PGA Tour . . . will make our sport less fractured and benefit global golf."

145. As part of their concerted efforts to tighten the reins, on June 24, 2022, the PGA Tour and European Tour suspended golfers who participated in the initial LIV Golf tournament from their three co-sanctioned events—the Scottish Open, Barbasol, and Barracuda Championships—and fined the suspended golfers €100,000. They further threatened to double the sanctions for future violations (which all participants in the second LIV Golf tournament in Portland, Oregon had already committed).

146. Just four days later, on June 28, 2022, the PGA Tour and the European Tour announced a further agreement to solidify their strategic alliance whereby: (1) the PGA Tour invested more in the European Tour Productions (the European Tour's media arm) to take a 40 percent share; and (2) the PGA Tour arranged for the European Tour to be a direct feeder tour into the PGA Tour, with the top 10 performing golfers on the European Tour earning PGA Tour cards. In a press conference announcing the agreement, when asked whether players who play in LIV Golf events could earn the tour cards, European Tour Commissioner Pelley and PGA Tour Commissioner Monahan both struggled to answer, until Commissioner Pelley conceded their plan to impose total bans on golfers who participate in LIV Golf events: "This won't come into place until next year and I honestly don't think we'll have that problem by then" because LIV Golf players will not be permitted to play on the European Tour to earn a PGA Tour card.

147. The PGA Tour's agreement with the European Tour to form a group boycott against LIV Golf and its players is further reflected in the punishments the European Tour imposed on its members who participated in LIV Golf events. The European Tour has historically considered playing in a competing event without a release to be a minor breach of its Regulations, with a punishment of €12,000 for a violation. In contrast, when its members participated in the first LIV Golf event, the European Tour issued punitive sanctions at the behest of the Tour, including fines of approximately €100,000 and suspensions from the three events the European Tour co-sanctions with the PGA Tour

(but not other European Tour events not co-sanctioned by the PGA Tour), and threatened that participating in further LIV Golf events would lead to double fines and suspensions. To engineer these punishments, the European Tour first amended its regulations twice—after entering into the illegal alliance with the PGA Tour—to make the relevant violation of the European Tour's Regulation a "Serious Breach," which would give the Commissioner discretion to punish players and expand the scope of the Regulation.

148. On July 1, 2022 three of the golfers suspended from the co-sanctioned events, Ian Poulter, Adrian Otaegui, and Justin Harding, sued the European Tour to stay their suspensions and allow them to participate in the Scottish Open. The players challenged the European Tour's sanction process as unfair and partial, and challenged the legality of its regulations. They also challenged the sanctions as contrary to the European Tour's interest, as it was clear the European Tour was acting in concert with the PGA Tour.

149. The matter was referred to an arbitrator (pursuant to European Tour rules and an agreement between the players and the European Tour to stay the players' suit), who granted the players' request to stay their suspension from the Scottish Open until the merits of their appeal could be heard before an independent panel. The arbitrator reasoned that European Tour CEO and Commissioner Keith Pelley undertook "no process . . . close to replicating the guidelines for a disciplinary hearing" and "was on record as having made strong adverse public statements on LIV," and, as the European Tour stated itself, he was "'necessarily partial.'"

150. On July 1, 2022, the PGA Tour demonstrated its power over the European Tour, and laid bare its anticompetitive motives in banning participants in LIV Golf events from its tournaments, by banning from the co-sanctioned events in the United States (the Barbasol and the Barracuda) all European Tour golfers in good standing who had played in the LIV Golf London Invitational. These golfers were not members of the PGA Tour, and thus could not have violated any PGA Tour rule. And even though they are members of the European Tour, they had not violated any European Tour rule

because they were permitted by the European Tour to participate in the LIV Golf event.[6] Nonetheless, the PGA Tour barred these golfers from playing in co-sanctioned events, because the PGA Tour has a policy of total foreclosure of LIV Golf players from any of its events.

151. On July 20, 2022, in furtherance of its agreement with the Tour to boycott LIV Golf and those who associate with it, the European Tour removed Henrik Stenson as the European Team's 2023 Ryder Cup Captain because he joined LIV Golf.

**PGA Tour Leans on the Majors to Do Its Bidding Against LIV Golf**

152. The Tour's threats to impose bans on players who join LIV Golf are vastly strengthened if the ban encompasses not only PGA Tour events, but also the four annual Major Championships—the PGA Championship, the Masters, the Open, and the U.S. Open—as well as the biannual Ryder Cup. Participating in and winning the Majors and the Ryder Cup are the ultimate goal of most top professional golfers. And, in turn, one of the goals of playing on a tour each year is to secure qualification to the Majors and the Ryder Cup. The Tour is aware that if it can foreclose LIV Golf players from having access to these events—or even create enough credible doubt about whether participation in LIV Golf will end a player's chance of playing in those events—LIV Golf will find it prohibitively difficult to sign and sustain a critical mass of players to field a competitive elite-level tour. Accordingly, the Tour has pressured and encouraged the Major organizations to join its group boycott and to prevent LIV Golf from entering the global golf ecosystem.

153. For example, PGA Tour Commissioner Jay Monahan wrote in his January 2020 Memorandum: "We have liaised with each [Major] organization to learn of its position regarding Private Equity Golf."

154. As with the Tour's ramping up of its player threats over time as the threat of LIV Golf's competitive entry has grown, the Tour's pressure on the Major organizations has grown over time as well. For example, as part of its strategy to pressure the Majors into doing its bidding, in July 2022, the Tour had its 2022 Presidents Cup Captain and Hall of Fame Golfer Davis Love III use his position

---

[6] The golfers did not need a release from the European Tour to play in the LIV Golf London event because they had not qualified for the conflicting event on the European Tour. Thus, the golfers had not breached any European Tour rule and were not subject to any discipline from the European Tour.

and influence to publicly encourage Tour members to enter into a group boycott of the Majors if the Majors do not ban all players who have played in LIV Golf.  As Mr. Love stated, in encouraging a *per se* unlawful group boycott among Tour members: "Well, here's the biggest lever; and it's not the nice lever.  But if a group of veterans and a group of top current players align with 150 guys on the Tour, and we say, 'Guess what?  We're not playing,' that solves it, right?  If LIV guys play in the U.S. Open, we're not playing.  If they sue in court, and they win, well, we're not playing.  You know, there won't be a U.S. Open.  It's just like a baseball strike."  As Mr. Love's comments make clear, the Tour and its representatives view themselves as being above the law, exempt from the requirements of the Sherman Act, and free to engineer a self-help group boycott aimed at frustrating any injunction entered by this Court.

155.    *The PGA Championship and the Ryder Cup.*  The PGA of America is a separate entity from the PGA Tour, which organizes the PGA Championship and co-organizes the Ryder Cup along with the European Tour.  The PGA of America has a representative, President Jim Richerson, on the PGA Tour Policy Board.  On May 4, 2021, during a time when LIV Golf was gaining momentum in attracting players' interest and on the eve of the PGA Championship in South Carolina, the CEO of the PGA of America, Seth Waugh, stated publicly that the PGA of America was aligned with the Tour in opposing LIV Golf's competitive entry.  Specifically, he said, "We [PGA of America] are in full support of the PGA Tour and the European Tour regarding the current ecosystem of the professional game."  Then, two weeks later, Mr. Waugh said that the PGA of America would ban players from future PGA Championships and the Ryder Cup if they joined LIV Golf.  Specifically, Mr. Waugh said, "If someone wants to play on a Ryder Cup for the U.S., they're going to need to be a member of the PGA TOUR—excuse me, a member of the PGA of America, and they get that membership through being a member of the TOUR. . . .  It's a little murkier in our championship, but to play from a U.S. perspective you also have to be a member of the TOUR and the PGA of America to play in our championship, and we don't see that changing."  Mr. Waugh went on to state, "I believe the Europeans feel the same way.  And so I don't know that we can be more clear than that."  Mr. Waugh's public threat inaccurately characterized the PGA of America's Constitution, as there are many ways to be a member of the PGA of America beyond being a member on the PGA Tour.

156.     At the September 2021 Ryder Cup, PGA of America representatives privately threatened golfers and their representatives that they would be banned from future Ryder Cups and the PGA Championship if they joined LIV Golf.

157.     Mr. Waugh repeated the threat a year later at the 2022 PGA Championship.  He said, "As I said, we're a fan of the current ecosystem and world golf ranking system and everything else that goes into creating the best field in golf.  Right now we really—I don't know what it'll look like next year.  We don't think this [LIV Golf] is good for the game and we are supportive of that ecosystem. We have our own bylaws that we will follow towards those fields."  He was then asked by the media, "I'm sorry do your bylaws preclude letting those players [players who played in LIV Golf] play?"  Mr. Waugh responded, "Not specifically, but our bylaws do say that you have to be a recognized member of a recognized Tour in order to be a PGA member somewhere, and therefore eligible to play."

158.     And then, in June 2022, the 2023 PGA of America Ryder Cup Captain Zach Johnson repeated the same unfounded threat and expanded it to suggest that Plaintiffs will not be eligible for the 2023 Ryder Cup.  When he was asked by the media whether a player who plays in LIV Golf will be eligible for his 2023 Captain Picks, he responded, "The way that we're members of the PGA of America is through the PGA Tour.  I'll let you connect the dots from there."

159.     *The Open.*  The R&A, the global golf rules organization and promoter of The Open Championship, has taken multiple actions to support the PGA Tour's efforts to exclude LIV Golf.  For example, the R&A has taken away the Asian Tour's Order of Merit winner's entry into the Open Championship in order to deter the Asian Tour from partnering with LIV Golf.  Similarly, the CEO of the R&A (Martin Slumbers) and the Chairman of Augusta National (Fred Ridley) called the CEO of the Asian Tour (Cho Minn Thant) to threaten consequences relating to the Asian Tour's position in the current "ecosystem" if the Asian Tour continued to support LIV Golf and its LIV Golf Invitational Series.  More recently, in July 2022, the R&A demonstrated its alignment with the PGA Tour by publicly disinviting two-time Open Championship winner Greg Norman from champions events at the 150th Open Championship because he is the CEO of LIV Golf.  The R&A also informed Mr. Mickelson he was not welcome.  And, at the Open Championship in July 2022, R&A CEO Martin Slumbers suggested that players who play in LIV Golf may not be eligible or qualify for future Open

Championships, and that it would be harder for them to make it in the tournaments.

160.  *The Masters.*  Augusta National, the promoter of The Masters, has taken multiple actions to indicate its alignment with the PGA Tour, thus seeding doubt among top professional golfers whether they would be banned from future Masters Tournaments.  As an initial matter, the links between the PGA Tour and Augusta National run deep.  The actions by Augusta National indicate that the PGA Tour has used these channels to pressure Augusta National to do its bidding.  For example, in February, 2022 Augusta National representatives threatened to disinvite players from The Masters if they joined LIV Golf.  In addition, Augusta National Chairman Fred Ridley personally instructed a number of participants in the 2022 Masters not to play in the LIV Golf Invitational Series.  Plainly, these threats to top players served no beneficial purpose, as they would only serve to weaken the field in the Masters.

161.  In May, 2022 the PGA Tour also encouraged Augusta National representatives to attend Tour Player Advisory Council meetings to discuss ramifications for players participating in LIV Golf events, further demonstrating how the Tour has leaned on Augusta National to aid it in dissuading golfers from joining LIV Golf.

162.  And, when LIV Golf CEO Greg Norman asked Mr. Ridley if he would meet with him to understand LIV Golf's business model and discuss how LIV Golf could operate in the existing professional golf world, Mr. Ridley declined the invitation—another example of LIV Golf trying to work with existing golfing entities and being turned away before even getting an opportunity to show them what LIV Golf is about.

163.  In addition, the Tour and others are utilizing their positions on the Governing Board of the OWGR to create enough credible doubt about whether LIV Golf will be eligible for OWGR points and whether players who participate in OWGR will be able to earn points playing in LIV Golf tournaments.

### The Tour Announces Policy to Permanently Ban Players Who Join LIV Golf

164.  Between January 2020 and February 2022, the Tour increased the severity of its threats of punishment to any player who would consider joining LIV Golf, as well as threats to the players' representatives and entities involved in golf sponsorship and advertisement.  These threats, both individually and in combination, were anticompetitive acts that harmed Plaintiffs and tortiously

interfered with the Plaintiffs' business relationships.

165.     With multiple press reports in early 2022 describing LIV Golf's forward momentum and reporting that LIV Golf was nearing the critical mass needed to launch its tour, the Tour once again increased its threats to the players.  In February 2022, the Tour gathered the agents of players (including the Player Plaintiffs' agents) who were assembled for a Tour event in Los Angeles, California and informed them that the Tour would impose a lifetime ban on any player who signed with LIV Golf. This threat was a significant deterrent for players to take the risk to join LIV Golf.  At that time, LIV Golf had not held its first tournament, and there was simply too great of a risk of career destruction in the face of such unlawful and brazen threats.  For example, one star player, who had been in favor of joining the LIV Golf League before the threat, stated that younger players were "s***ting in [their] pants" in response to this threat, and that he was not sure how LIV Golf could get the players it needed with the Tour's lifetime ban threat.

166.     On February 22, 2022, Commissioner Monahan addressed a meeting of Tour players at the Honda Classic and reiterated that any player who joined LIV Golf would receive a lifetime ban from the Tour.  According to an article quoting an anonymous player present at the meeting, Commissioner Monahan told players that if they were going to play in the league operated by LIV Golf to "walk out that door now" and "made the ban seem like it was in all capital letters."

167.     The Tour's threats of punishment and career destruction greatly affected LIV Golf's ability to sign enough elite professional golfers to fill out its League.  Some players (including Plaintiff DeChambeau) who had previously signed contracts with LIV Golf were forced to publicly profess loyalty to the Tour.  Other players who had previously agreed in principle to all terms with LIV Golf informed LIV Golf that they now could not sign, and instead publicly professed loyalty to the Tour. Players who had been enthusiastic about joining LIV Golf informed LIV Golf that they regrettably could not join in light of these threats.  Just as Commissioner Monahan had predicted in his 2020 Memorandum outlining the PGA Tour's plan to attack a new entrant, a competing tour without player support would prove unable to pose a competitive threat to the PGA Tour.

168.     The Tour's lifetime ban policy had its desired effect, as LIV Golf League's 2022 launch plan died.  LIV Golf was injured by having its launch plans derailed.  And Player Plaintiffs were injured

by losing the opportunity for increased playing and income opportunities and sustained competition for their services.

## LIV Golf Invitational Series

169. Forced to scrap its plans for a 2022 launch of the League, LIV Golf regrouped and developed a substantially scaled-down launch plan that became known as the LIV Golf Invitational Series. The Invitational Series did not include franchised teams or other planned League features, and promised two fewer events in 2022. Instead, on March 16, 2022, LIV Golf announced that the Invitational Series would feature an eight-event series showcasing a new golf format starting in June 2022. The format features both individual and team play, and offers more than $250 million in prize purses. The first seven LIV Golf Invitational Series events each carry a purse of $25 million, comprised of $20 million in individual prizes (all players in the field earn a share) and $5 million, split among the top three teams. Following the first seven LIV Golf Invitational Series events, an Individual Champion will be crowned and a $30 million bonus prize will be split among the top three individual performers throughout the series. The eighth LIV Golf Invitational Series event will be a Team Championship that will provide an additional $50 million in total prize funds. The LIV Golf Invitational 2022 schedule started with the LIV Golf London Invitational on June 9–11, 2022, the LIV Golf Portland Invitational at the Pumpkin Ridge Golf Club on June 30–July 2, 2022, and the LIV Golf New York Invitational in Bedminster, New Jersey on July 29–31, 2022. The remaining LIV Golf scheduled events are:

- Sept. 2–4: The International – Boston, Massachusetts
- Sept. 16–18: Rich Harvest Farms – Chicago, Illinois
- Oct. 7–9: Stonehill Golf Club – Bangkok, Thailand
- Oct. 14–16: Royal Greens Golf Club – Jeddah, Saudi Arabia
- Oct. 28–30: Trump Doral Golf Course – Miami, Florida

170. During weeks in which there is no LIV Golf Invitational Series tournament, LIV Golf encourages players to play wherever they choose, including Tour events, other events on other tours, or events that might be created in the future (and which are currently prevented from developing because of the Tour's restrictive rules).

171. While LIV Golf has moved forward with its scaled-down plans for the Invitational

Series, it has incurred financial losses that were far more severe than it would have incurred if its original launch plans had not been derailed by the Tour's anticompetitive conduct. These losses are partly due to the supracompetitive increases to player-acquisition costs it has incurred in light of the Tour's anticompetitive conduct, and partly due to the loss in revenue-generating opportunities as a result of the scaled-down nature of the Invitational Series in comparison to the original plans for the League.

### Efforts to Prevent and Harm LIV Golf's Invitational Series

172. On March 15, 2022, LIV Golf Commissioner and CEO Greg Norman sent emails regarding the LIV Golf Invitational Series to approximately 250 top professional golfers (including Plaintiffs). The Player Plaintiffs were excited that LIV Golf was going to host tournaments despite the obstacles the Tour put in its path. On March 23, 2022, LIV Golf formally invited the same group of players to participate in the LIV Golf Invitational Series. Several players (including the Player Plaintiffs) reached out to LIV Golf to say that they were interested in playing in the Invitationals, but they were concerned about doing so in light of the Tour's threats to players. The Player Plaintiffs remained interested in LIV Golf and continued discussions, as did others.

173. The Player Plaintiffs and many other players (at least 170 golfers) filed entry applications for LIV Golf Invitational Series' first event. The Player Plaintiffs and, on information and belief, some 80 Tour members sought conflicting events and media rights releases from the PGA Tour under the Conflicting Events and Media Rights Regulations.

174. In furtherance of its monopoly and its monopsony and its illegal agreement with the European Tour, on May 10, 2022, the Tour denied *all* requests from Tour members to participate in LIV Golf Invitational Series events. The denials were striking, because the Tour has historically granted releases to players to permit them to participate in events outside the U.S., but in this case the Tour issued an across-the-board denial for an event taking place in London. In its letter to the players denying the release requests, the Tour made clear that the reason it was departing from past practice was that LIV Golf planned to compete against the PGA Tour in North America:

> While releases have been granted in limited circumstances for one off-events outside North America or for events outside of North America on tours based exclusively outside of North America, the event for which you have requested

a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States.

175. There is no possible procompetitive justification for the denial, particularly because—as the Tour acknowledged—it would have granted the release for another event or tour that was not trying to compete against the Tour. This was simply an effort to defeat competition.

176. Then, unsatisfied with prohibiting all current Tour members from participating in LIV Golf events, the Tour extended its threat college golfers, explaining that if they played in any LIV Golf events they would be banned from entry into the PGA Tour University program, which provides top college golfers entry into the Tour's developmental tour (Korn Ferry Tour). Again, this action served no procompetitive purpose, nor could it plausibly be justified as an enforcement of any Tour member regulations, because the college golfers threatened by the Tour are not Tour members and are not bound by any Tour rules or regulations. Instead, this was simply aimed at thwarting competition by preventing LIV Golf from being able to secure top golfers to participate in its tournaments.

177. On May 17, 2022, the European Tour acted in concert with the Tour and sent notices to its members denying them permission to participate in the LIV Golf Invitational Series event in London. The European Tour stated that the basis for the denial is that the LIV Golf Invitational Series event will compete with its European Tour event. Notably, however, the European Tour historically did not deny golfers' requests to participate in conflicting events.

178. In response to these threats, LIV Golf was forced to commit to substantial up-front payments to a number of top golfers to convince the players to take on the risk of punishment from the Tour, as well as the risk of lost sponsorships and other injuries orchestrated by the Tour. These substantial payments have greatly increased LIV Golf's costs of launching its Invitational Series, and, if the Tour's conduct is not enjoined, the ongoing cash outlays significantly threaten the long-term viability of LIV Golf. Notably, however, while the increased payments have harmed LIV Golf, they also have not fully compensated the Player Plaintiffs for all of the injuries they have suffered as a result of the Tour's anticompetitive conduct, including both uncompensated monetary injury and ongoing irreparable injury in the form of lost professional playing and other opportunities that cannot be compensated through monetary relief. As such, both the Player Plaintiffs and LIV Golf have been injured and continue to suffer irreparable injury as a result of the Tour's anticompetitive conduct.

179.    On May 31, 2022, LIV Golf announced the field for its London Invitational.  In that announcement, the field included 16 PGA Tour players, 22 European Tour players, three promising young amateurs, and a number of other top players from across the world.  Players were very interested in the product.  But it was not the quality of field LIV Golf set out to have and was not the field of players LIV Golf would have had but for the PGA Tour's unlawful regulations and threats.

180.    Tour members who agreed to participate in the LIV Golf London Invitational publicly expressed the difficulty of doing so in light of the Tour's conduct.

a.    For example, the agent for PGA Tour member Dustin Johnson released a statement that:  "Dustin has been contemplating this opportunity off-and-on for the past couple of years.  Ultimately, he decided it was in his and his family's best interest to pursue it.  Dustin has never had any issue with the PGA Tour and is grateful for all it has given him, but in the end felt this was too compelling to pass up."

b.    Plaintiff Matt Jones averred that participating in the LIV Golf Invitational Series "was a good business opportunity for me and my family.  I like the concept, the idea of the three-day tournaments, [and] the team format aspect of things is great.  I have thought about that [threat of punishment from the PGA Tour], which is something I had to weigh.  I don't think banning players is a good look for the PGA Tour, or for golf in general."

c.    PGA Tour member Graeme McDowell stated, "[t]he perceived consequences are definitely concerning.  It was an exceedingly difficult decision.  It is a difficult decision as a player when there's so many unknowns.  We do not know what the reaction is going to be. It just boils down to the fact that I am a business and I have operated all over the world for 20 years.  This is a compelling opportunity."

181.    Other Tour members who agreed to compete in the LIV Golf London Invitational welcomed the innovations LIV Golf brought to the game.  Player Plaintiff Swafford stated that LIV Golf's "[s]chedule is very enticing to a guy who has two small kids.  I think the format, the team aspect,

is going to be incredible.  Look at Zurich [the Zurich Classic of New Orleans, which is a two-man team event], putting teams together turned an event that was in a tough part of the schedule into one that gets some incredible fields.  I'm really looking forward to seeing how that works."

182.    After the LIV Golf field was announced, the PGA Tour Player Advisory Council held an emergency meeting with representatives from Augusta National present.  They informed the golfers in attendance that the PGA Tour and Augusta National had agreed to work together to address LIV Golf.  As described above, the threat of exclusion from the Masters (and the other Majors) is a powerful weapon in the Tour's arsenal to deter players from joining LIV Golf.

183.    On information and belief, the Tour also ramped up its pressure on sponsors to prevent them from doing business with players who join LIV Golf, including pressuring a number of sponsors to sever longstanding relationships with players.

184.    The Tour also continued its campaign of direct pressure on players to seek to convince them to withdraw from the LIV Golf event.  The Tour sent letters to all Tour members listed in LIV Golf's May 31, 2022 press release, notifying them they were in violation of the PGA Tour Member Regulations and that the Tour Commissioner would take "appropriate course of action" against the players unless they withdrew from the LIV Golf Invitational Series event "in a manner reasonably satisfactory to the [PGA] Tour within forty-eight (48) hours."  The European Tour sent similar notices to its members who were included in the LIV Golf Invitational Series field.

185.    The PGA Tour also enforced its Regulations on players agreeing to participate in LIV Golf Invitational Series who had not even qualified for the Tour but are members of the developmental Korn Ferry Tour owned by the PGA Tour (and subject to nearly identical Regulations).  For example, the PGA Tour applied its Regulations to prohibit Korn Ferry Tour members Mr. Uihlein and Turk Pettit from participating in LIV Golf Invitational Series.

186.    The PGA Tour also sent a letter to Andy Ogletree, a Korn Ferry Tour Member, threatening him with punishment if he played in the LIV Golf event.  In response, Mr. Ogletree reached out to Tour Vice President of Competition Administration Kristen Burgess regarding the Tour's denial of his release request.  Mr. Ogletree explained that he had not qualified for the conflicting event on the Korn Ferry Tour taking place the same weekend as the London LIV Golf Invitational Series.  Thus, his

60

participation in the London LIV Golf Invitational Series event did not keep him from otherwise participating in a Korn Ferry Tour event (or, for that matter, a PGA Tour events). Mr. Ogletree informed the Tour that he had "spent thousands and thousands of dollars" in his unsuccessful effort to play in Korn Ferry Tour and PGA Tour events. He asked the PGA Tour: "Should I just sit at home on my couch next week and not make any money? It seems like this is your stance." Mr. Ogletree also noted the inconsistency of the Tour's stance since it had given Mr. Ogletree a release to participate in the Asian Tour International Series event from June 2–5, 2022 sponsored by LIV Golf. In response, the Tour cited the fact the LIV Golf Invitational Series will host events in the United States—specifically, that the LIV Golf Invitational Series competes with the Tour—as the basis for his event release denial.

187.   This episode highlights that there is no conceivable procompetitive justification for the Tour's punishment of players for participating in LIV Golf events. Mr. Ogletree was not going to play in any PGA Tour or Korn Ferry Tour event that weekend, because he was not qualified by those tours to participate in their events. The LIV Golf event thus did not pull Mr. Ogletree away from any PGA Tour event. Instead, it simply provided an opportunity for a player to pursue his trade and earn compensation, along with increasing overall output in the market. And yet the PGA Tour denied a release for Mr. Ogletree and subjected him to discipline for the offense of playing in a tournament when he otherwise would have been "just sit[ting] at home on [his] couch."

188.   It also demonstrates that the PGA Tour's opposition to LIV Golf is not based on the source of capital for LIV Golf events. The Tour granted a release to Mr. Ogletree to play in the Asian Tour event that was funded by LIV Golf, because the Asian Tour is not competing with the PGA Tour. But when Mr. Ogletree sought to participate in an event that the PGA Tour deemed a competitive threat, the Tour denied the release and threatened punishment against him.

189.   The Tour then went further to contact individually players who had chosen to play in the LIV Golf Invitational Series. Among them was Player Plaintiff Gooch. PGA Tour Chief Tournament & Competitions Officer Andy Pazder texted Mr. Gooch on June 2: "Just want to make sure you understand the implications of playing without an approved conflicting event release." Mr. Gooch responded, "Davis [Love III] called yesterday and said jay [Monahan, PGA Tour

Commissioner] is going to suspend, is this true?" In response, Mr. Pazder told Mr. Gooch that he would be banned from the Tour for life if he played in *one* LIV Golf Invitational Series event: "Our position has been that a player may choose to be a member of the Tour or to play in the Saudi/LIV events, but he can't do both. If the player chooses the latter, he should not expect to be welcomed back."

190. On June 3, 2022, the PGA Tour sent an additional letter to all its members who had agreed to participate in the LIV Golf London Invitational, informing them: "pursuant to Article VII, Section C, you are being placed on probation until further notice. Specifically, as reflected in the Notice of Disciplinary Inquiry to you dated June 1, 2022, the rule infraction triggering your probation is violation of Article V, Section A.2 of the PGA Tour Player Handbook & Tournament Regulations ("Regulations"). Accordingly, if you violate any other rule of the PGA Tour while on probation including, but not limited to, violating Article V, Section B.1, which prohibits your participation in a live or recorded golf program, such as the LIV Golf Invitational London, for which a media release has been denied, the Commissioner may immediately suspend your playing privileges." Article VII, Section C of the PGA Tour Regulations relates to "conduct unbecoming a professional." Thus, the Tour told its members that the act of playing in a professional golf tournament constituted "conduct unbecoming a professional golfer."

191. Simply put, the Tour's position that merely playing professional golf for another promoter constitutes "conduct unbecoming a professional" golfer is breathtaking. And it reveals the threat to competition that underlies the PGA Tour's Regulations giving the PGA Tour Commissioner absolute discretion to interpret the Regulations and punish its Members.

192. On June 4, 2022, former Tour member Kevin Na resigned his PGA Tour membership due to the PGA Tour's refusal to permit him to participate in the LIV Golf Invitational Series. Mr. Na expressed his desire as an independent contractor to "exercise[e] my right as a free agent" to have "the freedom to play wherever I want," noting that he "cannot remain a PGA Tour member" and exercise his independent contractor rights due to the Tour's Regulations and threats. He expressed his "sad[ness]" and his desire that PGA Tour Regulations change to enable him to play on the PGA Tour again.

193.     In total, 10 Tour members who agreed to participate in the LIV Golf London Invitational resigned from the PGA Tour in response to these threats to avoid Tour punishment.

194.     When the Tour learned that members were considering resignation to avoid the punishments it had threatened, it informed them that "should a member resign in an effort to avoid disciplinary action for future violations of the Regulations, the member would still be subject to disciplinary actions for violations prior to the date of Resignation.  In addition, a player should not expect that he will be able to rejoin membership or play in any events without membership at any particular time, as such matters would be governed by the Regulations and event requirements in effect at the time, as they may be amended from time to time."  Most PGA Tour tournaments are managed by other nonprofit organizations and offer sponsorship exemptions to PGA Tour and non-PGA Tour golfers.  Thus, in order for the PGA Tour's written threat to play out it requires agreement from other economic actors (the sponsors and tournament hosts).

195.     Minutes after the golfers teed off at the LIV Golf London Invitational on June 9, 2022, the Tour distributed letters to its current and former members immediately suspending them and promising "the same fate [would] hold" for any Tour member playing in future LIV Golf events.

196.     Also on June 9, 2022, Commissioner Monahan sent a letter to all PGA Tour Members and released the letter to the public identifying the golfers the PGA Tour was punishing.  Contrary to its historical practices, the Tour sought to expose and malign these golfers for pursuing their profession. In particular, the PGA Tour Commissioner wrote:

a.     Tour members, including the Player Plaintiffs and former members "are suspended or otherwise no longer eligible to participate in PGA Tour tournament play, including the Presidents Cup;"

b.     The suspension applies to all tours sanctioned by the PGA Tour (Korn Ferry, Champions, Canada, Latinoamerica);

c.     The golfers participating in the LIV Golf London Invitational Series "did not receive the necessary conflicting events and media rights releases—or did not apply for releases at all—and their participation . . . is in violation" of the Regulations;

d.     The Tour Commissioner made clear that any players "who participate in future [LIV Golf Invitational Series] events in violation of our Regulations" will suffer the "same fate" of suspension;

e.     Non-PGA Tour members who participated in LIV Golf Invitational Series "will not be permitted to play in PGA Tour tournaments as a non-member via a sponsor exemption or any other eligibility category;"

f.     The Commissioner tried to embarrass the Player Plaintiffs by claiming that they and others made "their own financial-based" choice and they cannot demand the same "PGA Tour membership benefits" as other golfers;

g.     The Commissioner further acknowledged that "there are true consequences for every shot" taken on the PGA Tour where a golfer could earn no compensation while paying for his travel to the event, whereas LIV Golf compensates its participants; and

h.     The Commissioner embraced the notion that the PGA Tour is the "preeminent organization in the world of professional golf."

197.     Also on June 9, 2022, the PGA Tour Vice President of Competition Administration, Kristen Burgess, sent letters to all former PGA Tour Members who participated in the LIV Golf London Invitational Series but had resigned from the Tour, informing them they "remain subject to disciplinary action for violations prior to the date of resignation" and they "should not expect that [they] will be able to rejoin membership or play in any events without membership at any particular time."

198.     The Tour expanded its punishments by threatening to revoke the agency credentials for agencies that represent golfers who join LIV Golf—thereby threatening to injure the agents' business for merely representing golfers who chose to join LIV Golf.

199.     The Tour also enlisted Tiger Woods to do its bidding and publicly criticize golfers—particularly younger golfers—for joining LIV Golf by suggesting they would never play in The Masters, The Open, or other Majors and would not earn OWGR points: "Some of these players may not ever get a chance to play in major championships. That is a possibility. We don't know that for sure yet. It's up to all the major championship bodies to make that determination. But that is a

possibility, that some players will never, ever get a chance to play in a major championship, never get a chance to experience this right here, walk down the fairways at Augusta National. . . , especially if the LIV organization doesn't get world-ranking points and the major championship change their criteria for entering the events."  Mr. Woods' comments echoed earlier evidence indicating that the Tour was continuing to pressure the Majors to join the Tour's unlawful group boycott to exclude LIV Golf and punish any players who played in any LIV events.

### PGA Tour Disciplinary Process

200.    On June 9, 2022, PGA Tour Senior Vice President of Tournament Administration Andy Levinson sent letters to all PGA Tour Members who participated in the LIV Golf London Invitational Series event, including the Player Plaintiffs.  In that Letter, Mr. Levinson informed golfers that (1) the PGA Tour considered them in violation of the Media Rights Regulation (V.B.1.b), (2) the PGA Tour considered them in violation of a PGA Tour Regulation against Public Attacks (VI.E.), (3) they were suspended immediately from playing in PGA Tour events "until further notice," and (4) they had 14 days to submit written statements and/or evidence that the PGA Tour Commissioner should consider "before determining an appropriate course of action separate from your current suspension."

201.    The PGA Tour's Regulations detail its Disciplinary Procedures and Appeals, which provide an unconscionable and unfair process by which the players have no legitimate chance of getting fair treatment as it relates to punishments having anything to do with LIV Golf.  Exhibit 1.  The Tour's Regulations provide that the Commissioner has discretion to hear the appeal in the first instance.  The Commissioner can also transfer the appeal to a panel of three Tour policy board members.  The procedures do not give the player a hearing as a matter of right.  After the procedures conclude, the Regulations provide that a player has released any and all claims against "the PGA TOUR Policy Board, the Commissioner or the Appeals Committee, PGA TOUR, Inc., the Professional Golfers' Association of America, and each director, officer, member, employee, agent or representative of any of the foregoing."  Thus, the Tour's Regulations are set up as follows:   (1) the Tour sets the Regulations which bind any player member, including changing those Regulations from time to time without input or consent from the player members, (2) the Regulations give the Commissioner the sole authority to interpret the Regulations in his discretion, (3) the Regulations demand that the biased Commissioner

serve as judge, (4) the Regulations allow that same biased Commissioner to hear any appeals, (5) the Regulations provide no independent review process, as the Tour Board is put in the position of reviewing a Tour commercial policy that it approved and executed over the last few years, and (6) at the end of it all, the Regulations purportedly provide that the player has no right to challenge the punishment having released all involved. That release is unenforceable and the Regulations' Disciplinary Procedures are procedurally and substantively unconscionable.

202. Several golfers submitted letters to the Tour challenging the Tour's indefinite suspension and objecting to any further course of action punishing the golfers.

203. On June 29, 2022, and various other dates, the PGA Tour suspended the Player Plaintiffs until March 31, 2023, issued threats to extend the suspensions based on further violations of the Regulations, including (in the Tour's view) continuing to play in LIV Golf events or even to talk favorably about LIV Golf. Commissioner Monahan considered the golfers in violation of the Conflicting Events Regulation and Media Rights Regulation. Additionally, Commissioner Monahan considered the golfers in violation of the PGA Tour's Regulation Section VI.E ("Public Comments, Public Attacks") provision which provides that:

> The favorable public reputation of PGA TOUR, its players and its tournaments are valuable assets and create tangible benefits for all PGA TOUR members. Accordingly, it is an obligation of membership to refrain from making comments that unreasonably attack or disparage others, including, but not limited to tournaments, sponsors, fellow members/players and/ or PGA TOUR. Speech that could be reasonably viewed as hateful, abusive, obscene and/ or divisive is expressly prohibited. Responsible expressions of legitimate disagreement with PGA TOUR policies are not prohibited. However, public comments that a member knows, or should reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow member/player, a tournament sponsor or a charity are expressly covered by this section. Any violation of this section shall be considered conduct unbecoming a professional.

Commissioner Monahan deemed the golfers' reasonable statements of opinion and compliments of LIV Golf in violation of this provision merely because favorable comments regarding a competitor to the PGA Tour supposedly could cause the Tour financial harm.

204. The Tour's punishments put the players in an untenable position: They were banned for roughly nine months, which prevents them from playing in PGA Tour events (and its subsidiary tours) and they have been told that if they play in any LIV Golf events while the suspensions are in

effect, the Tour will deem that an additional violation and impose event greater punishments. In effect, the Tour's punishments amount to a lifetime ban, because the only chance for a player to be clear of the PGA Tour's suspensions is to refrain from playing in any elite professional events—and thus essentially drop out of his profession.

205. On July 6, 2022, PGA Tour Board Member and President of the PGA Player Advisory Council Rory McIlroy said that golfers who join LIV Golf are "basically leaving all [their] peers behind to go make more money, which is fine. But just go over there. Don't try and come back and play over here again." Several years ago, Mr. McIlroy left the European Tour to play predominantly on the PGA Tour, and was still permitted by the PGA Tour to remain a European Tour member through his participation in the minimum number of events required by each tour.

206. On July 13, 2022, the Player Plaintiffs appealed their nine-month suspension (and career threatening ban from the PGA Tour). The grounds for the players' appeals were:

    a.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b are plainly unlawful restraints of trade that violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and various state laws, and therefore (1) no punishment for purportedly violating those unlawful provisions may issue and (2) any purported agreement by any person to adhere to those unlawful provisions is void and unenforceable;

    b.    Commissioner Monahan and the PGA Tour (the "Tour") violate Section 2 of the Sherman Act by applying Sections VII.E. and VII.C to unlawfully punish golfers to thwart LIV Golf's competitive entry, and therefore no punishment for purportedly violating those provisions may issue;

    c.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b enable Commissioner Monahan to unlawfully control what independent contractor-golfers do when they are not playing on the PGA Tour (the "Tour"), and thus no punishment for purportedly violating those provisions may issue;

    d.    The Tour has unlawfully agreed with other entities in the purported golf "ecosystem," including the European Tour, to establish a group boycott to prevent LIV Golf from succeeding and has targeted its Regulations to

impermissibly punish golfers to carry out its coordinated dealings with others in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e. Commissioner Monahan has violated the Tour's purported nonprofit purpose and violated his fiduciary duties to the Tour and its members by punishing golfers in this way;

f. There was patent injustice and a lack of fair process because Commissioner Monahan cannot be impartial in his determination whether to sanction golfers because he has engaged in a two-year vendetta against prospective and new competitor professional golf promoter(s) and golfers are being punished for participating in a competitive promoter's events;

g. There was injustice and a lack of fair process because the Regulations' Disciplinary Process is procedurally and substantively unconscionable; and

h. In the alternative, the sanction imposed by Commissioner Monahan is grossly disproportionate to the seriousness of the alleged breaches of the Regulations that the Tour contends the players committed.

i. In their appeal letters, Player Plaintiffs indicated their belief that their suspensions would be abated pending appeal of their suspensions.

207. While some of the Player Plaintiffs' appeals of the Commissioner's disciplinary action were pending, on July 23, 2022, Mr. Levinson sent them a letter informing that: (1) the PGA Tour Commissioner believed they violated the Conflicting Events and Media Rights Regulations (Article V, Sections A.2 and B.1) by participating in the June 30 – July 2, 2022 LIV Golf Invitational Portland event; (2) the PGA Tour Commissioner imposed a Major Penalty of suspension from participation in any PGA Tour-affiliated tournaments, including PGA Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour Latinoamérica, and PGA Tour Canada, and a suspension of their privileges at Tournament Players Clubs, for a period ending no earlier than March 31, 2024 (an additional year suspension), at which time they may seek in writing to have their suspension lifted; (3) the PGA Tour Commissioner may impose further disciplinary action for any additional violation of the Regulations; and (4) they may appeal the sanctions by written notice to the PGA Tour Commissioner within 14 days of the letter.

In other words, the PGA Tour Commissioner unilaterally imposed further sanctions—a full additional year of suspension for playing in a second LIV Golf tournament—while the appeal of the first Notice of Disciplinary Action was still pending.

208.  On July 25, 2022, the Tour informed the Player Advisory Council that golfers who were suspended for playing in LIV Golf would not be permitted to play in the FedEx Cup, even though some of their appeals of the suspensions were pending and should have been abated under the Tour's Regulations.

209.  On July 27, 2022, Commissioner Monahan referred some of the Player Plaintiffs' appeals to the Appeals Committee and requested that any materials in support of appeal be submitted by August 10, 2022.  In response, Plaintiff Gooch requested confirmation that the Tour would abate their suspensions pending appeal to the Appeals Committee.  In response, Commissioner Monahan indicated he would not abate the Player Plaintiffs' suspensions pending appeal.

210.  On July 29, 2022, Mr. Levinson informed some Player Plaintiffs that the Tour would no longer send them Notice of Disciplinary Inquiry letters for "ongoing violations."  The Tour thus chose to abandon its disciplinary process.

211.  And, then on August 2, 2022, the Tour informed Mr. Gooch that the Tour would not abate suspensions pending appeals in violation of the Tour's regulations.

212.  The Tour historically abated players' suspensions pending their appeal of their suspensions, consistent with Section VII.E.2 of the Regulations.

213.  The Player Plaintiffs' suspensions were a critical means employed by the Tour to achieve its anticompetitive end.  Punishing the players is essential to the scheme to eliminate competition in the market.  Absent participants in elite professional golf events, no nascent league can enter the market.  By suspending the Player Plaintiffs and threatening to suspend other players, the Tour endeavored to eliminate competition.

### Specific Player Plaintiffs' PGA Tour Disciplinary Proceedings and Harm

214.  **Phil Mickelson:**  The Tour's anticompetitive scheme is apparent from the disciplinary action levied against Plaintiff Mickelson.  On March 22, 2022, the Commissioner suspended Plaintiff Mickelson (with the opportunity to apply for reinstatement in May of 2022) for, among other alleged

reasons, "attempting to recruit players to join [LIV Golf]." Following an appeal, the appeals committee (a three-person committee comprised of members of the Tour Policy Board) affirmed the Commissioner's two-month suspension. On June 20, 2022, Mr. Mickelson applied for reinstatement from the two-month suspension. The Tour denied his request, stating that Plaintiff Mickelson violated Tour regulations by participating in the LIV Golf London Invitational. In addition to denying his request for reinstatement, the Tour extended Plaintiff Mickelson's suspension, forbidding him from seeking reinstatement to play professional golf with the Tour until March 31, 2023. While Plaintiff Mickelson was suspended from tournament play, the Tour continued to levy suspensions. On July 23, 2022, the Tour imposed additional sanctions on him for participating in the LIV Golf Invitational in Portland. Specifically, the Tour extended Plaintiff Mickelson's suspension once again, deferring even the mere opportunity to apply for reinstatement until after March 31, 2024.

215.   Mr. Mickelson's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Mickelson the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Mickelson the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Mickelson the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Mickelson access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Mickelson endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Mickelson's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Mickelson the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Mickelson the opportunity to earn deferred compensation pursuant to the

PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Mickelson's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Mickelson competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Mickelson and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Mickelson will be financially and irreparably harmed. As a lifetime member of the Tour, Mr. Mickelson is particularly harmed by the Tour wrongfully taking away what he has rightfully earned—opportunity to play in Tour events for the remainder of his golfing career.

216. The Tour's unlawful conduct has also denied Mr. Mickelson the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

217. The Tour's unlawful conduct has harmed Mr. Mickelson by denying him access to fans, viewers and playing opportunities in Tour events.

218. **Talor Gooch.** On June 9, 2022, the Tour unlawfully suspended Mr. Gooch on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Gooch from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Gooch's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Gooch if he continues to play in LIV Golf events when he is not playing on the Tour.

219. Mr. Gooch's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Gooch the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Gooch the strong chance to qualify for the 2023 Major Championships by

placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Gooch the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Gooch the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Gooch access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Gooch endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Gooch's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Gooch the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Gooch the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Gooch's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Gooch competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Gooch and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Gooch will be financially and irreparably harmed.

220. The Tour's unlawful conduct has also denied Mr. Gooch the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

221. The Tour's unlawful conduct has harmed Mr. Gooch by denying him access to fans, viewers and playing opportunities in Tour events.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

222.   **Hudson Swafford.**  On June 9, 2022, the Tour unlawfully suspended Mr. Swafford on an indefinite basis from playing on the Tour.  On June 29, 2022, the Tour unlawfully suspended Mr. Swafford from playing on the Tour (or any affiliated tours) through at least March 31, 2023.  On July 23, 2022, the Tour unlawfully extended Mr. Swafford's suspension through at least March 31, 2024.  The PGA Tour has threatened to impose further disciplinary sanction on Mr. Swafford if he continues to play in LIV Golf events when he is not playing on the Tour.

223.   Mr. Swafford's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Swafford the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Swafford the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings.  The Tour's suspension has denied Mr. Swafford the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings.  The Tour's suspension has denied Mr. Swafford the right to the platform and the public exposure provided by playing on the Tour.  The Tour's suspension has denied Mr. Swafford the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's suspension has denied Mr. Swafford access to play professional golf before his fans via live attendance and video broadcast of Tour events.  The Tour's unlawful conduct cost Plaintiff Swafford endorsement deals and sponsorships.  Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.  The Tour's unlawful conduct eliminated Plaintiff Swafford's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts).  The Tour's suspension has denied Mr. Swafford the opportunity to earn FedEx Cup rankings and OWGR rankings.  The Tour's suspensions have denied Mr. Swafford the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes.  The Tour's unlawful suspensions have

damaged Mr. Swafford's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Swafford competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Swafford and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Swafford will be financially and irreparably harmed.

224. The Tour's unlawful conduct has also denied Mr. Swafford the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

225. The Tour's unlawful conduct has harmed Mr. Swafford by denying him access to fans, viewers and playing opportunities in Tour events.

226. **Matt Jones.** On June 9, 2022, the Tour unlawfully suspended Mr. Jones on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Jones's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Jones if he continues to play in LIV Golf events when he is not playing on the Tour.

227. Mr. Jones's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Jones the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Jones the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Jones the

opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Jones access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Jones endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Jones's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Jones the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Jones the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Jones's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Jones competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Jones and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Jones will be financially and irreparably harmed.

228. The Tour's unlawful conduct has also denied Mr. Jones the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

229. The Tour's unlawful conduct has harmed Mr. Jones by denying him access to fans, viewers and playing opportunities in Tour events.

230. **Bryson DeChambeau.** On June 30, 2022, the Tour unlawfully suspended Mr. DeChambeau on an indefinite basis from playing on the Tour. On July 8, 2022, the Tour unlawfully suspended Mr. DeChambeau from playing on the Tour (or any affiliated tours) through at least March

31, 2023. The PGA Tour has threatened to impose further disciplinary sanction on Mr. DeChambeau if he continues to play in LIV Golf events when he is not playing on the Tour. On July 29, 2022, the Tour sent notice to Mr. DeChambeau that it was sanctioning him for talking to other Tour members about the positive experience he had had with LIV Golf.

231. Mr. DeChambeau's unlawful suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. DeChambeau the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. DeChambeau the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. DeChambeau the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. DeChambeau access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff DeChambeau endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff DeChambeau's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. DeChambeau the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. DeChambeau the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. DeChambeau's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. DeChambeau competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. DeChambeau and his use of his media rights are causing him irreparable, financial and

commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. DeChambeau will be financially and irreparably harmed.

232. The Tour's unlawful conduct has also denied Mr. DeChambeau the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

233. The Tour's unlawful conduct has harmed Mr. DeChambeau by denying him access to fans, viewers and playing opportunities in Tour events.

234. **Ian Poulter**. On June 9, 2022, the Tour unlawfully suspended Mr. Poulter on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Poulter's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Poulter if he continues to play in LIV Golf events when he is not playing on the Tour.

235. Mr. Poulter's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Poulter the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Poulter the opportunity to participate in events that would have permitted him the chance to qualify for the Tour in 2023. The Tour's suspension has denied Mr. Poulter the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Poulter the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Poulter access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Poulter endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Poulter's opportunity to earn up to $10 million annually in the Player

Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Poulter the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Poulter the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Poulter's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Poulter competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Poulter and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Poulter will be financially and irreparably harmed.

236. The Tour's unlawful conduct has also denied Mr. Poulter the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

237. The Tour's unlawful conduct has harmed Mr. Poulter by denying him access to fans, viewers and playing opportunities in Tour events.

238. **Peter Uihlein**. On June 9, 2022, the Tour unlawfully suspended Mr. Uihlein on an indefinite basis from playing on the Tour, the Korn Ferry Tour and any affiliated tours. On June 30, 2022, the Tour unlawfully suspended Mr. Uihlein from playing on the Tour, the Korn Ferry Tour, (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Uihlein's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Uihlein if he continues to play in LIV Golf events when he is not playing on the Tour or the Korn Ferry Tour.

239. Mr. Uihlein's unlawful two-year suspension from the PGA Tour and its affiliated tours, including but not limited to the Korn Ferry Tour, has caused him irreparable professional harm, as well

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Uihlein the right he has earned to play in events on the Korn Ferry Tour, to earn compensation playing on the Korn Ferry Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Uihlein the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's unlawful suspensions are denying Mr. Uihlein to the right he has earned to participate in the Korn Ferry Tour Championship Series finals (three events) to have a chance to earn a PGA Tour card for the 2022-2023 season.  If Mr. Uihlein is prohibited from playing that series then he will have no other way to qualify for the PGA Tour next season.  The Tour's suspension has denied Mr. Uihlein the right to the platform and the public exposure provided by playing on the Korn Ferry Tour (and possibly the Tour).  The Tour's suspension has denied Mr. Uihlein access to play professional golf before his fans via live attendance and video broadcast of Korn Ferry Tour events (and possibly the Tour events).  The Tour's suspension has denied Mr. Uihlein the opportunity to earn Korn Ferry season rankings (and possibly FedEx Cup rankings next season).and OWGR rankings.  The Tour's unlawful suspensions have damaged Mr. Uihlein's goodwill and caused him substantial reputational harm.  The Tour's unlawful Conflicting Events and Media Rights Regulations, which apply to Korn Ferry Tour members just as they apply to Tour member, have denied Mr. Uihlein competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities.  The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Uihlein and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Uihlein will be financially and irreparably harmed.

240.    The Tour's unlawful conduct has also denied Mr. Uihlein the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

241.    The Tour's unlawful conduct has harmed Mr. Uihlein by denying him access to fans, viewers and playing opportunities in Tour events.

**Tour Threatens Small Businesses and Vendors To Boycott LIV Golf**

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

242.    As part of its efforts to foreclose competition from LIV Golf and to foreclose competition for Plaintiffs' services, the Tour has also threatened companies and individuals in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf.  As a result of these unlawful threats, LIV Golf has suffered (and will continue to suffer) financial injuries because its offerings in the marketplace have been impaired and because it has been denied the opportunity to work with the third parties of its choice on terms that could be reached in a fair and open marketplace.  Furthermore, this conduct threatens ongoing and irreparable harm to LIV Golf, as the headwinds created by the Tour's anticompetitive conduct threaten LIV Golf's competitive viability.

243.    In January 2022, LIV Golf was negotiating with a tent vendor, Arena Americas, about providing tents for LIV Golf events.  Arena Americas indicated that it was interested in working with LIV Golf, and LIV Golf engaged Arena Americas for its LIV Golf Invitational Series.  However, Arena Americas subsequently informed LIV Golf that it could not work with LIV Golf because the Tour had told Arena Americas that it would cease doing business with Arena Americas if it worked with LIV Golf.

244.    LIV Golf had contracted with a technology company to provide live scoring during LIV Golf events for fans watching and following along on the Internet.  On March 23, 2022, LIV Golf received an email from that technology company that it needed to rescind the contract with LIV Golf due to a business issue and needed to discuss the issue with its attorney.  The company later represented to LIV Golf that representatives from the PGA Tour had threatened that the Tour would cease doing business with it if it provided LIV Golf with support.  The company also told LIV Golf that the PGA Tour has a "blacklist" for any vendor that works with LIV Golf.  A Tour representative called the company and threatened to blacklist the company if it worked with LIV Golf.

245.    LIV Golf was in negotiation with Top Tracer to license its shot-tracing technology for use during LIV Golf broadcasts.  The Chief Executive Officer of Top Tracer was engaged with LIV Golf on multiple calls, expressed major interest in providing LIV Golf with a license to Top Tracer technology and developing a broader relationship to deploy and develop innovative products.  Suddenly, however, Top Tracer ceased communication with LIV Golf.  After a period of radio silence,

Top Tracer informed LIV Golf that it would not be putting itself up for the potential business with LIV Golf.

246. LIV Golf was in negotiation with Levelwear athletic apparel for LIV Golf volunteer apparel for LIV Golf Invitational Series event staffing. On March 25, 2022, Levelwear informed LIV that it would not sell LIV Golf any apparel because it did not want to jeopardize its relationship with the Tour.

247. LIV Golf reached out to numerous producer candidates, many of whom are independent contractors, who have communicated to LIV Golf that NBC and Golf Channel personnel have informed all producers that they will not be hired or renewed for any work with NBC or Golf Channel moving forward if they work with LIV Golf.

248. Senior programming executives at CBS revealed to LIV Golf that they cannot touch LIV Golf even for consideration due to its relationship with the PGA Tour.

249. LIV Golf tried to retain the Endeavor Company, which includes IMG, IMG Arena, IMG Media and WME, and despite interest in working with LIV Golf, they have told LIV Golf they cannot work with it because Tour Commissioner Monahan has impressed upon Ari Emmanuel (Endeavor CEO) and Mark Shapiro (Endeavor President) that Endeavor cannot work with LIV Golf.

250. Other vendors, like Intersport (event management company) and Aggreko (Power/HVAC) engaged with LIV Golf but backed out without explanation, likely indicating that they were subjected to pressure from the PGA Tour similar to that expressed by other third-party vendors.

251. LIV Golf negotiated with Provision Events, an event management company. On February 15, 2020 Provision Events told LIV Golf, "we feel like we can provide exactly what you need and our ambition would be to become your activation partner." Provision Events and LIV Golf corresponded regarding scope and arranged for a meeting to occur in March 2022. On March 10, 2022, Provision Events emailed LIV Golf and informed LIV Golf without explanation that it could no longer work with LIV Golf.

252. To supply drug testing procedures for the competing athletes, LIV Golf contacted Drug Free Sport. A Drug Free Sport representative informed LIV Golf that it would have to take the prospect of doing business with LIV Golf to his boss because of Drug Free Sport's involvement with the Tour,

but stated that "we do business with other organizations, not sure why this would be any different." After checking with the "boss," the Drug Free Sport representative responded to LIV Golf, "I've spoken to our CEO and given current headwinds in our space, we won't be able to engage at this time."

253.    LIV Golf tried to negotiate with a golf shot technology company, Hawk Eye.  Chris Wary of Hawk Eye emailed LIV Golf that "[u]pon careful consideration and following internal discussions, regrettably, at this point in time, we are not in a position to proceed any further with the potential delivery of these technologies due to conflict of interest with our existing relationships." The Tour is a Hawk Eye client.

254.    LIV Golf tried to schedule events at a premier golf course, Sentosa Golf Club.  Bob Tan, Chairman of Sentosa Golf Club, informed LIV Golf that Dominic Wall of the R&A called him and informed him that Sentosa Golf Club would be excluded and shunned by the rest of the world of golf if it worked with LIV Golf.

255.    LIV Golf tried to engage Ticketmaster for ticketing at its events.  Ticketmaster was prepared to work with LIV Golf until Ticketmaster pulled out of helping LIV Golf with ticket sales in response to pressure from the PGA Tour.

256.    LIV Golf tried to engage Pro Secrets, a yardage book company.  Michael Etherington of Pro Secrets informed LIV Golf that the PGA Tour had asked Pro Secrets to not work with LIV Golf.

257.    LIV Golf tried to engage a company known as Cueto to provide software for organizing event volunteers.  Cueto was prepared to work with LIV Golf until Cueto informed LIV Golf that it cannot work with LIV Golf "because of the threat it received from the PGA Tour."

258.    LIV Golf tried to order custom hats through American Needle hat company, and American needle informed LIV Golf that it does not want to do business with LIV Golf because of its relationship with the PGA Tour and Augusta National.

259.    LIV Golf tried to enter into a business relationship with Dick's Sporting Goods.  In response, Dick's Sporting Goods informed LIV Golf that "[g]iven our relationship with the PGA Tour and our Tournament [PGA Tour Champions tournament], [] [Dick's Sporting Goods representatives] agree it's best to pass right now."

260.    The PGA Tour threatened numerous golf courses with adverse consequences if they

hosted LIV Golf events. LIV Golf secured commitments from pristine high level courses, but the PGA Tour and the R&A retaliated against the owners of the venues with which LIV Golf contracted. The R&A punished one golf course owner by adopting a policy that it would not host The Open at his course in the future because he is giving LIV Golf "a platform," and as the R&A is "firmly on the side of the traditional Tours [PGA Tour and European Tour]." The Tour informed the same golf course owner that it would never work with the Tour again because it had worked with LIV Golf.

261. In July 2022, LIV Golf's branding team, Czarnowski, terminated its relationship with LIV Golf due to pressure from the PGA Tour.

262. The Tour threatened sponsors that they would lose opportunities to partner with the Tour if they worked with LIV Golf.

**Relevant Markets and the PGA Tour's Monopoly Position**

263. The PGA Tour is a monopolist and/or a monopsonist in two relevant product markets: (1) the market for the services of professional golfers for elite golf events, and (2) the market for the promotion of elite professional golf events.

264. The relevant geographic market for each product market is national; in the alternative, the market for each product market is global in scope.

**The Market for Services of Professional Golfers for Elite Golf Events**

265. The first relevant product market is the services of professional golfers for elite golf events. A hypothetical monopsonist in this product market would have the power to suppress compensation for golfers substantially below competitive levels for a sustained period of time, because professional golfers who sell their services for elite golf events have no reasonable substitute to which they could plausibly turn in the event of a suppression of compensation below competitive levels. For example, non-elite golf events do not offer the level of purse sizes, Major qualifying opportunities, public platforms, sponsorship opportunities, OWGR ranking opportunities, or the other attributes of elite events that would make them viable options for professional golfers in the event that a hypothetical monopsonist controlled the market for the purchase of services of elite golf events. This is demonstrated in the evidence surrounding the PGA Tour, which has been able to impose sub-competitive compensation for elite golf events without losing a meaningful number of golfers to

1   another type of sport or event.

2       266.    The relevant geographic market for the product market is national; in the alternative,

3   the market for each product is global in scope.  A hypothetical monopsonist in the purchase of services

4   of professional golfers for elite events in the United States would have the power to suppress

5   compensation for golfers substantially below competitive levels for a sustained period of time, because

6   professional golfers would be unlikely to leave the country to pursue their profession in sufficient

7   numbers to make sub-competitive compensation unprofitable for a hypothetical monopsonist in the

8   United States.  This is also demonstrated in the evidence surrounding the PGA Tour, which has been

9   able to impose sub-competitive compensation for its elite golf events in the United States without losing

10  a meaningful number of golfers to golf tours in other countries.  In the alternative, the relevant

11  geographic market is global.  Under either formulation, the Tour has unquestioned monopsony power.

12      267.    Until LIV Golf's nascent entry, the Tour was the only viable buyer of professional golfer

13  services in the relevant market for the purchase of services of professional golfers for elite golf events

14  because there is no reasonable substitute for playing on the Tour.  The European Tour's participation

15  in the market is limited to events it co-sanctions with the Tour and thus, while it could be a purchaser

16  of services of professional golfers for elite events in the United States, it has entered into an agreement

17  with the Tour to not even try to compete with it.  And, in the alternative global market, the European

18  Tour is not a viable alternative to the Tour because it cannot compete with the Tour on purse size,

19  Major qualifying opportunities, OWGR rankings, public platforms, sponsorship opportunities and

20  other benefits, and, regardless, it has entered into an agreement not to compete with the Tour.

21      268.    Until LIV Golf's nascent entry, the Tour offered earnings opportunities for professional

22  golfers that are many times greater than any other tour in the world through far greater prize pools and

23  opportunities to secure sponsorships.  The Tour offers far greater opportunities for recognition and

24  exposure, on-course competition, and opportunity to accrue OWGR points than any other tour in the

25  world.  Until LIV Golf's nascent entry, virtually every golfer who qualifies for membership on the

26  PGA Tour joined it.  Until LIV Golf's nascent entry, all of the top 50 golfers in the world were members

27  of the PGA Tour.

28      269.    The Tour's monopsony control of the purchase of services of professional golfers for

elite golf events allows it to compensate players at substantially lower levels than professional golfers would earn in a competitive market, without risk of losing players to other promoters.

270.     The Tour has used its monopsony power to impose anticompetitive regulations, notably the Media Rights and Conflicting Events Regulations, which it forces on all of its Members and which have the intent and effect of excluding competition.

271.     Until LIV Golf's nascent entry, the Tour controlled the overwhelming share of the relevant market, as nearly all of the elite professional golfers in the United States (and the world) were members of the Tour.  Even after LIV Golf's entry—which the Tour's Commissioner has characterized as "irrational"—the Tour's share of the relevant market is dominant, as measured by the Tour's share of purchases in the services market for elite professional golf events.  Indeed, all of the top golfers in the world, other than those whom the Tour suspended, are locked into the PGA Tour.  The Tour's monopsony power is also reflected in the bonus pool, increased purses, new marquee high-purse events that the Tour established in response to the threat of entry by LIV Golf.  The bonus pool and increased purses are direct evidence of the Tour's monopsony power, as the Tour significantly raised its prices in response to LIV Golf's competitive entry.  This evidence also shows that compensation for professional golfers for elite events would be significantly greater in a competitive labor market.

272.     The Tour excludes competition for independent contractor players to sell their services to others and manage their own name, image, and likeness because the Tour uses its market power to prohibit them from doing so.  The Tour's Media Rights and Conflicting Events Regulations prevent competitors from acquiring the services of Tour members.  And even when a rival is able to get Tour members to play in its events, the Media Rights Regulation excludes competition because it prevents the competing event from securing broadcast partners for its events.  That the Tour is able to require Player Plaintiffs and the Tour's other members to agree to these rules without guaranteed compensation for doing so is powerful evidence of the Tour's monopsony power.

273.     The Majors are not substitutes for the PGA Tour in the market for services of elite professional golfers.  The Tour schedules its tournaments around the Majors and most qualifying opportunities for the Majors are derived from the players' play in the Tour.

**The Market for the Promotion of Elite Professional Golf**

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

274.     The second relevant product market is the market for the promotion of elite professional golf events.  A hypothetical monopolist in this product market would have the power to raise prices substantially above competitive levels for a sustained period of time, because advertisers, sponsors, broadcasters, and fans would not be able to turn to reasonable substitutes in sufficient volumes to make it unprofitable for the hypothetical monopolist to charge prices above competitive levels.  This is because the promotion of elite professional golf is uniquely attractive to fans of professional golf and it is uniquely valuable for sponsors, advertisers, broadcast partners, venues, and others who seek to market to fans of elite professional golf.

275.     The Tour represents to prospective advertisers that it offers the "most valuable audience in sports."  According to its Tour's marketing materials, its audience of golf fans is (a) "affluent," in that it is "55% more likely to have household net worth of $1M+"; (b) "educated," in that it is "43% more likely to have a master's degree"; and (c) comprised of "influencers," in that it is "63% more likely to be top management or C-level."  The Tour is differentiated from other sports or entertainment products by the access it offers to such a valuable audience.  Because elite golf events offer a unique opportunity to reach this valuable audience, TV advertisers and event sponsors would be expected to continue purchasing elite golf events even with a small but significant nontransitory monopoly premium in the cost of doing so.

276.     Furthermore, because the high degree of elite-level competition draws fans to watch elite golf events, the sponsors and TV broadcasters that pay for those events will not be able to reach those fans through events that do not provide similar elite-level competition.  Thus, a hypothetical monopolist supplier of elite events (of the sort provided by the Tour) would not be expected to see a material diversion of sponsor or TV network money to other types of golf events in response to a monopoly premium for elite golf events.

277.     Similarly, a substantial proportion of golf fans have a particular affinity for the sport, which is often tied to their participation in the sport.  As players of the sport themselves, golf fans have a particular connection with golf broadcasts, which cannot readily be replicated by broadcasts of other sports or entertainment events.  For the same reason, golf enthusiasts are a particular target of many advertisers on elite golf events, who seek to sell particular products and services (such as golf apparel

and equipment) to golf enthusiasts. Accordingly, a golf broadcaster, its golf advertisers, and the event sponsors cannot simply substitute coverage of another sport and expect the same golf fans to tune in. Thus, replacement of a golf telecast with a baseball game, automobile race, or other sporting event would likely retain some golf fans, but a substantial portion of golf fans—particularly the golf enthusiasts who will be the most loyal viewers and the primary targets for advertisers seeking to advertise to golf enthusiasts—would be lost by substituting to another type of programming.

278.    From a geographic perspective, the events organized by the PGA Tour occur mostly in the United States, and the fans who attend those events in person are mostly in the United States. These events and their live network broadcasts are scheduled to provide convenient time slots for fans in the United States, and therefore are focused on generating viewership in the United States. Furthermore, elite golf events taking place in the United States capture the overwhelming share of viewership in the United States, indicating that elite golf events taking place elsewhere in the world are not a substitute for events in the United States for fans, broadcasters, and advertisers. The Tour itself has recognized the national dimension of competition, as it has informed players that they would ordinarily be granted releases for playing in conflicting events taking place outside the United States, but because LIV Golf has plans to organize a tour with events taking place in the United States it has denied releases to the players. This indicates that the Tour itself has far greater concern with competing events in the United States than for events taking place in other countries, which underscores that the United States represents a separate geographic market. In the alternative, however, the only other plausible relevant geographic market would be global. In either potential geographic market, the Tour maintains monopoly power.

279.    For all of these reasons, a hypothetical monopolist in the supply of elite golf events in the United States would be able to profitably raise prices above competitive levels, indicating that the promotion of elite golf events in the United States is a relevant market.

### Barriers To Entry To The Relevant Markets

280.    The Tour's monopsony power in the market for the services of professional golfers for elite golf events and its monopoly power in the market for the promotion of elite professional golf events are protected by high barriers to entry. To enter these markets, a competing elite professional

golf promoter needs to raise at least hundreds of millions of dollars in capital, recruit a sufficient number of elite professional golfers to comprise a credible competing tour, arrange venues and tournaments, arrange for television coverage of tournaments, recruit sponsors and advertisers, and overcome the Tour's antitrust violations. It also needs to offer OWGR ranking points.

281. As the facts giving rise to this litigation attest, the Tour's Media Rights and Conflicting Events Regulations restrict a competitor's ability to contract for the services of professional golfers for elite golf events. Despite offering far greater prize money, and guaranteed compensation for participating players, LIV Golf was only able to attract a minority of elite golf professionals and had to pay excessively higher guaranteed payments to recruit a number of marquee players than would be required in a competitive market. And LIV Golf has been able to capture only a tiny share in the market for the promotion of elite golf events, as the viewership for LIV Golf events has been dwarfed by that of the PGA Tour's events, despite the more fan-friendly format and superior fan experience LIV Golf offers.

282. The Tour's threats to the Player Plaintiffs, its members, agencies, small businesses, and others, and the threats of those acting in concert with it, erect an additional and substantial barrier to entry. Any entity looking to enter the markets relevant to this litigation now knows what it will face. As Commissioner Monahan put it, the Tour will impose costs on any potential entrant such that there will be "no possibility of a return" on the enormous investment it would take to attempt to enter the market.

283. The last prospective entrant before LIV Golf to garner any meaningful support from players was the World Golf Tour in the mid-1990s. The Tour's Media Rights and Conflicting Events Regulations precluded its entry in short order. After the World Golf Tour folded, there was no meaningful threat of competitive entry for roughly a quarter-century. If the Tour's naked exercise of its market power renders LIV Golf unable to sustain its efforts to enter the market, it would be unreasonable to expect any attempt at competitive entry for the foreseeable future.

284. LIV Golf was able and prepared to enter the markets before the anticompetitive conduct of the Tour diminished its entry to what Commissioner Monahan dismissed as "exhibition matches" that were acquired with a cost structure that offered "no possibility of a return." LIV Golf is as serious

a nascent entrant as the PGA Tour has ever encountered.  And despite all of LIV Golf's attributes and efforts, the Tour's ongoing anticompetitive conduct threatens LIV Golf's competitive viability.  If LIV Golf fails, there will be no alternatives for the participants in elite professional golf events, fans, and sponsors of the game.  They will be left with whatever the Tour chooses to offer.

285.    Absent the Tour's anticompetitive conduct, LIV Golf would be an established and healthy competitor to the Tour in the markets for the services of professional golfers for elite golf events and the promotion of elite professional golf events.  The Tour recognizes that LIV Golf "would be competitive to the PGA Tour."  It denied LIV Golf access to the Player Plaintiffs' and its other members' services because it viewed LIV Golf as a competitor.  But because of the Tour's anticompetitive conduct, LIV Golf is faced with a risk that it will not be able to remain competitively viable.  As such, LIV Golf risks irreparable harm to its business and there is a severe risk of irreparable harm to competition if the Tour's conduct is not enjoined.

286.    The Player Plaintiffs, other professional golfers and Tour members are participants in the restrained markets because they sell their services to the PGA Tour and are thus subject to its monopsony power.  In addition, the Player Plaintiffs, other professional golfers, and Tour members are the target of the Tour's anticompetitive scheme to destroy LIV Golf and monopolize the market.

**Anticompetitive Effects of the Tour's Conduct, Antitrust Injury, and Irreparable Harm**

287.    The Tour's conduct, including (1) unreasonably restrictive regulations, (2) threats of and now imposition of career-threatening bans, (3) suspensions of the Player Plaintiffs and other members who played at LIV Golf events, (4) the promise it will visit the "same fate" on any member who follows their example, (5) the Tour's threats and punishments to non-members who participate in LIV events and a wide range of other businesses who do business with LIV Golf, and (6) its exclusionary group boycott with other golfing bodies in the "ecosystem," all serve no purpose other than to thwart competitive entry and preserve the Tour's entrenched monopoly power.  Faced with punishments of this nature, which could cause incalculable damage to players' careers, the Player Plaintiffs have been denied their right as independent contractors to sell their services to buyers other than the PGA Tour.  And they have been directly and irreparably harmed by being prevented from participating in events in which they have already qualified, including the FedEx Cup Playoffs.  While

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

some Player Plaintiffs have received higher payments from LIV Golf as a result of the risks they took by playing in LIV Golf events, they have not been compensated in full for the financial injuries they have already suffered and will continue to suffer. Nor have the Player Plaintiffs been compensated for the substantial irreparable injuries they have suffered and will continue to suffer if the Tour's attacks on them are allowed to continue unabated. Many other players are effectively prevented from playing in LIV Golf events due to fear of punishment from the PGA Tour.

288. LIV Golf has also suffered and will continue to suffer severe financial injuries as well as irreparable harms to its business from the Tour's anticompetitive conduct. The fields LIV Golf has been able to attract are weaker than would have been the case in the absence of the punishments from the PGA Tour, because many golfers are simply unwilling to take on the risks of playing in even a single LIV Golf event. This threatens irreparable harm to all of the Plaintiffs because it threatens to thwart LIV Golf's nascent entry and permanently entrench the PGA Tour's monopsony and monopoly power.

289. The punishments from the PGA Tour and others have forced LIV Golf to concentrate funds towards increasing upfront payments, and they have caused LIV Golf to scale down its entry plans and offer fewer tournaments in 2022. This has caused LIV Golf to suffer severe financial injuries as a result of the Tour's anticompetitive conduct.

290. Furthermore, while LIV Golf has the financial resources to make initial cash outlays to launch its product, the ongoing cash outlays significantly impact long-term viability of LIV Golf. Specifically, if the Tour's anticompetitive conduct continues unabated, it will threaten the competitive viability of LIV Golf.

291. The risk that LIV Golf could be driven out of the marketplace only serves to make it more difficult for players (including the Player Plaintiffs) to overcome the threat of punishments from the PGA Tour. It has been suggested that the actions of the PGA Tour and others have simply presented Plaintiffs with a "choice"—stay within the existing "*ecosystem*" or choose to switch to the LIV Golf series. But this is a false choice for several reasons.

292. As Commissioner Monahan admitted in his 2020 Memorandum, the Tour's Media Rights and Conflicting Events Regulations are intended to restrict its member players from offering

their services to others.  The Tour's amendments of its Regulations and the procedures for members being released from them underscore the obvious:  the Tour uses these provisions to create a roadblock to competition.  The Conflicting Events and Media Rights Regulation serve no legitimate business purpose.

293.     The Tour's unlawful conduct has depressed professional golfer wages, denied the Player Plaintiffs labor mobility, blunted the effective entry of the potential entrants into the markets that could challenge the Tour's monopoly, decreased the output of elite professional golf events and tours, decreased opportunities for broadcast of elite professional golf, decreased opportunities for advertising and sponsoring surrounding professional golf, decreased output of elite professional golf entertainment for fans, and diluted LIV Golf's opportunity to compete in the elite professional golf marketplace.  The Tour's unlawful conduct has likewise caused severe financial injuries to LIV Golf in the form of higher costs and lost revenue, while also threatening to impose irreparable injuries to LIV Golf.

294.     The Tour's punishments have deprived the Player Plaintiffs' opportunities to continue playing on the Tour, earning deserved compensation, earning opportunities into Majors, sponsorship relationships and revenue, and future opportunities to play and earn on the Tour.  The Tour's punishments have also caused irreparable harm to the Player Plaintiffs' goodwill, reputation, and brand. The Tour denied Player Plaintiff Gooch, Swafford and Jones entry into the FedEx Cup Playoffs, which they earned through their performance, which has caused and will continue to cause severe injuries to these Plaintiffs.

295.     LIV Golf sought to secure commitments from players by March 2022 to establish its League for the summer 2022.  The Tour's anticompetitive conduct caused top professional golfers not to sign up.  The Tour's conduct thus caused severe financial injury to LIV Golf, and it denied the Player Plaintiffs and other Tour members compensation they would earned from the LIV Golf League.  Its anticompetitive conduct diminished competition, reduced marketwide output, and put LIV Golf League on the shelf for 2022.

296.     Moreover, the Tour's threats of possible punishment for violating its Regulations and its actual punishments have caused even further foreclosure and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

297.    The Tour's Regulations, unilateral and coordinated threats of lifetime bans, and imposition of career-threatening punishment have scared off the large majority of elite professional golfers and other participants in elite professional golf events and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

298.    The Tour's conduct has substantially diminished and impaired the entry of the promoters that could meaningfully threaten the PGA Tour's monopoly, which has stood unchallenged for decades.  Its conduct has denied LIV Golf the opportunity to pursue its innovative business model in 2022.  Its conduct decreased elite professional golf tournaments in 2022 and 2023 as LIV Golf was required to change its model and allocate further capital to try to overcome the Tour's Regulations and threats.

299.    The Tour's conduct has harmed the Player Plaintiffs as they have been suspended from what the Tour calls the "preeminent" golf association in the world for exercising their right as independent contractors to pursue their livelihood, sell their services to buyers other than the incumbent monopolist, and expand their sponsorship opportunities.

300.    The Tour's conduct has also harmed the Player Plaintiffs as they have lost sponsorship opportunities and other business opportunities as a result of the Tour's pressure on sponsors and other entities with which the Plaintiffs do business.

301.    The Tour's conduct has harmed consumers, giving them less choice, less output, and less innovation.  Fans are unable to watch Player Plaintiffs in Tour events.  Fans are unable to watch LIV Golf on television or other streaming services.  Fans suffer from reduced output of elite professional golf events and suffer from getting fewer opportunities to watch Player Plaintiffs, Dustin Johnson, Brooks Koepka and many others whom the Tour has excommunicated from its events.

302.    If the Tour's unlawful conduct is not enjoined, the harm to Plaintiffs will be permanent and irreparable.  While LIV Golf has partially entered the markets at great expense, it has done so on terms that the Tour recognizes are "irrational."  If the Tour's unlawful conduct is not enjoined, LIV Golf faces a risk that it will not be competitive in the long run.  For competition for the Player Plaintiffs' services, the Tour's anticompetitive Regulations and other conduct frustrating the labor mobility of its members and tying up their media rights must be enjoined.

303.    If the Tour can force LIV Golf out of the relevant markets altogether and/or foreclose LIV Golf from offering a set of products and services that provides a meaningful competitive constraint on the Tour, the Tour's monopoly and monopsony power will be cemented for many years to come, and immune to even attempted entry.  Injunctive relief is necessary to restore competition for Tour members' services and to innovate the game that the Tour, only in theory, promises to support.  All of the equities and the public interest support such relief.  Otherwise, the harm to competition will be irreversible and permanent.

### The PGA Tour's Alleged Procompetitive Defenses Are Pretextual

304.    To assert a procompetitive justification for its conduct under the antitrust laws, the Tour must, at a minimum, offer a nonpretextual claim that its conduct is a form of competition on the merits.  As set forth in detail above, the Tour cannot make such a showing, because its conduct is aimed at foreclosing the only meaningful competitive threat it has faced in a quarter century.  Rather than competing on the merits, the Tour's conduct is aimed at kneecapping LIV Golf to foreclose nascent competition.

305.    The Tour's purported justifications for its conduct are pretextual.  For example, the Tour asserts that it is merely enforcing its membership rules that have some benign purposes.  This argument is betrayed as pretextual in multiple respects.  First, as detailed in the 2020 Monahan Memorandum, the Tour expressly expanded its membership rules for the purpose of defeating competition from a new entrant such as LIV Golf.  Second, the Tour only enforces its rules to deny releases to players when they are playing in *competing* events, demonstrating that these rules are aimed at defeating competition.  Third, the Tour has threatened and imposed punishments on a variety of golfers who are not even Tour members (and therefore are not subject to the Tour's rules at all), including European Tour members, college golfers, and Asian Tour members.  Instead of enforcing its rules on its members, the Tour threatens and imposes punishments on any golfer anywhere in the world who participates in LIV Golf events.  There is nothing *pro*competitive about the Tour's actions—they are aimed at thwarting the only competition it has faced in decades.

306.    Similarly, the Tour's conduct reveals as pretextual its claim that it is acting to prevent some sort of "free-riding" on investments the Tour supposedly makes in players.  As noted, the Tour's

93

attacks are not limited to those players in whom it has supposedly made some sort of investment, but instead extend to all golfers anywhere, including college players and members of other tours who have never been members of the PGA Tour. At the other end of the spectrum, the Tour's "free-riding" claim is absurd when applied to golfers such as Plaintiff Mickelson, who has devoted 30 years of his Hall of Fame career to playing on the Tour, providing massive benefits to the Tour throughout his career. And any punishments meted out by the Tour to players like Mr. Mickelson (and others) are disproportionate to the unspecified investments the Tour claims to make in the early stages of golfers' careers.

307. The Tour's words and conduct also betray as mere pretext its assertion that it is attacking LIV Golf and any players who participate in its events because the Tour does not want to be associated with any player who participates in a league that is majority funded by the Public Investment Fund of Saudi Arabia. Commissioner Monahan's 2020 Memorandum outlining the Tour's attacks on a new entrant says nothing about Saudi Arabia. Instead, it is focused on the competitive threat that the new entrant—which Commissioner Monahan labeled "Private Equity Golf"—presented to the Tour. The Tour's pretextual arguments about Saudi funding are further betrayed by its willingness to do business with dozens of sponsors who do billions of dollars of business each year in Saudi Arabia. Furthermore, the Tour's pretext is exposed by its willingness to have the PGA Tour Fan Shop operated by Fanatics, which has received substantial funding from the Public Investment Fund of Saudi Arabia—the same fund that the Tour supposedly finds so objectionable when it sponsors LIV Golf.

308. The Tour's own actions also reveal that the Tour's various objections to LIV Golf's innovative format are pretextual. While the Tour has suggested that there is something about LIV Golf's no-cut, high purse tournaments and its team-golf format that justify its opposition to the new entrant, the Tour itself has disclosed plans to copy LIV Golf's format.

309. Furthermore, the Tour and its spokespersons have asserted that they object to LIV Golf because LIV Golf is supposedly operating outside the "ecosystem" and is not cooperating with other existing tours or sanctioning bodies. The facts, however, demonstrate the pretext in any such argument. For example, the sponsors of LIV Golf sought to work with the European Tour, but in the meeting in Malta in July 2021, the European Tour revealed that although it recognized the "appeal and fit" of the new tour, it feared the "mighty power" of the PGA Tour and therefore had to reject the proposed

partnership. LIV Golf has likewise sought to partner with others in the golf "ecosystem" and grow the game at multiple levels, including through proposed partnerships with entities ranging from the Asian Tour, to the LPGA, to the Ladies European Tour. At every turn, the PGA Tour has either directly foreclosed LIV Golf's efforts or exerted extreme pressure on other golfing bodies to exclude LIV Golf. For example, the PGA Tour and the European Tour threatened severe consequences on the Asian Tour and have punished golfers on the Asian Tour in their effort to prevent the Asian Tour from partnering with LIV Golf. The Tour prevented the LPGA and the Ladies European Tour from partnering with LIV Golf, thus harming countless women professional golfers by denying them additional playing opportunities and much-needed funding for their tours—all for the purpose of foreclosing LIV Golf from the "ecosystem." And, as detailed above, the Tour has leaned on the bodies that sponsor the Majors and the OWGR to lock arms with the Tour in excluding LIV Golf. Thus, having used every tool at its disposal to prevent LIV Golf from working with other bodies in the golf "ecosystem," and punishing those who make the choice to partner with LIV Golf, it is pure pretext for the Tour to suggest that it is somehow justified in opposing LIV Golf because LIV Golf has been left to operate largely outside the "ecosystem."

## CLAIMS FOR RELIEF

**COUNT I:    Unlawful Monopsonization of the market for ELITE GOLF EVENT SERVICES in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

310.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count I.

311.    At all relevant times, the Tour has had monopsony power over the market for the services of professional golfers for elite golf events in the United States (or, alternatively, in the world).

312.    The Tour has willfully maintained and abused its monopsony power through anticompetitive conduct, including, among other things, by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to

enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

313.   The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any legitimate procompetitive benefits.

314.   The PGA Tour's exclusionary conduct has unreasonably restrained competition in the market for services of professional golfers for elite golf events, including by:

- Preventing vigorous competition for services of professional golfers for elite golf events;
- Suspending the Player Plaintiffs for playing professional golf;
- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;
- Impacting competition in contracting for the services of elite professional golfers;
- Depressing compensation for the services of professional golfers for elite golf events below competitive levels;
- Decreasing the output of opportunities for professional golfers for elite golf events;
- Denying the Player Plaintiffs the right to have free agency for their independent contractor services;
- Interfering with the Player Plaintiffs' and others' contractual negotiations with LIV Golf;
- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters, and partners to work with LIV Golf; and
- Preventing LIV Golf from promoting elite professional golf to fans.

315.   As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed;

the PGA Tour will unlawfully maintain its monopsony position; and players, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

316.  Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that Plaintiffs need injunctive relief in order to stop immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes to thwart LIV Golf's entry and maintain the PGA Tour's monopsony and an order enjoining enforcement of the PGA Tour's anticompetitive Regulations.

317.  The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act.  Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count I.

**COUNT II:   Unlawful Monopolization of the market for the PROMOTION OF ELITE PROFESSIONAL GOLF EVENTS in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

318.  Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count II.

319.  At all relevant times, the PGA Tour has had monopoly power over the market for the promotion of elite professional golf events in the United States (or, alternatively, in the world).  The only viable competitor to the PGA Tour's dominant market position in this market is LIV Golf.

320.  The PGA Tour has willfully maintained and abused its monopoly power through anticompetitive conduct, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies,

businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

321.    The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.

322.    The PGA Tour's exclusionary conduct has unreasonably constrained competition in the market for the promotion of elite professional golf events, including by:

- Preventing vigorous competition for the promotion of elite professional golf entertainment;
- Preventing LIV Golf from contracting with players regarding their own media rights needed to promote elite professional golf tournaments;
- Preventing Player Plaintiffs from contracting with LIV Golf and others regarding their own media rights;
- Decreasing the output of elite professional golf tournaments;
- Suspending Player Plaintiffs and other golfers for playing professional golf;
- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players need to offer elite professional golf entertainment product;
- Impacting competition in contracting for the play of elite professional golfers;
- Depressing compensation for the services of professional golfers in elite events below competitive levels;
- Interfering with LIV Golf's contractual negotiations with players to join LIV Golf;
- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters and partners to work with LIV Golf; and
- Preventing LIV Golf from promoting elite professional golf to fans.

323.    As a result of the PGA Tour's anticompetitive conduct, LIV Golf and Player Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed; the PGA Tour will unlawfully maintain its monopoly position; and players,

consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

324.    Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive player Regulations.

325.    The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act. Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count II.

### COUNT III:   Unlawful Attempted Monopolization in Violation of Sherman Act § 2 (15 U.S.C. § 2)

326.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count III.

327.    In the event that the PGA Tour's position in the relevant markets does not amount to monopoly and/or monopsony power, either by virtue of LIV Golf's nascent entry or otherwise, Plaintiffs plead in the alternative that the Tour's conduct constitutes unlawful attempted monopolization and monopsonization in violation of Section 2 of the Sherman Act.

328.    The Tour has unlawfully attempted to monopolize and monopsonize the relevant markets.

329.    At all relevant times, the Tour has had monopoly and/or monopsony power or, at a minimum, a dangerous probability of success in acquiring (or re-acquiring) monopoly and/or monopsony power, over the relevant markets in the United States (or, alternatively, in the world).

330.    The PGA Tour has engaged in anticompetitive conduct to try to monopolize the relevant markets, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable

and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

331.    As set forth in detail above, the Tour's conduct carries a dangerous probability of destroying the competitive viability of LIV Golf.  The Tour's anticompetitive conduct forced LIV Golf to change its commercial strategy for 2022.  LIV Golf was forced to announce a substantially scaled-down version of its League concept by offering 8 invitationals in 2022 (the LIV Golf Invitational Series).  The Tour then attacked LIV Golf's Invitational Series events.  Furthermore, because of the Tour's anticompetitive conduct, LIV Golf has been unable to broadcast its events in the United States—an encumbrance that threatens its long-term viability.

332.    Furthermore, the Tour's conduct has denied and will continue to deny LIV Golf access to many top players.  The Tour's Regulations and unilateral and conspiratorial threats of punishment have scared off the large majority of elite players as well as the pipeline of future elite players.  And for those players whom LIV Golf has been able to sign, it has had to offer supracompetitive compensation well above the levels that would prevail in a market not polluted by the Tour's anticompetitive conduct.  This has forced LIV Golf into an unsustainable business model.  If the Tour's anticompetitive conduct is not enjoined, LIV Golf will be unable to sustain a competitively viable tour.

333.    And, the Tour's attempted monopolization and unlawful exclusionary conduct presents a dangerous probability that the Tour will succeed, to the extent it has not already, in its attempt to monopolize the relevant markets, as shown by its willful and intentional efforts and success in:

- Preventing vigorous competition;

- Preventing the PGL from entering the markets;

- Suspending Player Plaintiffs;

- Preventing Plaintiff LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;

- Impacting competition in contracting for the services of elite professional golfers;

- Depressing compensation for the services of elite professional golfers below competitive levels;

- Decreasing the output of elite professional golfer services opportunities;

- Denying Player Plaintiffs the right to have free agency for their independent contractor services;

- Interfering with Plaintiffs' and others' contractual negotiations;

- Preventing Plaintiff LIV Golf from promoting elite professional golf to fans;

- Encouraging other golfing entities to pressure golfers against joining LIV Golf, including by threatening to disallow LIV Golf players from playing in various tournaments; and

- Orchestrating a group boycott of LIV Golf with the European Tour in furtherance of their agreement to boycott LIV Golf and golfers who would play for a competitive tour.

334.    Absent injunctive relief halting the Tour's anticompetitive conduct, LIV Golf will be unable to sustain a competitively viable business, and it will be unable to meaningfully constrain the Tour's monopoly power.

335.    The Tour's conduct has substantially diminished and impaired the entry of the only entrant that could meaningfully threaten the PGA Tour's monopoly and monopsony power in the relevant markets, which has stood unchallenged for decades.  And if it not enjoined, the Tour's conduct will forever destroy the competitive viability of the only potential challenger to the Tour's monopoly

and monopsony power.

336.   The Tour has acted with the specific intent to monopolize and monopsonize the relevant markets.  The Tour's actions are irrational but for its anticompetitive effect, including by degrading its own offerings.   The Tour's specific intent to monopolize and monopsonize the relevant markets is shown through its statements and actions, including: (1) the PGA Tour Commissioner's statements in the January 2020 Monahan Memorandum, (2) the Tour's public and private statements since 2020 related to the Tour's desire to "protect this business model" and prevent a new entrant from contracting with Tour members through threats and enforcement of unlawful Regulation provisions, (3) statements of Tour officials and Members related to the Tour's desire to destroy LIV Golf, (4) the Tour's May 10, 2022 denial of Tour members' requests to participate in the LIV Golf London Invitational, (5) the Tour's coordinated efforts to get others to support its boycott of LIV Golf and those who associate with LIV Golf, (6) the Tour pressuring small businesses not to work with LIV Golf or be blacklisted by the Tour, (7) the Tour's application of its Regulations to impose irreparable punishment on Player Plaintiffs and others for playing professional golf.

337.   As a result of the PGA Tour's anticompetitive conduct, LIV Golf and the Player Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant markets will be harmed; the PGA Tour will unlawfully monopolize and monopsonize the relevant markets; and players, consumers, and other stakeholders will be harmed.

338.   Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive player Regulations.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

339.   Accordingly, to the extent the Tour argues that LIV Golf's nascent entry means the Tour is not presently a monopolist, the Tour's anticompetitive conduct carriers a dangerous probability of restoring and maintaining the Tour's monopoly and monopsony power in the relevant markets, in

violation of Section 2 of the Sherman Act.

340.     Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count III.

**Count IV:     Unlawful Restraint of Trade in Violation of Sherman Act § 1 (15 U.S.C. § 1)
[Group Boycott]**

341.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count IV.

342.     The PGA Tour has unlawfully reached an agreement, with the purpose to eliminate competition, with the European Tour, a potential horizontal competitor, (and possibly others) to not compete for players' services and to prevent the entry and competitive viability of LIV Golf into the relevant markets.  Specifically, the PGA Tour and the European Tour have agreed to engage in a group boycott of LIV Golf, other potential competitors, golfers (like Player Plaintiffs) who agree to play in LIV Golf's events, and any other person or entity who seeks to partner with LIV Golf, to harm competition for the services of professional golfers for elite golf events and for the promotion of elite golf events.

343.     The actions of the Tour and the European Tour make clear that they had a conscious commitment to a common scheme: to prevent the entry of new competitors into the market.  The unlawful agreement is evidenced by the actions and statements of the Tour and the European Tour, as set forth in this Complaint, including:

- The Tour admitted the existence of an unlawful agreement with the European Tour. In his January 2020 Memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European Tour as a potential horizontal competitor through its potential to partner with a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant;

- As Mr. Pelley detailed, in November 2020 the European Tour and the PGA Tour

ceased competing with each other for players' services, and instead formed an illegal alliance to eliminate new competition for players' services;

- Following the agreement, in November 2020, the European Tour announced it would not partner with PGL;

- Pursuant to its illegal alliance, the European Tour agreed not to partner with LIV Golf despite recognizing the "fit and appeal" of partnering with LIV Golf because the European Tour had contracted with the Tour and could not upset the "US PGA mighty power;"

- The Tour and the European Tour then took steps in furtherance of their scheme, including threatening all players with lifetime bans if they competed in the PGL and, later, LIV Golf tournaments; and

- In addition, the Tour and European Tour agreed to suspend players who competed in LIV Golf tournaments.

344. The Tour used its Regulations to implement the unlawful agreement and achieve the anticompetitive purpose of the agreement, harming Plaintiffs and competition.

345. After the agreement was reached, the Tour enforced its unlawful Regulations and proceeded to suspend the Player Plaintiffs for violating the Regulations. Further evidencing the agreement that was in fact reached, the Tour enforced the Regulations in a way that they had not been enforced previously. Historically, the Tour permitted members to associate with multiple tours simultaneously and routinely granted releases for golfers to compete in non-Tour affiliated tournaments. In contrast, the Tour denied all releases for LIV Golf events and imposed effective career-ending suspensions on Plaintiffs. The Tour made clear its enforcement of these Regulations is intended to destroy the entry of LIV Golf, harming the Plaintiffs and competition as a whole in the process. Likewise, as detailed in this Complaint, the European Tour has departed from its longstanding practices regarding conflicting events to align with the Tour in furtherance of their agreement to act jointly to exclude LIV Golf and punish the Player Plaintiffs and other golfers who play in LIV Golf events.

346. Professional golfers (including the Player Plaintiffs) are essential to the Tour's scheme to eliminate competition in the market. As Commissioner Monahan admitted: "The impact that [the

new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished."

347. The Player Plaintiffs are the pawns (and targets) used to effectuate the group boycott and eliminate competition in the markets; the Player Plaintiffs' suspensions are a necessary means to accomplish the Tour's anticompetitive scheme.

348. *Per se* **violation:** The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. The agreement constitutes a group boycott orchestrated by a monopolist and joined by a potential competitor that is expressly aimed at foreclosing the entry of the only viable alternative to the Tour into the relevant market. No elaborate analysis is required to demonstrate the anticompetitive character of this group boycott.

349. **Rule of Reason violation:** The agreements are also unreasonable restraints of trade that are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason analytical framework. The principal tendency of the agreement is to restrain competition, reinforce the market power of the PGA Tour, defeat the nascent entry of LIV Golf, and eliminate competition in the relevant markets. This harmed the Player Plaintiffs and other professional golfers by eliminating competition in the market for their services and also restricted competition in the market generally. It has also harmed LIV Golf and competition in the relevant markets by hindering LIV Golf's entry and threatening to destroy its competitive viability. The agreement between the Tour and the European Tour to lock arms in a joint effort to foreclose competitive entry lacks any legitimate procompetitive justifications.

350. As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant markets will be harmed; the PGA Tour will unlawfully maintain its monopoly position; and Plaintiffs, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

351. Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's

unlawful conduct such that Plaintiffs need injunctive relief in order to stop the PGA Tour's unlawful conduct.

352.    The PGA Tour's anticompetitive acts violate Section 1 of the Sherman Act.

353.    Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count IV.

**Count V:    Unlawful Agreement to Restrain Trade in Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720(a), 16726) [Group Boycott]**

354.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count V.

355.    The PGA Tour has unlawfully agreed with the European Tour (and potentially others) "[t]o create or carry out restrictions in trade or commerce." Cal. Bus. & Prof. Code §§ 16720(a), 16726. Moreover, the Tour's violation of Section 1 of the Sherman Act necessarily constitutes a violation of the Cartwright Act.

356.    The Tour operates six annual tournaments in the state of California, owns golf courses in California, committed multiple acts in furtherance of its unlawful group boycott in California, co-hosted a tournament with the European Tour in California from which it banned any golfers who participated in a LIV Golf event, harmed California resident golfers (including Plaintiff Mickelson), and harmed competition for professional golfers' services for elite events in California. Moreover, the law and public policy of other affected states is materially similar to the law of California.

357.    The Tour has unlawfully agreed with the European Tour to not compete for players' services and to act jointly to prevent the entry of LIV Golf into the relevant markets. Specifically, the PGA Tour and the European Tour agreed to boycott LIV Golf, players who work with LIV Golf, and any other person or entity that seeks to partner with LIV Golf. The Tour entered an agreement with the European Tour so as to—as Commissioner Monahan vowed—"remov[e] the European Tour as a potential partner" of a new entrant like LIV Golf.

358.    The PGA Tour and the European Tour have taken acts in furtherance of their unlawful boycott. For instance, the European Tour has agreed to suspend and punish golfers for playing in LIV

Golf, to no longer compete with the PGA Tour for players' services, and to not partner with LIV Golf or other potential entrants. The two tours have unlawfully agreed to deny (and taken steps to deny) golfers who play in LIV Golf events the opportunity to play in the tours' co-sanctioned events (including the event they co-sanctioned in California), and to unfairly punish independent contractors for playing with a competitor promoter.

359. The Tour's agreement with the European Tour has the illegal purpose to eliminate a competitor and future potential entrants. In particular, the Tour seeks to deny LIV Golf access to the services of professional golfers for elite golf events along with the other partners and inputs necessary to compete for the services of professional golfers for elite golf events. The two tours have also unlawfully agreed to not compete for players' services in order to suppress wages and decrease output of opportunities.

360. The tours' agreement constitutes an unreasonable restraint of trade that is *per se* illegal under California Business and Professions Code §§ 16720(a), 16726. The agreement constitutes a group boycott orchestrated by a monopolist that is expressly aimed at foreclosing the entry of the only viable alternative to the Tour into the relevant markets. No elaborate analysis is required to demonstrate the anticompetitive character of this group boycott.

361. The agreement also constitutes an unreasonable restraint of trade that is unlawful under California Business and Professions Code §§ 16720(a), 16726, under a rule-of-reason analysis. The principal tendency of the agreements is to restrain competition, reinforce the market power of the PGA Tour, and seriously hamper (or outright defeat) the competitive effectiveness and prospective entry of LIV Golf—by harming professional golfers like the Player Plaintiffs and thus eliminating competition for their services—the only viable alternative in the relevant market, and thereby harm competition in the relevant markets. This harmed the Player Plaintiffs and other professional golfers by eliminating competition in the market for their services and also restricted competition in the markets generally. It has also harmed LIV Golf and competition in the market for the promotion of elite events by hindering LIV Golf's entry and threatening to destroy its competitive viability. The agreement lacks any legitimate procompetitive justifications, because, among other things, the group boycott deprives Plaintiff Mickelson and other Player Plaintiffs of means to practice their profession that are so essential

that they are necessary to compete effectively in the sport of professional golf.

362. As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant markets will be harmed; the PGA Tour will unlawfully maintain its monopoly position and unlawful boycott; and Plaintiffs, LIV Golf, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

363. As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be irreparably harmed such that they need injunctive relief in order to stop immediately the PGA Tour's unlawful conduct.

364. The PGA Tour's anticompetitive acts violate the Cartwright Act. Cal. Bus. & Prof. Code §§ 16720(a), 16726.

365. Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to Cal. Bus. & Prof. Code § 16750(a), and any other relief this Court deems just and proper under Count V.

## Count VI: Breach of Contract (Player Plaintiffs)

366. Player Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count VI.

367. On various dates, Player Plaintiffs and the Tour entered into a contract when the Plaintiffs submitted their respective membership applications and membership renewal applications and agreed to be bound by the Tour's Regulations. The Regulations (other than those described in this Complaint that violate the antitrust laws and therefore are unenforceable) are a legally binding agreement by and between Player Plaintiffs, respectively and individually, and the Tour. Player Plaintiffs maintain that provisions within the Regulations are not enforceable, but the provision the Tour has breached is not one of those provisions.

368. Player Plaintiffs performed all enforceable provisions in the Tour's Regulations and have complied with all obligations under the Tour's Disciplinary Process detailed in the Tour's Regulations.

369.    The Tour breached Section VII.E.2 of the Regulations because it failed to abate Plaintiffs' suspensions pending their appeals of the Tour's Disciplinary Actions.  Section VII.E.2 provides that "[a]n appeal shall operate to stay the effective date of any penalty, except suspension from a tournament then in progress or scheduled for the calendar week in which the alleged violation occurred, until after the final decision on the appeal."  Exhibit 1.  The Tour was thus required to honor some Player Plaintiffs' requests to participate in Tour events, including the FedEx Cup Playoff events, occurring while Player Plaintiffs' appeals to the Tour's Appeals Committees remained pending.

370.    The Tour's breach caused Player Plaintiffs to incur substantial damages in the form of irreparable harm (in the form of loss of FedEx Cup ranking points, loss of OWGR ranking points, loss of career opportunities, loss of goodwill, and reputational harm), loss of income-earning opportunities, loss of retirement-plan payments, consequential damages, expenses, and costs.

**Count VII:    Tortious Interference with LIV Golf's Contractual Relationships (LIV Golf)**

371.    LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VII.

372.    LIV Golf has entered into contractual relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

373.    The PGA Tour knew that LIV Golf had entered into contractual relationships with professional golfers and other third parties.

374.    The PGA Tour's unlawful actions detailed herein were intended to prevent professional golfers and other third parties from performing their contracts with LIV Golf.

375.    The professional golfers and other third parties have been unable to perform under their contracts with LIV Golf as a result of the PGA Tour's actions described herein.

376.    There was no legal justification for the PGA Tour's anticompetitive conduct.

377.    As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

378.    LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

379.    LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VII.  LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's business relationships.

**Count VIII:    Tortious Interference with LIV Golf's Prospective Business Relationships**
**(LIV Golf)**

380.    LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VIII.

381.    LIV Golf has been on the verge of entering business relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

382.    The PGA Tour knew that LIV Golf was contacting players and other third parties about entering into a business relationship.

383.    The PGA Tour's actions detailed herein were independently tortious as detailed herein and were intended to prevent professional golfers and other third parties from entering into a business relationship with LIV Golf.

384.    Several professional golfers and other third parties have not entered into such business relationships with LIV Golf to-date as a result of the PGA's Tours anticompetitive actions and restrictions.

385.    There was no legal justification for the PGA Tour's anticompetitive conduct.

386.    As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

387.    LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

388.    LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VIII.  LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's prospective business relationships..

**JURY DEMAND**

389.    Plaintiffs demand a trial by jury of all issues so triable.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following preliminary injunctive relief against the PGA TOUR:

a.    Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player Plaintiffs;

b.    Prevent the PGA Tour from banning or threatening to ban from the PGA Tour (and its affiliated Tour) players who talk to, contract with, play in, or associate with LIV Golf;

c.    Prevent the PGA Tour from expelling players from the PGA Tour (and its affiliated Tours) or PGA Tour tournaments who talk to, contract with, play in, or associate with LIV Golf;

d.    Prevent the PGA Tour from threatening or imposing any other punishments or otherwise harming or threatening to harm anyone who talks to, contracts with, or associates with LIV Golf;

e.    Prevent the PGA Tour from conspiring or unlawfully agreeing with the European Tour to ban or threaten to ban players from participating in European Tour events or participating in the Ryder Cup for talking to, contracting with, playing in, or associating with LIV Golf;

f.    Prevent the PGA Tour from pressuring or coordinating with the R&A, Masters, and/or PGA of America (or others), to punish, exclude or threaten to exclude players otherwise eligible under current eligibility rules from participating in golf events (including the Majors);

g.    Prevent the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events, such as the FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players,

the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T Pebble Beach Open, and the Presidents Cup;

h.     Prevent the PGA Tour from enforcing its unlawful restrictions on independent-contractor golfers, including the Media Rights Regulation and the Conflicting Events Regulation;

i.     Prevent the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events;

j.     Prevent the PGA Tour from applying rules beyond their meaning to punish players who associate with LIV Golf, or otherwise to thwart competition; and

k.     Prevent the PGA Tour from taking any other actions intended to undermine competition on the merits from LIV Golf.

WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following permanent injunctive relief against the PGA TOUR:

a.     Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player Plaintiffs;

b.     Enjoin the PGA Tour from banning or threatening to ban from the PGA Tour (and its affiliated Tour) players who talk to, contract with, play in, or associate with LIV Golf;

c.     Enjoin the PGA Tour from expelling players from the PGA Tour (and its affiliated Tour) or PGA Tour tournaments who talk to, contract with, play in, or associate with LIV Golf;

d.     Enjoin the PGA Tour from threatening or imposing any other punishments or otherwise harming or threatening to harm anyone who talks to, contracts with, or associates with LIV Golf;

e.     Enjoin the PGA Tour from conspiring or unlawfully agreeing with the European Tour to ban or threaten to ban players from participating in European Tour events or participating in the Ryder Cup for talking to, contracting with, playing in, or associating with LIV Golf;

f.   Enjoin the PGA Tour from agreeing, contracting or threatening the R&A, Masters, and/or PGA of America (or others), to punish, exclude or threaten to exclude players otherwise eligible under current eligibility rules from participating in golf events (including the Majors);

g.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events, such as the FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players, the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T Pebble Beach Open, and the Presidents Cup;

h.   Enjoin the PGA Tour from enforcing its unlawful restrictions on independent-contractor golfers, including the Media Rights Regulation and the Conflicting Events Regulation;

i.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events;

j.   Enjoin the PGA Tour from applying rules beyond their meaning to punish players who associate with LIV Golf, or otherwise to thwart competition; and

k.   Enjoin the PGA Tour from taking any other actions intended to undermine competition on the merits from LIV Golf.

WHEREFORE, Plaintiffs request that this Honorable Court:

a.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the services of professional golfers for elite golf events in violation of Section 2 of the Sherman Act;

b.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

c.   In the alternative, adjudge and decree that the PGA Tour is attempting to monopolize the market for the services of professional golfers for elite golf

events and the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

d.    Adjudge and decree that the PGA Tour unreasonably restrained trade in violation of Section 1 of the Sherman Act when it entered agreement with the European Tour to boycott LIV Golf and potential competitors and those who associate with LIV Golf to try to foreclose competition from LIV Golf in the relevant markets;

e.    Adjudge and decree that the PGA Tour breached its Regulations when it refused to abate Player Plaintiffs' suspensions pending their respective appeals;

f.    Adjudge and decree that the PGA Tour unlawfully and tortiously interfered with LIV Golf's contractual and prospective business relationships;

g.    Award Plaintiffs monetary damages, treble damages, and economic damages;

h.    Award LIV Golf punitive damages for the PGA Tour's bad faith and egregious interference with LIV Golf's contractual and prospective business relationships;

i.    Award Plaintiffs their costs in this action, including attorneys' fees; and

j.    Award Plaintiffs any further relief as may be just and proper.

DATED:  August 26, 2022

Respectfully submitted,

By:  _____ /s/ Rachel S. Brass _____

RACHEL S. BRASS, SBN 219301
 rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice*
 rwalters@gibsondunn.com
SCOTT K. HVIDT, *pro hac vice*
 shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice*
 jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice*
 klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500

JOHN B. QUINN, SBN 90378
 johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
 dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
 kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000
Facsimile:  650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford,*
*Matt Jones, Bryson DeChambeau, Ian Poulter, Peter*
*Uihlein, and LIV Golf Inc.*

DATED:  August 26, 2022      BAKER McKENZIE LLP


By:         */s/ William V. Roppolo*
      William V. Roppolo

WILLIAM V. ROPPOLO, *pro hac vice*
  william.roppolo@bakermckenzie.com
JODI A. AVILA, *pro hac vice*
  jodi.avila@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone: 305.789.8900

JEFFREY MARTINO, SBN 222805
  jeffrey.martino@bakermckenzie.com
BAKER McKENZIE LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212.626.4100

*Attorneys for Phil Mickelson*

116

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1    ## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

2        Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that

3    concurrence in the filing of the document has been obtained from each of the other signatories to this

4    document.

5

6    DATED:  August 26, 2022                    GIBSON, DUNN & CRUTCHER LLP

7

8                                   By:  _____
                                              */s/ Rachel S. Brass*
                                            Rachel S. Brass
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28